PATTI GOLDMAN (DCB# 398565)
KRISTEN L. BOYLES (WSB #23806)
JOSHUA OSBORNE-KLEIN (WSB #36736)
Earthjustice
705 Second Avenue, Suite 203
Seattle, WA  98104
(206) 343-7340
(206) 343-1526 *[FAX]*
pgoldman@earthjustice.org
kboyles@earthjustice.org
josborne-klein@earthjustice.org

*Attorneys for Defendant-Intervenors*

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| AMERICAN FOREST RESOURCE COUNCIL, | ) | Case No.  1:07-cv-00484-JDB |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| H. DALE HALL, Director, United States Fish and Wildlife Service, DAVID M. VERHEY, Acting Assistant Secretary for Fish and Wildlife and Parks, and DIRK KEMPTHORNE, Secretary of Interior, | ) ) ) ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| AUDUBON SOCIETY OF PORTLAND, CENTER FOR BIOLOGICAL DIVERSITY, CONSERVATION NORTHWEST, ENVIRONMENTAL PROTECTION INFORMATION CENTER, GIFFORD PINCHOT TASK FORCE, OREGON WILD, SEATTLE AUDUBON SOCIETY, SIERRA CLUB, and THE WILDERNESS SOCIETY, | ) ) ) ) ) ) ) | |
| | ) | |
| Defendant-Intervenors. | ) | |

**DEFENDANT-INTERVENORS' MEMORANDUM IN OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND
IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT**

DEFENDANT-INTERVENORS' MEMO IN OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN
SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

BACKGROUND ...................................................................................................................3

    I.    LEGAL FRAMEWORK ......................................................................................3

        A.    The ESA Protects Species, Subspecies, and Distinct Population Segments. ...4

        B.    The ESA Listing Process ...................................................................................5

        C.    Five-Year Status Review Process ......................................................................6

    II.    THE MARBLED MURRELET.............................................................................7

        A.    1992 Listing Decision .......................................................................................8

        B.    2002 AFRC Suit................................................................................................9

        C.    2004 Evaluation Report .....................................................................................9

        D.    2004 5-Year Status Review .............................................................................10

        E.    2007 USGS Status Review ..............................................................................12

        F.    Listing Challenges ...........................................................................................13

            1.    The Coos County Decision. ..........................................................13

            2.    The Present Action.......................................................................14

ARGUMENT.......................................................................................................................14

    I.    STANDARD OF REVIEW ................................................................................15

    II.    FWS'S 5-YEAR STATUS REVIEW IS NOT A FINAL AGENCY ACTION. ...16

    III.    THE COURT DOES NOT HAVE SUBJECT MATTER JURISDICTION OVER AFRC'S CLAIMS...........................................................................................19

    IV.    FWS'S DECISION TO MAINTAIN THE TRI-STATE POPULATION LISTING WAS NEITHER ARBITRARY NOR CAPRICIOUS.........................22

        A.    Washington, Oregon, and California Are a Significant Portion of the Marbled Murrelet's Range. ...............................................................23

DEFENDANT-INTERVENORS' MEMO IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT   - i -

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

B.    FWS's August 2004 Decision That the Tri-State Murrelet Population Was Not a DPS Is Incorrect.....................................................23

V.    REGIONAL DIRECTOR ALLEN HAD DELEGATED AUTHORITY TO OVERSEE THE FIVE-YEAR STATUS REVIEW PROCESS. ....................28

CONCLUSION.......................................................................................................................29

DEFENDANT-INTERVENORS' MEMO IN OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN
SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT   - ii -

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

TABLE OF AUTHORITIES

CASES

AFRC v. Department of Interior,
    No 02-6087-AA (D. Or.) ............................................................................9, 10

Abbott Laboratoriess v. Gardner,
    387 U.S. 136 (1967), overruled on other grounds,
    Califano v. Sanders, 430 U.S. 99 (1977) .........................................................16

American Lands Alliance v. Norton,
    242 F. Supp.2d 1 (D.D.C. 2003), partially vacated on other grounds,
    360 F. Supp.2d 1 (D.D.C. 2003) ................................................................7, 21

In re American Rivers and Idaho Rivers United,
    372 F.3d 413 (D.C. Cir. 2004) ...........................................................................3

Babbitt v. Sweet Home Chapter of Communities for a Great Oregon,
    515 U.S. 687 (1995)............................................................................................3

Bennett v. Spear,
    520 U.S. 154 (1997)..........................................................................................16

Coos County Board of County Commissioners v. Norton,
    No. 06-6010-HO, 2006 WL 1720496 (D. Or. June 19, 2006)................................. passim

DRG Funding Corp. v. Secretary of Housing & Urban Development,
    76 F.3d 1212 (D.C. Cir. 1996) ...................................................................17, 19

Defenders of Wildlife v. Norton,
    239 F. Supp.2d 9 (D.D.C. 2002) ..................................................................5, 23

Defenders of Wildlife v. Norton,
    258 F.3d 1136 (9th Cir. 2001) .....................................................................5, 23

Heckler v. Chaney,
    470 U.S. 821 (1985)..........................................................................................22

Maine v. Norton,
    257 F. Supp.2d 357 (D. Me. 2003) .....................................................................4

Marbled Murrelet v. Lujan,
    No. C91-522R (W.D. Wash. September 17, 1992) .............................................8

DEFENDANT-INTERVENORS' MEMO IN OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN
SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT     - iii -

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

National Association of Home Builders v. Norton,
    340 F.3d 835 (9th Cir. 2003) ........................................................................25

National Association of Home Builders v. Norton,
    415 F.3d 8 (D.C. Cir. 2005) ..........................................................................16

Northwest Ecosystem Alliance v. Fish and Wildlife Service,
    475 F.3d 1136 (9th Cir. 2007) ........................................................................4

Oregon Natural Resources Council v. Allen,
    476 F.3d 1031 (9th Cir. 2007) ........................................................................2

Pacific Legal Foundation v. Andrus,
    657 F.2d 829 (6th Cir. 1981) ........................................................................15

Public Citizen v. National Highway Traffic Safety Administration,
    848 F.2d 256 (D.C. Cir. 1988) ......................................................................15

Telecommunications. Research and Action Center v. FCC,
    750 F.2d 70 (D.C. Cir. 1984) ........................................................................15

Tennessee Valley Authority v. Hill,
    437 U.S. 153 (1978).........................................................................................3

United States v. Romm,
    455 F.3d 990 (9th Cir. 2006) ........................................................................15

## STATUTES

5 U.S.C. § 701(a) ................................................................................................16, 22

5 U.S.C. § 706(2) ......................................................................................................15

16 U.S.C. § 1531.......................................................................................................2, 3

16 U.S.C. § 1532.....................................................................................................4, 23

16 U.S.C. § 1533(a) ................................................................................................5, 20

16 U.S.C. § 1533(b) ..............................................................................4, 5, 6, 17, 20

16 U.S.C. § 1533(c) ..............................................................................3, 5, 6, 7, 19

16 U.S.C. § 1536.........................................................................................................3

16 U.S.C. § 1538.........................................................................................................3

DEFENDANT-INTERVENORS' MEMO IN OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN
SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT   - iv -

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7470*

16 U.S.C. § 1540(g) ................................................................................................15, 16, 19, 21

## REGULATIONS

50 C.F.R. § 402.01 ................................................................................................................4, 28

50 C.F.R. § 424.02(i) ..................................................................................................................28

50 C.F.R. § 424.11 .................................................................................................................18, 22

## MISCELLANEOUS

Fed. R. Civ. P. 56(c) ...................................................................................................................16

56 Fed. Reg. 28,362 (June 20, 1991) ...........................................................................................1

57 Fed. Reg. 45,328 (Oct. 1, 1992)......................................................................................8, 9, 23

61 Fed. Reg. 26,255 (May 24, 1996) .......................................................................................8, 9

61 Fed. Reg. 4,722 (Feb. 7, 1996) ..........................................................................................4, 24

62 Fed. Reg. 13,134 (Mar. 18, 1998) ..........................................................................................25

71 Fed. Reg. 53,838 (Sept. 12, 2006) ...........................................................................................9

H.R. Rep. No. 97-835 (1982)........................................................................................................21

DEFENDANT-INTERVENORS' MEMO IN OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN
SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT   - v -

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

INTRODUCTION

In the Pacific Northwest, a small seabird known as the marbled murrelet makes its home. About the size of a robin, marbled murrelets spend most of their relatively long lives on the coastal sea, diving for and feeding on small fish and invertebrates. These unassuming birds would hardly seem to be the focus of controversy, except that murrelets nest almost exclusively in coastal old-growth trees. This nesting behavior puts this shy seabird squarely in the path of the timber industry. Due primarily to extensive timber cutting over the past 190 years, up to 90 percent of marbled murrelet nesting habitat in Washington, Oregon, and California has been destroyed. 56 Fed. Reg. 28,362, 28,363-64 (June 20, 1991) (Excerpts of Record "ER" at 929-30).[1] In the face of industrial logging, the murrelet has lost.

In 1992, due primarily to extensive harvest of late-successional and old-growth forest, the U.S. Fish and Wildlife Service ("FWS") listed the population of marbled murrelets in Washington, Oregon, and California (the "tri-state population") as threatened under the Endangered Species Act ("ESA"). Despite the protections provided by listing and FWS's subsequent designation of critical habitat, the marbled murrelet population throughout North America continues to decline at an alarming rate.

The tri-state murrelet listing has long irritated plaintiff American Forest Resource Council ("AFRC"), a timber and forest products trade association, because it has restricted some logging primarily on federal public land. Over the last several years, AFRC has engaged in a litigation campaign to remove all protections from the murrelet and its old-growth habitat –

---

[1] In this brief, citations to the excerpts of the administrative record filed by FWS are identified first by document name and internal pagination, followed by the parallel Bates-stamped page numbers designated by FWS. Because FWS has not filed the complete administrative record with the Court, documents that are not included in the excerpts are submitted as exhibits to this motion.

DEFENDANT-INTERVENORS' MEMO IN OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN
SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT   - 1 -

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

despite recent scientific studies showing the continued decline of murrelets in both the tri-state region and north in Canada and Alaska.  This litigation campaign has led to a proposal to reduce murrelet habitat protections by almost 95%, and it led to a 2004 5-Year Status Review that questioned the policy behind listing the marbled murrelet solely in the tri-state region.

This case focuses on that 5-Year Status Review.  In this most recent attempt to undermine the ESA protections for the marbled murrelet, AFRC claims that the tri-state murrelet protections are illegal, and that FWS has acted arbitrarily and capriciously in keeping the murrelet protected since the 5-Year Status Review.  AFRC asks this Court to order FWS to immediately submit a proposed rulemaking to delist the marbled murrelet in Washington, Oregon, and California.

AFRC's claims are legally and factually wrong.  First, the 5-Year Status Review is not a final agency action subject to judicial review.  Indeed, if the Court were to accept AFRC's legal theory, it would not only harm the marbled murrelet, but it could cripple the ESA listing process and undermine the purpose of the Act to protect ecosystems and "afford endangered species the highest of priorities."  Oregon Natural Res. Council v. Allen, 476 F.3d 1031, 1033 (9th Cir. 2007) (citation omitted); 16 U.S.C. § 1531(b)-(c).  While this may be the result AFRC desires, it is not one this Court should validate.  Second, because AFRC has failed to petition for delisting of the murrelet, this Court lacks subject matter jurisdiction over AFRC's claims.  Finally, even if this Court had jurisdiction, FWS's decision to maintain the tri-state murrelet listing was not arbitrary and capricious, given the best available science and correct interpretation of agency policy.

For the reasons discussed below, defendant-intervenors Audubon Society of Portland et al. (collectively "Audubon") respectfully ask the Court to deny AFRC's motion for summary judgment and grant Audubon's cross-motion for summary judgment.

DEFENDANT-INTERVENORS' MEMO IN OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN
SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT   - 2 -

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

BACKGROUND

I.    LEGAL FRAMEWORK

Congressional intent in the ESA "to halt and reverse the trend toward species extinction, whatever the cost," counsels close scrutiny of AFRC's claims. <u>Tennessee Valley Auth. v. Hill</u>, 437 U.S. 153, 184 (1978). Congress enacted the ESA "to provide a means whereby the ecosystems upon which endangered and threatened species depend may be conserved [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b). It is, as AFRC notes, "'the most comprehensive legislation for the preservation of endangered species ever enacted by any nation.'" <u>Babbitt v. Sweet Home Chapter of Cmtys. for a Great Oregon</u>, 515 U.S. 687, 698 (1995) (quoting <u>Tennessee Valley Auth. v. Hill</u>, 437 U.S. 153, 180 (1978)).

The ESA was designed to allow recovery of listed species to the point where they no longer need ESA protections. 16 U.S.C. § 1531(b)-(c); <u>see also</u> <u>Trout Unlimited v. Lohn</u>, No. CV06-0483-JCC, slip op. at 26 (W.D. Wash. June 13, 2007) ("[I]n evaluating any policy or listing determination under the ESA, its polestar must be the viability of naturally selfsustaining populations in their naturally-occurring habitat."); <u>In re American Rivers and Idaho Rivers United</u>, 372 F.3d 413, 414-15 (D.C. Cir. 2004) ("Congress enacted the ESA to provide a means for conserving endangered and threatened species as well as the ecosystems they depend on.") (citations omitted). To accomplish these purposes, section 4 of the ESA directs FWS to publish a list of all species determined to be "threatened species" or "endangered species" and to designate critical habitat for such species. 16 U.S.C. §§ 1533(c)(1), (a)(3)(A). Once a species is listed and critical habitat designated, various safeguards apply to prevent activities that will cause harm to members of the species, jeopardize the survival and recovery of the species in its native ecosystem, or adversely modify or destroy its designated critical habitat. <u>See</u> 16 U.S.C. §§ 1536,

DEFENDANT-INTERVENORS' MEMO IN OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN
SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT   - 3 -

1538.  FWS must make all its listing determinations "solely on the basis of the best scientific and commercial data available . . . ."  16 U.S.C. § 1533(b)(1)(A).

      A.    <u>The ESA Protects Species, Subspecies, and Distinct Population Segments.</u>

Under the ESA, the term species "includes any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature."  16 U.S.C. § 1532(16).  An "endangered species" is "any species which is in danger of extinction throughout all or a significant portion of its range . . . ." 16 U.S.C. § 1532(6).  A "threatened species" is "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range."  16 U.S.C. § 1532(20).

Congress did not define the terms "distinct population segment" or "significant portion of its range"; however, the courts and FWS have offered guidance for determining whether a species qualifies for listing under these provisions.  FWS and the National Marine Fisheries Service ("NMFS")[2] have adopted a joint policy interpreting the term "distinct population segment" ("DPS") as used in the ESA.  61 Fed. Reg. 4,722 (Feb. 7, 1996).  Under the DPS Policy, a population is a DPS, and therefore a listable entity, if the population is both "distinct" and "significant."  <u>Id.</u> at 4,725; <u>see also</u> <u>Northwest Ecosystem Alliance v. FWS</u>, 475 F.3d 1136, 1144-45 (9th Cir. 2007) (upholding the DPS Policy as "a reasonable construction of 'distinct population segment.'"); <u>Maine v. Norton</u>, 257 F. Supp.2d 357, 387-88 (D. Me. 2003) ("The use of international boundaries to delineate distinct population segments is consistent with congressional intent that we should not allow the United States population of an animal to go

---

[2] NMFS is responsible for administering the ESA with respect to marine species; FWS is responsible for administering the ESA for all other species.  <u>See</u> 50 C.F.R. § 402.01(b).

DEFENDANT-INTERVENORS' MEMO IN OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN
SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT   - 4 -

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

extinct merely because it is more abundant elsewhere.").  The marbled murrelet was listed in

1992, before the agencies adopted the DPS Policy.

Additionally, FWS must list a species if it is threatened or endangered throughout a

"significant portion of its range."  See Defenders of Wildlife v. Norton, 239 F. Supp.2d 9, 18-21

(D.D.C. 2002); see also Defenders of Wildlife v. Norton, 258 F.3d 1136, 1140-45 (9th Cir. 2001).

The D.C. district court has interpreted the term "significant" as used in the ESA to mean "'a

noticeably or measurably large amount.'"  Defenders, 239 F. Supp.2d at 19.  AFRC has not

challenged FWS's 1992 determination that marbled murrelets are threatened throughout a

significant portion of their range – that is, in Washington, Oregon, and California.

B.    The ESA Listing Process

The ESA requires FWS to "publish in the Federal Register a list of all species

determined . . . to be endangered species and a list of all species determined . . . to be threatened

species . . . ."  16 U.S.C. § 1533(c)(1).  Congress has carefully crafted criteria and procedures for

implementing this listing mandate.  The listing criteria are as follows:

> The Secretary shall by regulations promulgated in accordance with subsection (b)
> of this section determine whether any species is an endangered species or a
> threatened species because of any of the following factors:
>
> (A)    the present or threatened destruction, modification, or curtailment of its
>        habitat or range;
> (B)    overutilization for commercial, recreational, scientific, or educational
>        purposes;
> (C)    disease or predation;
> (D)    the inadequacy of existing regulatory mechanisms; or
> (E)    other natural or manmade factors affecting its continued existence.

16 U.S.C. § 1533(a)(1).  When, after considering such criteria, FWS on its own initiative

proposes to adopt or change an ESA listing, it must follow the APA notice and comment

procedures applicable to rulemaking.  16 U.S.C. § 1533(b)(4).  Within one year of the proposal,

DEFENDANT-INTERVENORS' MEMO IN OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN
SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT   - 5 -

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

FWS must make a final determination as to whether the proposed listing decision should go forward. 16 U.S.C. § 1533(b)(6)(A).

In addition to the internally driven listing process described above, Congress established a means by which interested parties may petition FWS to list a species or modify a listing. <u>See</u> 16 U.S.C. § 1533(b)(3)(A). Within 90 days of receiving a valid petition to list, reclassify, or delist a species, FWS must, "[t]o the maximum extent practicable," make a finding "as to whether the petition presents substantial scientific or commercial information indicating that the petitioned action may be warranted." 16 U.S.C. § 1533(b)(3)(A). Within one year of receiving the petition, FWS must publish a finding in the Federal Register as to whether the petitioned action is warranted, not warranted, or warranted but precluded. 16 U.S.C. § 1533(b)(3)(B)(i)-(iii). If FWS determines that the petitioned action is warranted, it must contemporaneously publish a proposal to implement the petitioned action. 16 U.S.C. § 1533(b)(3)(B)(ii). FWS must follow the APA notice and comment procedures for rulemaking, 16 U.S.C. § 1533(b)(4), and, within one year of the proposal, must either publish a final regulation, withdraw the proposal, or provide notice of extension within one year of publication of the proposal. 16 U.S.C. § 1533(b)(6)(i)(I)-(IV). A party must first petition FWS to delist a species before it may challenge FWS's failure to delist in court. <u>Coos County Bd. of County Comm'rs v. Norton</u>, No. 06-6010-HO, 2006 WL 1720496, at *1-2 (D. Or. June 19, 2006) (Exhibit A).

C.    <u>Five-Year Status Review Process</u>

The ESA also requires FWS to review the status of listed species "at least once every five years." 16 U.S.C. § 1533(c)(2)(A). On the basis of the 5-Year Status Review, FWS shall "determine . . . whether any such species should (i) be removed from such list; (ii) be changed in status from an endangered species to a threatened species; or (iii) be changed in status from a threatened species to an endangered species." 16 U.S.C. § 1533(c)(2)(B)(i)-(iii). If FWS

DEFENDANT-INTERVENORS' MEMO IN OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN
SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT  - 6 -

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104*
*(206) 343-7340*

determines that a species' listing status should be changed, the new listing decision "shall be

made in accordance with the provisions of subsections (a) and (b) of [ESA section 4]."

16 U.S.C. § 1533(c)(2).  However, if FWS decides that no change in the listing is necessary and

chooses to maintain the listing, the procedural requirements of ESA section 4 are inapplicable.

See Coos County, 2006 WL 1720496 (Exhibit A); see also American Lands Alliance v. Norton,

242 F. Supp.2d 1, 9-11 (D.D.C. 2003), partially vacated on other grounds, 360 F. Supp.2d 1

(D.D.C. 2003).

II.      THE MARBLED MURRELET



Evaluation Report at cover (ER at 363).

The marbled murrelet is a robin-sized diving seabird that nests almost exclusively in old-

growth coniferous forests within approximately 40 miles of the pacific coast of North America.

Evaluation Report at 2-5 (ER at 393); USGS Status Review at 8 (ER at 062).  The breeding

range of the marbled murrelet spans from the Aleutian Islands in southern Alaska, through

British Columbia, into Washington and Oregon, and down to central California.  Evaluation

DEFENDANT-INTERVENORS' MEMO IN OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN
SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT   - 7 -

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7310*

Report at 3-6 through 3-12 (ER at 416-22); USGS Status Review at 8-9 (ER at 062-63). Marbled murrelet abundance continues to decline rapidly throughout its range despite its current listing as a threatened species in Washington, Oregon, and California. Evaluation Report at 6-28 (ER at 665); USGS Status Review at 139 (ER at 193). The primary cause of the marbled murrelet's decline is the loss of old-growth nesting habitat upon which the marbled murrelet depends. Evaluation Report at 6-27 through 6-34 (ER at 664-72).

    A.    <u>1992 Listing Decision</u>

In 1988, over 40 Audubon chapters petitioned FWS to list the tri-state population of marbled murrelets. <u>Marbled Murrelet v. Lujan</u>, No. C91-522R, slip op. at 4 (W.D. Wash. September 17, 1992) (ER at 905). When FWS failed to meet the ESA's statutory deadlines for responding to the petition, several of the groups commenced litigation to compel FWS to meet its ESA obligations. The district court determined that the tri-state marbled murrelet population qualified for listing under the ESA because the marbled murrelet habitat in Washington, Oregon, and California constituted a significant portion of the marbled murrelet's range:

> [T]he court concludes that, based on the uncontradicted findings that the marbled murrelet qualifies for listing as a threatened species throughout a significant portion of its range within the meaning of the ESA, there is no need to consider the alternative basis of whether the tri-state population is a distinct population segment which might qualify for protection under the ESA.

<u>Marbled Murrelet</u>, slip op. at 12 (ER at 913). The district court also found that all credible science supported finding that the tri-state population was a DPS and that the Service failed "to establish the existence of any scientific dispute on this [DPS] point." <u>Id.</u> at 12-13 (ER at 913-14).

As a result of the 1992 litigation, FWS listed the tri-state marbled murrelet population as threatened, 57 Fed. Reg. 45,328 (Oct. 1, 1992) (ER at 887), and designated critical habitat for the marbled murrelet, 61 Fed. Reg. 26,255 (May 24, 1996). In the final listing decision for the tri-

DEFENDANT-INTERVENORS' MEMO IN OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN
SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT   - 8 -

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

state population, FWS recognized that "[t]he three states encompass roughly one-third of the geographic area occupied by this subspecies, comprising a significant portion of its range" and declared "the marbled murrelet in Washington, Oregon, and California to be a threatened species." 57 Fed. Reg. at 45,328 (ER at 887). FWS subsequently designated 3,887,800 acres of critical habitat for the tri-state marbled murrelet population.[3] 61 Fed. Reg. at 26,256.

B.    2002 AFRC Suit

In 2002, AFRC sued over the tri-state marbled murrelet listing and critical habitat designation, in part challenging FWS's failure to conduct a five-year status review of the species. AFRC v. Dep't of Interior, No 02-6087-AA (D. Or.) (Complaint) (Exhibit B). FWS entered into a settlement with AFRC in 2003, agreeing to perform the 5-Year Status Review for the marbled murrelet by December 31, 2003. AFRC v. Dep't of Interior, No 02-6087-AA (D. Or.) (Second Amendment to Settlement Agreement) (ER at 349). The parties to the settlement agreement ultimately extended the deadline for the status review until August 31, 2004. Id. In the 2002 case, AFRC was unabashed about its desire to open the marbled murrelet's scarce and fragile nesting areas to logging. See Complaint, No 02-6087-AA, at ¶¶ 6-9 (Exhibit B).

C.    2004 Evaluation Report

To discharge its settlement obligation, FWS contracted with a private consulting firm to conduct the 5-Year Status Review of the tri-state population. In March 2004, these independent scientists released an "Evaluation Report for the 5-Year Status Review of the Marbled Murrelet in Washington, Oregon, and California." Like the earlier listing decisions, the Evaluation Report attributed the decline in abundance of the marbled murrelet to the loss of old-growth forests that serve as primary nesting habitat:

---

[3] As a result of a prior AFRC lawsuit discussed below, in late 2006 FWS proposed reducing marbled murrelet critical habitat by almost 95%. 71 Fed. Reg. 53,838 (Sept. 12, 2006).

DEFENDANT-INTERVENORS' MEMO IN OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN
SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT    - 9 -

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

> Population declines appear to be related to the loss of nesting habitats due to logging and urbanization over the past 150 years. In most areas within the listed range, murrelets are left with small, isolated stands of older trees for nesting. At present and for the foreseeable future, these remnant populations are struggling to be self sustaining . . . . It is unrealistic to expect that the species will recover before there is significant improvement in the amount and distribution of suitable nesting habitat.

Evaluation Report at 6-34 (final conclusions) (ER at 672); see also id. at 6-27 through 6-34 (ER

at 664-72). The independent scientists concluded that the tri-state population qualified as a DPS:

> Based on the review of available information on genetic, ecological, and behavioral differences within the breeding range, the global metapopulation of marbled murrelets should be considered to include at least 3 "distinct populations": (1) the Aleutian Islands or "northern" population; (2) the Alaska Peninsula to Puget Sound or "central" population; and (3) the California, Oregon, and western Washington or "southern" population.

Evaluation Report at 6-17 (ER at 655). The Evaluation Report also recognized that the tri-state

region was a significant portion of the marbled murrelet's range, noting that although the coasts

of Washington, Oregon, and California constitute approximately 18% of the marbled murrelet's

geographical range, only 2.3% of marbled murrelets currently reside in the tri-state region.

Evaluation Report at 6-27 (ER at 664). The Evaluation Report concluded that, despite the

current ESA protections for marbled murrelet, the tri-state population has continued to decline by

approximately 4% to 7% per year. Evaluation Report at 6-28 (ER at 665).

    D.    2004 5-Year Status Review

    In April 2004, shortly after the release of the Evaluation Report, FWS's Regional Office

in Portland, Oregon, sent a draft of the 5-Year Status Review to Washington D.C. for

finalization. In the draft status review, FWS concluded that, primarily due to loss of nesting

habitat, the tri-state population continues to decline and is "likely to become an endangered

species within the foreseeable future throughout all or a significant portion of its range." Draft

Status Review at 17 (Exhibit C). On the issue of the specific listed population, FWS determined

DEFENDANT-INTERVENORS' MEMO IN OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN
SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT   - 10 -

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

that the marbled murrelet population in Washington, Oregon, and California was a DPS because of (1) "differences in conservation status between Canada and Washington, Oregon, and California"; (2) "difference in management between the U.S. and Canada," and (3) "differences in regulatory mechanisms between the U.S. and Canada."  Draft Status Review at 11-12 (Exhibit C).  FWS also noted in the draft that "[l]oss of the [tri-state marbled murrelet] DPS would result in a significant gap in the range.  This gap is significant because the Washington, Oregon, and California area is a large fraction of the range, roughly 18% of the total coastal distribution, encompassing 17 degrees of latitude."  Draft Status Review at 13 (Exhibit C).

In August 2004, FWS released its final 5-Year Status Review for the tri-state population. In the final status review, FWS confirmed that the historic loss of the marbled murrelet's habitat "continues to pose a threat to the murrelet population in Washington, Oregon, and California." 5-Year Status Review at 18 (ER at 338).  FWS also agreed that "[t]he threat situation has not changed" and the tri-state population should still be considered threatened under the ESA.  Id. at 21 (ER at 341).  However, FWS reversed course and found that the tri-state population of murrelets was not a DPS.  Id. at 14-17 (ER at 334-37).  FWS reasoned that the tri-state population was not "discrete" because Canada had recently enacted its Species at Risk Act ("SARA"), which FWS believed would provide equivalent protection for marbled murrelets in British Columbia.  Id. at 14-16 (ER at 334-36).

Although FWS determined that the tri-state population did not satisfy the discreteness criteria in the DPS Policy, FWS did not initiate delisting proceedings.  Instead, FWS indicated that it would undertake a species-wide status review before deciding whether to propose delisting.  5-Year Status Review at 28 (ER at 348).  FWS Regional Director David Allen explained that while FWS determined "that the current designation of the marbled murrelet as a

DEFENDANT-INTERVENORS' MEMO IN OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN
SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT   - 11 -

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

DPS does not satisfy the criteria identified in our 1996 DPS policy," it would "retain[] Federal listing status for the marbled murrelet until we can complete a range-wide review of the species to determine whether it is in danger of extinction throughout all or a significant portion of its range."  Letter from Regional Director Allen to Scott Horngren (ER at 320).  Regional Director Allen further noted that "[a]ny delisting or reclassification of the marbled murrelet under the Endangered Species Act will require a separate rulemaking, involving public notice and comment."  Id. (ER at 320).

      E.     2007 USGS Status Review

     In early 2007, pursuant to FWS's request, the U.S. Geological Service ("USGS") reviewed the status of the marbled murrelet in British Columbia and Alaska, the portions of the marbled murrelet's range that were not examined in the 2004 status review.  USGS recognized that "[t]he questions of whether the population in Washington, Oregon, and California constitutes a significant portion of the species' population throughout its entire range, or whether the species as a whole is at risk of extinction, must be addressed before any action is made to change the status of the murrelet as a Threatened Species under the ESA."  USGS Status Review at 2 (ER at 056).

     In the 2007 review, USGS warned that marbled murrelets in Alaska and British Columbia were declining at an even faster rate than the tri-state population.  Specifically, USGS estimated that the marbled murrelet population in Alaska has declined more than 70% during the past 20 years and that the British Columbia population is declining at a rate of 5.8% to 31% per year.  USGS Status Review at 139 (ER at 193).  In addition, USGS determined that suitable nesting habitat for the marbled murrelet had declined by 15% in Alaska and 33% to 49% in British Columbia over the last 50 years.  Id. at 1 (ER at 055).  Accordingly, while the marbled murrelet populations in Alaska and British Columbia were more abundant than those in the lower 48

DEFENDANT-INTERVENORS' MEMO IN OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN
SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT   - 12 -

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

states, USGS determined that "[g]iven that declines were estimated for sites over essentially the entire northern range of the species, there is cause for concern about the species' status." Id. (ER at 055).

USGS also warned FWS that new information released since the 2004 status review indicated that the regulatory mechanisms for protecting marbled murrelet habitat in British Columbia may be inadequate and suggested that FWS reconsider its determination that the tri-state marbled murrelet population is not a DPS. USGS Status Review at 139 (ER at 193).

F.    Listing Challenges

Despite FWS's 2004 status review determination that the tri-state population of marbled murrelets did not qualify as a DPS, no entity in the ensuing years submitted a petition to delist the species. Instead, this case marks the second time litigants have tried to invoke the power of the federal courts to bypass the best available science and the requirements of the law.

1.    The Coos County Decision.

Last year, anti-murrelet plaintiffs brought nearly identical claims in federal district court in Oregon. Coos County, 2006 WL 1720496 (Exhibit A). The Coos County plaintiffs did not petition for delisting; instead, they argued that FWS violated the ESA and APA by failing to publish proposed and final rules to delist the marbled murrelet after determining, in the 5-Year Status Review, that the tri-state population was not a DPS. 2006 WL 1720496, at *1; see also id. at *1 n.2. The district court held that it did not have subject matter jurisdiction. Although those plaintiffs argued that "the five-year review process of [ESA section 4(c)(2)] substitutes for the petition process of subsection (b)(3)," id. at *1, the district court "reject[ed] plaintiff's argument that in the absence of a petition, the Secretary must take actions mandated by [ESA section 4(b)(3)] after completing the species review and determinations required by [ESA section 4(c)(2)]." Id. The Coos County court concluded:

DEFENDANT-INTERVENORS' MEMO IN OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN
SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT    - 13 -

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

> Because plaintiffs have not alleged or demonstrated that they filed a petition, they cannot establish that the Secretary has a duty under [ESA section 4(b)(3)(B)(ii)] to publish a proposed regulation in accordance with [ESA section 4(b)(5)].  It follows that there can be no duty to publish a final regulation.  Because the complaint identifies no duty or act required by [ESA section 4], the court lacks jurisdiction under the ESA and APA.

Id. at *2 (citations omitted).

### 2.   The Present Action.

Like the plaintiffs in Coos County, in the present case AFRC claims that FWS's determination that the tri-state population is not a DPS compels the delisting of the marbled murrelet.  While AFRC attempts to couch its claims under different statutory provisions, all of AFRC's claims, like those rejected in Coos County, are premised on the notion that the DPS finding in the 5-Year Status Review somehow triggered a mandatory delisting obligation.  However, as the Coos County court explained, such a mandatory obligation could have only been triggered by the filing of a petition to delist or the promulgation of a proposed delisting regulation.  See 2006 WL 1720496, at *2; see also id. at *1 n.2.  Despite the passage of almost 15 years since FWS listed the tri-state population,[4] FWS has never officially proposed to initiate rulemaking to delist the tri-state population, and AFRC has never used the petition process to address its alleged injury.

### ARGUMENT

The Court should deny AFRC's motion for summary judgment and grant Audubon's cross-motion for at least four reasons.  First, AFRC's claims are not justiciable because FWS's

---

[4] AFRC's hyperbolic claim that the tri-state population has been unlawfully listed for 15 years, see AFRC Br. at 13, is untenable even if AFRC's legal arguments were correct (which they are not).  Even under the dubious FWS determination that the murrelet population did not qualify as a DPS, the reason for that finding was Canada's enactment of the Canadian Species at Risk Act ("SARA") in 2003, not any scientific evidence in the proceeding years.  5-Year Status Review at 14-16 (ER at 334-36).

DEFENDANT-INTERVENORS' MEMO IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT   - 14 -

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

5-Year Status Review is not a final agency action.  Second, the Court does not have subject

matter jurisdiction over AFRC's claims because AFRC did not petition for the delisting.  Third,

even if the Court finds that AFRC's claims are justiciable, FWS's determination to maintain the

tri-state population listing pending further scientific investigation was neither arbitrary nor

capricious.  Fourth, AFRC's claim that the signatures on the 5-Year Status Review were

somehow defective or represented an improper delegation of power is without merit.[5]

I.      STANDARD OF REVIEW

        AFRC has brought its claims under the citizen suit provision of the ESA, 16 U.S.C.

§ 1540(g)(1)(C), and section 706(2) of the APA, 5 U.S.C. § 706(2).  These provisions only

---

[5] In its amended complaint, AFRC brought additional claims that it has not briefed in its motion
for summary judgment.  Specifically, AFRC failed to move for summary judgment on its Second
Claim for Relief, which presented the theory that FWS violated section 706(1) of the APA by
unreasonably delaying or unlawfully withholding rulemaking to delist the tri-state population.  In
addition, although AFRC included a footnote in its opening brief mentioning its Fifth and Sixth
Claims for Relief, AFRC presented no argument or evidence to support the allegations that FWS
violated the Unfunded Mandates Reform Act, the Regulatory Flexibility Act, or the National
Environmental Policy Act.  AFRC has waived its Second, Fifth, and Sixth Claims for Relief.
See United States v. Romm, 455 F.3d 990, 997 (9th Cir. 2006) ("'[A]rguments not raised by a
party in its opening brief are deemed waived.'") (quoting Smith v. Marsh, 194 F.3d 1045, 1052
(9th Cir. 1999)).

        If the Court decides that AFRC has not waived its Second, Fifth, and Sixth Claims for
Relief, the Court should grant summary judgment in Audubon's favor on each of these claims, as
they are all premised on the same erroneous assumption that FWS had an affirmative obligation
to initiate rulemaking to delist the tri-state population.  Specifically, as only a few months have
passed since the USGS completed its status review for the murrelet, FWS's conduct cannot
constitute a violation of § 706(1) of the APA (AFRC's Second Claim).  See generally
Telecomms. Research and Action Center v. FCC, 750 F.2d 70 (D.C. Cir. 1984).  AFRC's Fifth
Claim for Relief is without merit because the requirements of the Regulatory Flexibility Act and
the Unfunded Mandates Reform Act are triggered by the promulgation of a regulation and, as
discussed below, the 5-Year Status Review is not a regulation.  AFRC's Sixth Claim for Relief is
flawed because, even if the tentative decision to maintain the marbled murrelet listing could
somehow be characterized as a major government action under NEPA, NEPA's environmental
impact statement and environmental assessment requirements do not generally apply to ESA
listing determinations.  Pac. Legal Found. v. Andrus, 657 F.2d 829, 836 (6th Cir. 1981); see also
Public Citizen v. National Highway Traffic Safety Admin., 848 F.2d 256, 263 n.27 (D.C. Cir.
1988).

DEFENDANT-INTERVENORS' MEMO IN OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN
SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT    - 15 -

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

authorize suits against FWS alleging the failure to perform a non-discretionary duty.  16 U.S.C.

§ 1540(g)(1)(C); 5 U.S.C. § 701(a).  Because the ESA specifies no standard of review for agency

actions, the D.C. Circuit applies the APA standard of review set forth in section 706(2), under

which the reviewing court must satisfy itself that agency decisions are not "arbitrary, capricious,

an abuse of discretion, or otherwise not in accordance with law."  The Court should grant

summary judgment only if there is "no genuine issue as to any material fact" and the "moving

party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

II.    FWS'S 5-YEAR STATUS REVIEW IS NOT A FINAL AGENCY ACTION.

Courts traditionally avoid interfering with administrative decisionmaking "until an

administrative decision has been formalized and its effects felt in a concrete way by the

challenging parties."  Abbott Labs. v. Gardner, 387 U.S. 136, 148-49 (1967), overruled on other

grounds, Califano v. Sanders, 430 U.S. 99 (1977).  This requirement of finality is applicable to

challenges brought under both the APA and ESA.  See Nat'l Ass'n of Home Builders v. Norton,

415 F.3d 8, 13 (D.C. Cir. 2005) ("There exists no statutory review provision in the ESA that

authorizes judicial review of agency action beyond that provided for in the APA.  Thus, an

agency action must be final in order to be judicially reviewable.") (citations omitted).  Two

conditions must be satisfied in order for an agency action to be final.  First, the agency action

must "not be of a merely tentative or interlocutory nature" but, instead, "must mark the

'consummation' of the agency's decision making process."  Bennett v. Spear, 520 U.S. 154, 177-

78 (1997).  Second, the action must be one from which "legal consequences will flow" or "rights

or obligations have been determined."  Id. at 178 (citations omitted).  The functions of the

finality requirement ensure that courts "allow[] the agency an opportunity to apply its expertise

and correct its mistakes, . . . avoid[] disrupting the agency's processes, and relie[ve] the courts

from having to engage in 'piecemeal review which is at the least inefficient and . . . might prove

DEFENDANT-INTERVENORS' MEMO IN OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN
SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT   - 16 -

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

unnecessary.'"  DRG Funding Corp. v. Sec. of Housing & Urban Dev., 76 F.3d 1212, 1214 (D.C. Cir. 1996).

Here, the non-final nature of FWS's decision to maintain the tri-state population listing is clear; FWS expressly stated that its decision was interlocutory.  5-Year Status Review at 28 (ER at 348) ("The Washington, Oregon, and California population does not satisfy the criteria for designation as a distinct population segment under the Service's 1996 DPS Policy.  There will be no change in the species status pending completion of a range-wide status review.") (emphasis added).  Completion of the range-wide review was necessary for FWS to ensure that any listing decision for the tri-state marbled murrelet population be based on the best available scientific and commercial data, as required by the ESA.  See 16 U.S.C. § 1533(b)(1)(A).  As discussed below, this decision made sense because the tri-state population listing was not dependent on its status as a DPS, and FWS's August 2004 decision that the tri-state population was not a DPS is incorrect.  See infra Argument, Section IV.  The determination in the 5-Year Status Review did not mark the end of the decisionmaking process—if FWS determined that delisting should proceed, it would be required to follow to the procedural requirements of ESA section 4 by issuing a proposed delisting regulation in the Federal Register, following the APA notice and comment procedures, and, within one year of the proposal, promulgating a final rule implementing the delisting decision.  16 U.S.C. § 1533(b)(5).  Because the 5-Year Status Review did not mark the consummation of FWS's process, it is not a final agency action and is not reviewable in federal court.  Cf. DRG Funding, 76 F.3d at 1215.

The 5-Year Status Review is also not final because no rights or obligations have been determined by that decision.  Regardless of its conclusion that the tri-state population does not qualify as a DPS, in the absence of a petition for delisting, FWS has no mandatory obligation to

DEFENDANT-INTERVENORS' MEMO IN OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN
SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT   - 17 -

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

initiate delisting proceedings. See infra Argument, Section III. Indeed, AFRC knows that FWS does not have a non-discretionary duty to delist a species following a 5-Year Status Review. In its original complaint, AFRC asserted that "50 C.F.R. § 424.11 imposes a non-discretionary duty that '[t]he Secretary shall delist a species if [a] status review determines that a species no longer meets the criteria in section 4(a)(1).'" AFRC Complaint at ¶ 31 (Docket 1) (emphasis and brackets in original complaint). That regulatory citation and quotation, however, were taken from draft, unpromulgated revisions to the ESA regulations.[6] The actual enacted version of 50 C.F.R. § 424.11 provides that:

> The factors considered in delisting a species are those in [50 C.F.R. § 424.11(c)] of this section as they relate to the definitions of endangered or threatened species. Such removal must be supported by the best scientific and commercial data available to the Secretary after conducting a review of the status of the species. A species may be delisted if such data substantiate that it is neither endangered nor threatened for one or more of the following reasons:
>
> (1)    Extinction. . . .
> (2)    Recovery. . . .
> (3)    Original data for classification in error. . . .

50 C.F.R. § 424.11(d) (emphasis added). Neither before nor after filing its amended complaint and excising the claims based on non-existent law has AFRC alleged that any of the criteria prescribed under the real delisting regulation are satisfied. While the not-yet-enacted regulation might have imposed a mandatory duty to delist, the regulation currently in force contains no such obligation. If AFRC believes it is injured by FWS's maintenance of the marbled murrelet listing, it may petition for delisting, but it should not be permitted to use this Court to circumvent the carefully crafted procedures for delisting a species.

---

[6] In light of AFRC's reliance on non-existent regulatory language, Audubon lodged a partial motion to dismiss with its motion for intervention. Audubon's Partial Motion to Dismiss (Apr. 30, 2007) (Docket 12). AFRC subsequently amended its complaint, excised all citations to the draft regulations, and withdrew the claims that were dependent on the language in the draft regulations.

DEFENDANT-INTERVENORS' MEMO IN OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN
SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT    - 18 -

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

AFRC's position that 5-Year Status Reviews standing alone are justiciable final agency actions could cripple implementation of the ESA.  Over 1,800 species of plants and animals are currently listed under the ESA and over 250 additional species are candidates for listing.[7]  Under the ESA, FWS and NMFS must review the status of each listed species every five years. 16 U.S.C. § 1533(c)(2)(A).  If the Court were to decide that FWS must essentially redo all of its listing decisions every five years, even if no change was warranted, it could cripple the listing process—a result that Congress did not intend.

FWS's decision to maintain the tri-state population listing has none of the characteristics of a final agency action.  In light of the tentative nature of FWS's decision and the lack of any legal consequences flowing from that decision, AFRC's claims are not justiciable, and Audubon is entitled to judgment as a matter of law.  See DRG Funding, 76 F.3d at 1214 ("If the agency action is not final, the court . . . cannot reach the merits of the dispute.") (footnote omitted).

III.    THE COURT DOES NOT HAVE SUBJECT MATTER JURISDICTION OVER
        AFRC'S CLAIMS

Under the ESA, a party may only challenge "a failure of the Secretary to perform any act or duty under [ESA section 4] which is not discretionary with the Secretary."  16 U.S.C. § 1540(g)(1)(B).  The non-discretionary procedural duties in ESA section 4 are triggered in two ways: either a party files a petition for a listing, reclassification, or delisting or FWS on its own initiates such rulemaking proceedings.  Here, because AFRC has not petitioned to delist the tri-state population of marbled murrelets and FWS has not proposed to modify the tri-state population listing, FWS has not violated any non-discretionary duty and the Court lacks subject matter jurisdiction over AFRC's claims.  This was the decision reached in Coos County, 2006

---

[7] See List of Endangered and Threatened Species, http://ecos.fws.gov/tess_public/Boxscore.do (visited Aug. 20, 2007); List of Candidate Species, http://ecos.fws.gov/tess_public/SpeciesReport.do?listingType=C (visited Aug. 20, 2007).

DEFENDANT-INTERVENORS' MEMO IN OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN
SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT    - 19 -

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

WL 1720496 (Exhibit A), in which the district court "reject[ed] plaintiff's argument that in the absence of a petition, the Secretary must take actions mandated by [ESA section 4(b)(3)] after completing the species review and determinations required by [ESA section 4(c)(2)]." Id. The same reasoning applies here.

To avoid the Coos County outcome, AFRC argues that it is not required to petition for delisting because ESA section 4(a)(1) requires FWS to decide whether to maintain the tri-state listing "by regulation"; however, section 4(a)(1) merely incorporates the procedures of ESA section 4(b) to listing decisions and does not impose independent procedural requirements. 16 U.S.C. § 1533(a)(1) ("The Secretary shall by regulation promulgated in accordance with [ESA section 4(b)] determine whether any species is an endangered species or a threatened species . . . .") (emphasis added). All of the procedural requirements in section 4(b) of the ESA are triggered by either (1) the filing of a petition or (2) the initiation of rulemaking proceedings. E.g., 16 U.S.C. § 1533(b)(3)(A) ("To the maximum extent practicable, within 90 days after receiving the petition of an interested person . . . the Secretary shall make a finding as to whether the petition presents substantial scientific or commercial information indicating that the petitioned action may be warranted.") (emphasis added); 16 U.S.C. § 1533(b)(3) ("Within 12 months after receiving a petition that is found under [ESA section 4(b)(3)(A)] to present substantial information . . . the Secretary shall make one of the [enumerated] findings . . . .") (emphasis added); 16 U.S.C. § 1533(b)(4) ("Except as provided in [ESA sections 4(b)(5) and 4(b)(6)], the provisions of [APA section 553] shall apply to any regulation promulgated to carry out the purposes of this chapter.") (emphasis added); 16 U.S.C. § 1533(b)(5) ("With respect to any regulation proposed by the Secretary to implement a determination, designation, or revision referred to in subsection (a)(1) or (3) of this section, the Secretary shall . . . .") (emphasis added).

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

Because AFRC has failed to petition, an act which would have triggered these non-discretionary duties, the Court lacks subject matter jurisdiction over AFRC's claims.[8]

The legislative history of the ESA further supports the conclusion that FWS has no non-discretionary duty to begin the delisting process for murrelets.  In 1982, when Congress amended section 4 to implement the petition process currently embodied in ESA section 4(b)(3), it explained that the petition process would impose non-discretionary duties on the wildlife services that had not existed before:

> [T]hese amendments will replace the Secretary's discretion with mandatory, non-discretionary duties.  For example, under current law, if a petition presents substantial evidence warranting a review of the status of a species, the Secretary is to undertake such a review.  However, the statute imposes no deadlines within which such review is to be completed.  In practice, such status review have often continued indefinitely, sometimes for many years.  The amendments will force action on listing and delisting proposals by requiring that the Secretary, to the maximum extent practicable, within 90 days after receiving a petition, publish a finding whether the petition presents substantial scientific or commercial information indicating that the petitioned action may be warranted.

H.R. Rep. No. 97-835, at 20-21 (1982) (Conf. Rep.); see also American Lands Alliance v. Norton, 242 F. Supp.2d 1, 10 (D.D.C. 2003), partially vacated on other grounds, 360 F. Supp.2d 1 (D.D.C. 2003).  In short, Congress added the petition process to provide an exception to the non-discretionary nature of FWS's listing obligations.  Here, however, AFRC has not taken advantage of the option to petition for delisting.

In sum, FWS's decision to maintain the tri-state marbled murrelet listing pending the range-wide status review was a decision committed to FWS's discretion, and the Court lacks subject matter jurisdiction over AFRC's claims.  See 16 U.S.C. § 1540(g)(1)(C); see also

---

[8] While section 4(c)(2) of the ESA enumerates three determinations that must be "made in accordance" with ESA sections 4(a) and 4(b)—delisting, downlisting from endangered to threatened, or uplisting from threatened to endangered—FWS's decision to retain the murrelet listing pending a range-wide species review does not fall into any of these categories.

DEFENDANT-INTERVENORS' MEMO IN OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN
SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT   - 21 -

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

5 U.S.C. § 701(a) (APA does not allow judicial review of "agency action is committed to agency discretion by law"); <u>Heckler v. Chaney</u>, 470 U.S. 821, 830 (1985) (If the statute allows for agency discretion, then there is "no law to apply" and "no meaningful standard against which to judge the agency's exercise of discretion.") (internal citations and punctuation omitted).  This conclusion does not leave AFRC without recourse, as AFRC can petition for delisting of the murrelet to invoke FWS's non-discretionary duties.[9]  What AFRC cannot do, however, is enlist this Court in its attempt to short-circuit the statutory process for protecting imperiled species.

IV.     FWS'S DECISION TO MAINTAIN THE TRI-STATE POPULATION LISTING WAS
        NEITHER ARBITRARY NOR CAPRICIOUS.

        If the Court were to determine that AFRC's claims are justiciable (a step that the Court should not take), Audubon is still entitled to summary judgment.  AFRC asserts that FWS's decision to maintain the tri-state murrelet listing was arbitrary and capricious because FWS determined that the tri-state population did not qualify as a DPS.  AFRC's Summary Judgment Memo at 13-16.  However, under the ESA, a delisting may occur "only if" the best available science and commercial data "substantiate that it is neither endangered or threatened" because of extinction, recovery, or the original data for the classification was in error.  50 C.F.R. § 424.11(d).  Accordingly, FWS was justified in maintaining the listing because (1) the tri-state marbled murrelet listing was not dependent on its status as a DPS, and (2) FWS's August 2004 decision that the tri-state population was not a DPS is incorrect.

---

[9] AFRC's requested relief—an order from the Court directing that a proposed murrelet delisting rule be published within 15 days—indicates a current sense of urgency at odds with AFRC's lack of action for the past three years.

DEFENDANT-INTERVENORS' MEMO IN OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN
SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT   - 22 -

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

A.    <u>Washington, Oregon, and California Are a Significant Portion of the Marbled Murrelet's Range.</u>

In arguing that FWS acted arbitrarily and capriciously in failing to initiate rulemaking to delist the tri-state population, AFRC claims that "[l]isting a population of fish or wildlife in violation of the DPS Policy is unlawful."  AFRC's Br. at 14.  In making this assertion, however, AFRC ignores the ESA provisions that require FWS to list a species that is threatened or endangered in "a significant portion of its range."  16 U.S.C. § 1532(6), (20); <u>see</u> <u>also</u> <u>Defenders</u>, 239 F. Supp.2d at 18-21; <u>Defenders</u>, 258 F.3d at 1140-45.

The history of the marbled murrelet's listing demonstrates that the tri-state population's qualification as a DPS is irrelevant to the propriety of the listing.  In 1992, four years before the DPS Policy was promulgated, a federal district court found that the marbled murrelet was threatened throughout a significant portion of its range.  <u>Marbled Murrelet</u>, slip op. at 12 (ER at 913) (the murrelet in the tri-state region "qualifies for listing as a threatened species throughout a significant portion of its range within the meaning of the ESA.").  Consistent with this order, when FWS listed the tri-state population, it acknowledged that "[t]he three states encompass roughly one-third of the geographic area occupied by this subspecies, comprising a significant portion of its range."  57 Fed. Reg. at 45,330 (ER at 889).  Because the original basis for listing the tri-state population was not dependent on the population's status as a DPS, but rather on the significant portion of range analysis, it was entirely reasonable and prudent for FWS to maintain the tri-state listing "pending the completion of a range-wide status review."  5-Year Status Review at 28 (ER at 348).

B.    <u>FWS's August 2004 Decision That the Tri-State Murrelet Population Was Not a DPS Is Incorrect.</u>

Even if the tri-state murrelet listing was dependent on its qualification as a DPS, FWS acted rationally in maintaining the listing because FWS's conclusion that the tri-state population

DEFENDANT-INTERVENORS' MEMO IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT    - 23 -

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

did not qualify as a DPS was contradicted by the opinions of its experts and represented a departure from the normal application of the DPS Policy.  Under the DPS Policy, a population must be "discrete" and "significant" in order to be listed as a DPS.  61 Fed. Reg. at 4,725.  FWS considers a population discrete if it (1) "is markedly separated from other populations of the same taxon as a consequence of physical, physiological, ecological, or behavioral factors" or (2) "is delineated by international governmental boundaries within which differences in control of exploitation, management of habitat, conservation status, or regulatory mechanisms exists that are significant in light of section 4(a)(1)(D) of the Act."  Id.  In the 2004 status review, FWS concluded that the tri-state population was not discrete and did not qualify as a DPS because Canada's enactment of SARA in 2003 meant there were no significant differences in control of exploitation, management of habitat, conservation status, or regulatory mechanisms between the U.S. and Canada.  5-Year Status Review at 15-16 (ER at 335-36).

FWS's determination that the tri-state population does not qualify as a DPS due to Canada's SARA has been widely disputed.  In the Evaluation Report, released just months before the 2004 status review, independent scientists concluded that the tri-state population was indeed a DPS based on genetic, behavioral, and ecological considerations.  Evaluation Report at 6-17 (ER at 655).  In the draft 5-Year Status Review for the tri-state population, FWS Region 1 again concluded that the tri-state population was a DPS, this time because of differences in the conservation status of the marbled murrelet in the U.S. and Canada, differences in management practices between the U.S. and Canada, and differences in regulatory mechanisms between the two nations.  Draft Status Review at 11-12 (Exhibit C).  In the 2007 status review, USGS questioned FWS's determination that the tri-state population was not a DPS, noting significant differences in habitat management practices between British Columbia and the United States.

DEFENDANT-INTERVENORS' MEMO IN OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN
SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT   - 24 -

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

USGS Status Review at 139 (ER at 193).  USGS suggested that FWS should revisit its decision

that the tri-state population was not a DPS:

> In 2004, when the USFWS decided that the [tri-state] population of Marble[d]
> Murrelet did not satisfy the criteria for designation as a DPS, Canada's [SARA]
> had only recently passed. . . .  Unavailable at the time the USFWS completed its
> 5-year review of the Marbled Murrelet in [the tri-state region] was a report by the
> Forest Practices Board (FPB) in British Columbia that was critical of the
> province's implementation of the existing forest practices regime for conservation
> of forest nesting habitat of this species (Forest Practices Board 2004).

Id.  USGS concluded that FWS "may wish to examine new information on forest habitat

management in British Columbia and in particular the efficacy of existing laws and regulations

in promoting the conservation of Marbled Murrelet nesting habitat there."  Id.

FWS departed from its normal practice in two ways in applying the DPS Policy to

reverse the conclusions of the independent scientists and Region 1.  First, in the 2004 status

review, FWS determined that although the continental U.S. has a smaller population of murrelet

(approximately 24,000) than in Canada (approximately 66,000), differences in the marbled

murrelet's "conservation status" between the U.S. and British Columbia did not qualify it as a

DPS because "there is no accepted protocol by which these statistics yield a meaningful

comparison of conservation status across the border for purposes of the DPS policy."  5-Year

Status Review at 16 (ER at 336).  This conclusion runs counter to FWS's past interpretation of

the DPS Policy:

> The DPS Policy does not define the term "conservation status."  The FWS argues
> that the term 'conservation status' means 'the number of individuals left in the
> population.'  As a consequence, 'differences in conservation status' mean
> 'differences in the number of owls' on either side of the border.  A court must
> defer to an agency's interpretation of its own regulations unless it is plainly
> erroneous.

See Nat'l Ass'n of Home Builders v. Norton, 340 F.3d 835, 843 (9th Cir. 2003); see also 62 Fed.

Reg. 13,134 (Mar. 18, 1998) (finding "significant differences between the United States and

DEFENDANT-INTERVENORS' MEMO IN OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN
SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT   - 25 -

Mexico in regard to the species' conservation status" where "the population in Baja California is not likely to be in danger of extirpation within the foreseeable future because there are significantly more animals there than occur in the United States"). FWS has never before used the absence of a particular statistical criteria relating to conservation status as a justification for determining that a population does not qualify as a DPS.

Second, the Office of the Solicitor for the Department of the Interior has gone so far as to "suggest[] that the conclusion reached by the Department on the [marbled murrelet] 5-year review was based on an incorrect 'discreteness' analysis under the DPS policy, as it compared current levels of legal protection in the United States (Endangered Species Act) and Canada (Species at Risk Act), rather than comparing the levels that would exist if the species were not listed in the United States." Letter from Acting Regional Director of FWS Region 1 to the Director of FWS at 2 (Exhibit D). Indeed, FWS's mode of analysis presents a "catch-22" by comparing existing laws—the ESA and SARA—as a means for justifying the elimination of ESA protections when the elimination of such protections will invariably result in significantly reduced protection for marbled murrelets in the U.S. compared to Canada, which could ultimately re-qualify the U.S. population for listing as a DPS.

There is also increasing evidence that SARA and other Canadian wildlife laws do not have comparable protections to the ESA. Enacted in 2003, SARA is a Canadian statute that applies to federal lands and became effective in June 2004. See Canada Gazette Part II, Order Fixing the Dates of the Coming into Force of Certain Sections of the Act, available at http://canadagazette.gc.ca/partII/2003/20030618/pdf/g2-13713.pdf (visited Aug. 20, 2007). Because marbled murrelets were already considered a threatened species in 2003, section 42 of SARA required a recovery strategy to be promulgated by June 5, 2007. Species at Risk Act: A

DEFENDANT-INTERVENORS' MEMO IN OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN
SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT    - 26 -

Guide, http://www.sararegistry.gc.ca/the_act/HTML/Guide_e.cfm#17 (visited Aug. 20, 2007).

However, this deadline has been missed, and as of the date of this brief, no recovery strategy has

been promulgated for Canadian marbled murrelets.  See Marbled Murrelet - Justification for

Delay, http://www.sararegistry.gc.ca/virtual_sara/files/plans/rs%5Fmarbled%5Fmurrelet%5Fe%2E.pdf

(visited Aug. 20, 2007).  Without a recovery strategy, critical habitat has not been identified, and

SARA's prohibitions against harming critical habitat cannot be enforced.

     This is not an isolated example of a missed deadline.  In December 2006, the Secretariat

of the Commission for Environmental Cooperation, pursuant to the North American Agreement

on Environmental Cooperation (a NAFTA side agreement), positively responded to a submission

by Sierra Legal Defence Fund alleging that Canada is failing to effectively enforce SARA "in

regard to the process and timelines for listing species, developing and adopting recovering

strategies, and ensuring that SARA requirements are met on non-federal lands."  Determination

in Accordance with Articles 14(1) and (2) of the North American Agreement for Environmental

Cooperation (Exhibit E).  The submission alleged that as of September 29, 2006, Canada had

failed to meet the mandatory deadlines for over 100 recovery strategies for newly listed species,

with only 23 of 133 strategies due in 2006 done by September 2006.  Id. at 3-5.

     Furthermore, approximately 80% of the forest nesting habitat for murrelets in Canada

falls under provincial, not federal, jurisdiction.  USGS Status Review at 136 (ER at 190).  In

British Columbia, only 1% of mature forest, by area, of each forest district is allocated to wildlife

protection, as opposed to timber harvest.  Id.  The Forest Practices Board ("FPB") strongly

condemned the provincial government in 2005, stating that "there is a systemic failure in

government policy to protect threatened species such as Marbled Murrelets on crown forest

lands."  Id. at 137 (ER at 191).

DEFENDANT-INTERVENORS' MEMO IN OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN
SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT   - 27 -

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

The FPB concluded that conservation of Marbled Murrelet habitat under the Forest and Range Practices Act is limited and very slow. The FPB was particularly concerned that while the process of developing a conservation strategy for Marbled Murrelets is still ongoing, logging projects continue to be approved, thereby eliminating future options for murrelet habitat conservation, especially on the southern British Columbia coast where conservation is most needed. The FPB was also critical of British Columbia's implementation of the Identified Wildlife Management Strategy under the FRPA. Under this strategy, British Columbia arbitrarily restricted protection of forest habitat for all IWMS species to less than 1 percent of the mature timber land base (in which most murrelet nesting habitat occurs). In the FPB's view, this prevents conservation of the most important murrelet nesting habitat and deflects conservation to less suitable habitat.

Id. at 139 (ER at 193). Considering the evidence that SARA and other Canadian laws are not

protecting the murrelet and its habitat, the validity of FWS's August 2004 determination is

dubious at best.

In light of the uncontested finding that the tri-state region constitutes a significant portion

of the marbled murrelet's range and the flaws in FWS's analysis of murrelets as a DPS, a

decision to initiate delisting proceedings for the tri-state murrelet population would have been

inconsistent with the substantive mandate that delistings be based on the best available scientific

and commercial data. Accordingly, FWS's decision to maintain the tri-state population's listing

pending further study was nether arbitrary nor capricious.

V.    REGIONAL DIRECTOR ALLEN HAD DELEGATED AUTHORITY TO OVERSEE
      THE FIVE-YEAR STATUS REVIEW PROCESS.

Finally, AFRC argues that the 5-Year Status Review was unlawful because it was signed

"by low level FWS employees who did not have delegated authority to make the decision."

AFRC's Br. at 20. This assertion is wrong. The ESA authorizes the delegation of

decisionmaking authority to subordinate agency officials. 50 C.F.R. § 424.02(i). Congress

assigned the responsibility of conducting five-year reviews to the Secretary of the Interior, who

has delegated authority for administering the ESA to FWS and NMFS. 50 C.F.R. § 402.01. The

DEFENDANT-INTERVENORS' MEMO IN OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN
SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT   - 28 -

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

Director of FWS has redelegated the authority for overseeing the 5-Year Status Review process to the Regional Directors of FWS. General Program Redelegations, 032 FW 5 (ER at 884-86). David Allen was the FWS Regional Director for Region 1, encompassing the entire tri-state murrelet region, at the time of the 2004 5-Year Status Review, and it was proper for him to sign the status review for the tri-state population. 5-Year Status Review at 28 (ER at 348).

AFRC has not argued that any of the underlying delegations were improper. Furthermore, the authorities AFRC cites in its motion for summary judgment (at pages 20-21) are inapposite because they pertain to "listing decisions," "proposed and final rules," and various "notices" relating to petitions and rulemaking, not recommendations made in the course of the five-year review process. See 5-Year Review Guidance at 2-4 (ER at 359). The section of the Endangered Species Listing Handbook specifically relating to the five-year review process indicates that Regional Director Allen had the authority to ratify the Marbled Murrelet 5-Year Status Review. See 5-Year Review Guidance at 2-4 (ER at 359) ("If the Regional Director has retained signature authority over the five-year review, then the completed review should be forwarded to the Regional Director for concurrence . . . ."). Audubon is entitled to summary judgment on AFRC's First Claim for Relief.

## CONCLUSION

AFRC has long sought to log more of our nation's increasingly rare old-growth forests by removing the ESA protections for the marbled murrelet. Despite AFRC's continuing attacks on the tri-state marbled murrelet listing and critical habitat designation, FWS has prudently decided to keep the murrelet protected while it gathers evidence on the status of the species as a whole. Audubon respectfully asks the Court to reject AFRC's attempts to have the Court bless its view of the ESA's statutory and regulatory mandates. If AFRC believes the marbled murrelet should be delisted, it must petition FWS. AFRC has failed to do so, despite the passage of over three

DEFENDANT-INTERVENORS' MEMO IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT  - 29 -

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98101*
*(206) 343-7340*

years since FWS released the status review.  The 5-Year Status Review is not a final or justiciable agency action, and federal courts cannot provide short-cuts to the statutorily described petition process.

Nor is AFRC's view of murrelet science due any deference.  In early 2007, the USGS released a report indicating that the marbled murrelet remains threatened throughout Washington, Oregon, and California.  The report warned that the Alaska and British Columbia populations of marbled murrelets are declining at an even faster rate than the tri-state population, and found that, contrary to FWS's determination in the 2004 status review, the tri-state population may indeed constitute a DPS.  In light of the fragile and declining status of the tri-state murrelet population as well as the Alaska and British Columbia populations of marbled murrelets, it was entirely appropriate for FWS to maintain the tri-state population listing. Accordingly, Audubon asks the Court to deny AFRC's motion for summary judgment and grant Audubon's cross-motion.

DEFENDANT-INTERVENORS' MEMO IN OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN
SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT   - 30 -

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

Respectfully submitted this 21st day of August, 2007.

/s/  Joshua Osborne-Klein
PATTI GOLDMAN (DCB# 398565)
KRISTEN L. BOYLES (WSB #23806)
JOSHUA OSBORNE-KLEIN (WSB #36736)
Earthjustice
705 Second Avenue, Suite 203
Seattle, WA  98104
(206) 343-7340
(206) 343-1526 *[FAX]*
pgoldman@earthjustice.org
kboyles@earthjustice.org
josborne-klein@earthjustice.org

*Attorneys for Defendant-Intervenors Audubon Society of Portland, Center for Biological Diversity, Conservation Northwest, Environmental Protection Information Center, Gifford Pinchot Task Force, Oregon Wild, Seattle Audubon Society, Sierra Club, and The Wilderness Society*

DEFENDANT-INTERVENORS' MEMO IN OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN
SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT   - 31 -

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

PATTI GOLDMAN (DCB# 398565)
KRISTEN L. BOYLES (WSB #23806)
JOSHUA OSBORNE-KLEIN (WSB #36736)
Earthjustice
705 Second Avenue, Suite 203
Seattle, WA  98104
(206) 343-7340
(206) 343-1526 *[FAX]*
pgoldman@earthjustice.org
kboyles@earthjustice.org
josborne-klein@earthjustice.org

*Attorneys for Defendant-Intervenors*

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN FOREST RESOURCE COUNCIL, ) | Case No.  1:07-cv-00484-JDB |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| H. DALE HALL, Director, United States Fish and ) | |
| Wildlife Service, DAVID M. VERHEY, Acting Assistant ) | |
| Secretary for Fish and Wildlife and Parks, and DIRK ) | |
| KEMPTHORNE, Secretary of Interior, ) | |
| ) | |
| Defendants, ) | |
| ) | |
| and ) | |
| ) | |
| AUDUBON SOCIETY OF PORTLAND, CENTER FOR ) | |
| BIOLOGICAL DIVERSITY, CONSERVATION ) | |
| NORTHWEST, ENVIRONMENTAL PROTECTION ) | |
| INFORMATION CENTER, GIFFORD PINCHOT TASK ) | |
| FORCE, OREGON WILD, SEATTLE AUDUBON ) | |
| SOCIETY, SIERRA CLUB, and THE WILDERNESS ) | |
| SOCIETY, ) | |
| ) | |
| Defendant-Intervenors. ) | |

**STATEMENT OF GENUINE ISSUES
NECESSARY TO BE LITIGATED**

STATEMENT OF GENUINE ISSUES NECESSARY
TO BE LITIGATED   - 1 -

Pursuant to Local Rules 7(h) and 56.1, defendant-intervenors Audubon Society of Portland et al. (collectively "Audubon") submit this statement of genuine issues necessary to be litigated in connection with their opposition to AFRC's motion for summary judgment. As a general matter, Audubon avers that the facts relevant to AFRC's motion for summary judgment and Audubon's cross-motion for summary judgment are contained in the administrative record for this case, excerpts of which were filed by federal defendant FWS on August 7, 2007. The record documents themselves, rather than the parties' characterizations, provide the touchstone for the Court's review of this case. See Camp v. Pitts, 411 U.S. 138, 142 (1973) (judicial review under the Administrative Procedure Act generally limited to the administrative record).

When appropriate, Audubon has responded to AFRC's statement of undisputed facts with reference to the relevant document in the excerpts of record (cited as "ER __"). Records in this case that were not included in FWS's excerpts are provided as exhibits to Audubon's cross-motion for summary judgment. Audubon specifically denies each and every allegation in AFRC's statement of undisputed facts not otherwise expressly admitted, qualified, or denied herein. The numbered paragraphs below correspond to the numbered paragraphs in AFRC's statement of undisputed facts.

1.    ADMIT.

2.    Audubon lacks sufficient information to admit or deny the allegations in paragraph 2.

3.    Audubon lacks sufficient information to admit or deny the allegations in paragraph 3. Audubon avers that AFRC has not substantiated its claim that management of federal land to protect marbled murrelets results increased risk to adjacent landowners.

STATEMENT OF GENUINE ISSUES NECESSARY
TO BE LITIGATED   - 2 -

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104*
*(206) 343-7340*

4.      ADMIT.  Audubon avers that Regional Director David Allen had delegated

authority to oversee and ratify the 5-year status review for the marbled murrelet.  See General

Program Redelegations, at 1-2 (ER at 884-85).

5.      ADMIT.

6.      Audubon ADMITS the allegation that marbled murrelets are more abundant in

Alaska and British Columbia than they are in Washington, Oregon, and California.  Audubon

avers that the marbled murrelet population in Alaska has declined more than 70% during the past

20 years and that the British Columbia population is declining at a rate of 5.8% to 31% per year.

USGS Status Review at 139 (ER at 193).  In addition, Audubon avers that suitable nesting

habitat for the marbled murrelet had declined by 15% in Alaska and 33% to 49% in British

Columbia over the last 50 years.  Id. at 1 (ER at 055).  Audubon lacks sufficient knowledge to

admit or deny AFRC's allegation that marbled murrelets "spend the majority of their life on the

ocean . . . ."

7.      ADMIT.

8.      ADMIT.

9.      ADMIT.

10.     ADMIT.

11.     ADMIT.

12.     ADMIT.

13.     ADMIT.

14.     ADMIT.  Audubon avers that the federal district court in Oregon held that it did

not have subject matter jurisdiction over claims nearly identical to those at issue in the present

case:

STATEMENT OF GENUINE ISSUES NECESSARY
TO BE LITIGATED   - 3 -

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

> Because plaintiffs have not alleged or demonstrated that they filed a petition, they cannot establish that the Secretary has a duty under [ESA section 4(b)(3)(B)(ii)] to publish a proposed regulation in accordance with [ESA section 4(b)(5)].  It follows that there can be no duty to publish a final regulation.  Because the complaint identifies no duty or act required by [ESA section 4], the court lacks jurisdiction under the ESA and APA.

Coos County Bd. of County Comm'rs v. Norton, No. 06-6010-HO, 2006 WL 1720496, at *2 (D. Or. June 19, 2006) (Exhibit A) (citations omitted).

15.    ADMIT.

16.    Audubon DENIES the allegation that "FWS never conducted a range-wide status review of the marbled murrelet."  Audubon avers that FWS reviewed the status of the marbled murrelet in Washington, Oregon, and California in 2004 and that the U.S. Geological Survey ("USGS"), at FWS's behest, reviewed the remaining portions of the marbled murrelet's range in 2007.  5-Year Status Review (ER at 321); USGS Status Review (ER at 039).  Audubon ADMITS the remaining allegations in paragraph 16.

17.    ADMIT.

18.    While Audubon ADMITS that FWS has not published a proposed delisting rule in the Federal Register, Audubon lacks sufficient information to admit or deny the allegation that "FWS has taken no action to propose removing the Three-State Murrelet Population from the list of threatened species."  AFRC's allegation that the tri-state population is "non-listable" is a legal conclusion to which no response is required.  Audubon avers that the tri-state population qualifies for listing as "distinct population segment" ("DPS").  Evaluation Report at 6-17 (ER at 655); Draft Status Review at 11-12 (Exhibit C); USGS Status Review at 139 (ER at 193).  Audubon further avers that the marbled murrelet must be listed because it is threatened throughout a significant portion of its range.  Marbled Murrelet v. Lujan, No. C91-522BR, slip

STATEMENT OF GENUINE ISSUES NECESSARY
TO BE LITIGATED   - 4 -

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

op. at 12 (W.D. Wash. September 17, 1992) (ER at 913); 57 Fed. Reg. 45,328 (Oct. 1, 1992) (ER

at 887); Evaluation Report at 6-27 (ER at 664; Draft Status Review at 13 (Exhibit C).

 Respectfully submitted this 21st day of August, 2007.


     /s/  Joshua Osborne-Klein
     PATTI GOLDMAN (DCB# 398565)
     KRISTEN L. BOYLES (WSB #23806)
     JOSHUA OSBORNE-KLEIN (WSB #36736)
     Earthjustice
     705 Second Avenue, Suite 203
     Seattle, WA  98104
     (206) 343-7340
     (206) 343-1526 *[FAX]*
     pgoldman@earthjustice.org
     kboyles@earthjustice.org
     josborne-klein@earthjustice.org

     *Attorneys for Defendant-Intervenors Audubon Society of Portland, Center for Biological Diversity, Conservation Northwest, Environmental Protection Information Center, Gifford Pinchot Task Force, Oregon Wild, Seattle Audubon Society, Sierra Club, and The Wilderness Society*

STATEMENT OF GENUINE ISSUES NECESSARY
TO BE LITIGATED  - 5 -

PATTI GOLDMAN (DCB# 398565)
KRISTEN L. BOYLES (WSB #23806)
JOSHUA OSBORNE-KLEIN (WSB #36736)
Earthjustice
705 Second Avenue, Suite 203
Seattle, WA  98104
(206) 343-7340
(206) 343-1526 *[FAX]*
pgoldman@earthjustice.org
kboyles@earthjustice.org
josborne-klein@earthjustice.org

*Attorneys for Defendant-Intervenors*

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN FOREST RESOURCE COUNCIL,     ) | Case No.  1:07-cv-00484-JDB |
|     ) | |
|     Plaintiff,     ) | |
|     ) | |
|   vs.     ) | |
|     ) | |
| H. DALE HALL, Director, United States Fish and     ) | |
| Wildlife Service, DAVID M. VERHEY, Acting Assistant ) | |
| Secretary for Fish and Wildlife and Parks, and DIRK     ) | |
| KEMPTHORNE, Secretary of Interior,     ) | |
|     ) | |
|     Defendants,     ) | |
|     ) | |
|   and     ) | |
|     ) | |
| AUDUBON SOCIETY OF PORTLAND, CENTER FOR ) | |
| BIOLOGICAL DIVERSITY, CONSERVATION     ) | |
| NORTHWEST, ENVIRONMENTAL PROTECTION     ) | |
| INFORMATION CENTER, GIFFORD PINCHOT TASK ) | |
| FORCE, OREGON WILD, SEATTLE AUDUBON     ) | |
| SOCIETY, SIERRA CLUB, and THE WILDERNESS     ) | |
| SOCIETY,     ) | |
|     ) | |
|     Defendant-Intervenors.     ) | |

**CERTIFICATE OF SERVICE**

CERTIFICATE OF SERVICE   - 1 -

I am a citizen of the United States and a resident of the State of Washington.  I am over

18 years of age and not a party to this action.  My business address is 705 Second Avenue, Suite

203, Seattle, Washington 98104.

On August 21, 2007, I served a true and correct copy of:

1.    Defendant-Intervenors' Cross-Motion for Summary Judgment;
2.    Defendant-Intervenors' Memorandum in Opposition to Plaintiffs' Motion for
       Summary Judgment and in Support of Cross-Motion for Summary Judgment;
3.    Exhibits to Defendant-Intervenors' Opposition to Plaintiffs' Motion for Summary
       Judgment and Cross-Motion for Summary Judgment;
4.    [Proposed] Order Granting Defendant-Intervenors' Cross-Motion for Summary
       Judgment and Denying Plaintiffs' Motion for Summary Judgment;
5.    Statement of Genuine Issues Necessary to Be Litigated;
6.    Defendant-Intervenors' Statement of Undisputed Material Facts; and
7.    Certificate of Service.

on the parties listed below:

James T. McDermott                            ☐ via facsimile
Ball Janik LLP                                ☐ via overnight courier
101 S.W. Main Street, Suite 1100              ☐ via first-class U.S. mail
Portland, OR  97204                           ☐ via hand delivery
(503) 228-2525                                ☒ via electronic service by Clerk
(503) 226-3910 *[FAX]*                        ☐ via e-mail
jmcdermott@balljanik.com
*Attorney for Plaintiffs*

Mark C. Rutzick                               ☐ via facsimile
4912 Shadow Valley Drive                      ☐ via overnight courier
Fairfax, VA  22030                            ☐ via first-class U.S. mail
(703) 865-8418                                ☐ via hand delivery
markrutzick@comcast.net                       ☐ via electronic service by Clerk
*Attorney for Plaintiffs*                     ☒ via e-mail

CERTIFICATE OF SERVICE   - 2 -

Meredith L. Flax
Courtney Taylor
Attorney
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife and Marine Resources Section
P.O. Box 7369
Washington, D.C.  20044-7369
**Street Address**:
601 D Street, N.W., Room 3908
Washington, D.C.  20004
(202) 305-0404 (Meredith)
(202) 353-7548 (Courtney)
(202) 305-0275 *[FAX]*
meredith.flax@usdoj.gov
courtney.taylor@usdoj.gov
*Attorneys for Federal Defendants*

☐ via facsimile
☐ via overnight courier
☐ via first-class U.S. mail
☐ via hand delivery
☒ via electronic service by Clerk
☐ via e-mail

    I declare under penalty of perjury that the foregoing is true and correct.  Executed on this

21st day of August, 2007, at Seattle, Washington.

Catherine Hamborg

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

PATTI GOLDMAN (DCB# 398565)
KRISTEN L. BOYLES (WSB #23806)
JOSHUA OSBORNE-KLEIN (WSB #36736)
Earthjustice
705 Second Avenue, Suite 203
Seattle, WA  98104
(206) 343-7340
(206) 343-1526 *[FAX]*
pgoldman@earthjustice.org
kboyles@earthjustice.org
josborne-klein@earthjustice.org

*Attorneys for Defendant-Intervenors*

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| AMERICAN FOREST RESOURCE COUNCIL, | ) | Case No.  1:07-cv-00484-JDB |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| H. DALE HALL, Director, United States Fish and | ) | |
| Wildlife Service, DAVID M. VERHEY, Acting Assistant | ) | |
| Secretary for Fish and Wildlife and Parks, and DIRK | ) | |
| KEMPTHORNE, Secretary of Interior, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| AUDUBON SOCIETY OF PORTLAND, CENTER FOR | ) | |
| BIOLOGICAL DIVERSITY, CONSERVATION | ) | |
| NORTHWEST, ENVIRONMENTAL PROTECTION | ) | |
| INFORMATION CENTER, GIFFORD PINCHOT TASK | ) | |
| FORCE, OREGON WILD, SEATTLE AUDUBON | ) | |
| SOCIETY, SIERRA CLUB, and THE WILDERNESS | ) | |
| SOCIETY, | ) | |
| | ) | |
| Defendant-Intervenors. | ) | |

**EXHIBITS TO DEFENDANT-INTERVENORS' OPPOSITION
TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND
CROSS-MOTION FOR SUMMARY JUDGMENT**

EXHIBITS TO DEFENDANT-INTERVENORS' OPPOSITION TO
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND
CROSS MOTION FOR SUMMARY JUDGMENT

# EXHIBIT A

Westlaw.

Not Reported in F.Supp.2d                                                    Page 1

Not Reported in F.Supp.2d, 2006 WL 1720496 (D.Or.)

**(Cite as: Not Reported in F.Supp.2d)**

**Coos County** Bd. of County Com'rs v. Norton
D.Or.,2006.
Only the Westlaw citation is currently available.
United States District Court,D. Oregon.
**COOS COUNTY** BOARD OF COUNTY
COMMISSIONERS, Plaintiff,
v.
Gale A NORTON, et al., Defendants.
**No. 06-6010-HO.**

June 19, 2006.

Jill S. Gelineau, Schwabe Williamson & Wyatt, PC, Portland, OR, Robin L. Rivett, Pacific Legal Foundation, Bellevue, WA, Scott Andrew Shepard, Pacific Legal Foundation, Sacramento, CA, for Plaintiff.
Courtney O'Hara Taylor, U.S. Department of Justice, Washington, DC, for Defendants.

ORDER

MICHAEL R. HOGAN, District Judge.
**\*1** Alleging violations of the Endangered Species Act (ESA) and the Administrative Procedure Act (APA), plaintiffs seek to compel defendants to publish in the Federal Register proposed and final rules to remove the Washington, Oregon and California population of the marbled **murrelet** (the **murrelet**) from the list of threatened species. *See* 16 U.S.C. § 1533(c)(1). Defendants filed a motion to dismiss under Rules 12(b)(1) or 12(b)(6) of the Federal Rules of Civil Procedure. The court lacks jurisdiction over plaintiffs' claims. In the alternative, the complaint fails to state a claim upon which relief may be granted. Defendants' motion is therefore granted.

*Discussion*

Plaintiffs allege that after defendants completed a five year review of the **murrelet**,[FN1] defendants violated the ESA and the Administrative Procedure Act (APA) by failing to publish proposed and final rules " delisting" the **murrelet**.[FN2] Defendants argue that the court lacks jurisdiction over plaintiffs' claims and plaintiffs fail to state a claim because the complaint does not allege the failure to perform an act or duty required by 16 U.S.C. § 1533.

FN1. The Fish and Wildlife Service found that the Washington, Oregon and California marbled **murrelet** population does not satisfy the criteria for designation as a distinct population segment (DPS) under the Service's 1996 DPS policy. Complaint, ex. 1, attachment A at 28. The Service determined not to change the threatened status of the species pending the completion of a range-wide status review. *Id.*

FN2. Specifically, plaintiffs allege that defendants violated 16 U.S .C. § (b)(3)(B)(ii), (b)(5)(A), (b)(6)(A) and by extension, (c)(2). Section 1533(c)(2) requires that the Secretary, at least once every five years, conduct a review of listed species and determine whether species should be removed from the lists or changed in status. The determination must be made in accordance with the provisions of subsections 1533(a) and (b). 16 U.S.C. § 1533(c)(2). Section 1533(b)(3)(B)(ii) requires that the Secretary, after finding that a petitioned action is warranted, " promptly publish in the Federal Register a general notice and the complete text of a proposed regulation to implement such action in accordance with paragraph (5) ." Section 1533(b)(5) provides in part,
With respect to any regulation proposed by the Secretary to implement a determination, designation, or revision referred to in subsection (a)(1) or (3) of this section, the Secretary shall-
(A) not less than 90 days before the effective date of the regulation-
(i) publish a general notice and the complete text of the proposed regulation in the Federal Register, and
(ii) give actual notice of the proposed regulation (including the complete text of the regulation) to the
State agency in each State in which the species is believed to occur, and to each county or equivalent jurisdiction in which the species is believed to occur, and invite the comment of such agency, and each such jurisdiction, thereon[.]
16 U.S.C. § 1533(b)(5). Section

1533(b)(6)(A) provides, Within the one-year period beginning on the date on which general notice is published in accordance with paragraph (5)(A)(i) regarding a proposed regulation, the Secretary shall publish in the Federal Register-

(i) if a determintion as to whether a species is an endangered species or a threatened species, or a revision of critical habitat, is involved, either-

(I) a final regulation to implement such determination,

(II) a final regulation to implement such revision or a finding that such revision should not be made,

(III) notice that such one-year period is being extended under subparagraph (B)(i), or

(IV) notice that the proposed regulation is being withdrawn under subparagraph (B)(ii), together with the finding on which such withdrawal is based; or

(ii) subject to subparagraph (C), if a designation of critical habitat is involved, either-

(I) a final regulation to implement such designation, or

(II) notice that such one-year period is being extended under such subparagraph.

16 U.S.C. § 1533(b)(6)(A).

Under subsection (b)(3) of section 1533 upon which plaintiffs rely, the Secretary need publish a proposed regulation only after receiving a petition to add or remove species from the lists of threatened and endangered species and making certain findings. 16 U .S.C. § 1533(b)(3). The complaint does not allege that plaintiffs submitted a petition to remove the **murrelet** from the list of threatened species. Plaintiffs do not dispute defendants' contention that plaintiffs did not file such a petition. Plaintiffs instead contend that the five-year review process of subsection (c)(2) substitutes for the petition process of subsection (b)(3). Pls' Memo. at 8. Plaintiffs' interpretation finds no support in the plain language of either subsection.

Plaintiffs make a structural argument that the subsection (c)(2) species review process must substitute for the subsection (b)(3)(A) petition process, else the Secretary might be required to needlessly duplicate effort when a petition is filed after completion of species review under subsection (c)(2).[FN3] This argument contemplates a scenario not

before the court and in any event is not strong enough to overcome the plain language of the statute. The Secretary need complete the status review contemplated by subsection (b)(3)(A) only if he first finds that the petition presents substantial information indicating that the petitioned action may be warranted. 16 U.S.C. § 1533(b)(3)(A). If the petition presents information considered in the subsection (c)(2) species review, little extra effort may be required to complete a subsection (b)(3)(A) status review. If the petition presents new information, extra effort is properly expended on the subsection (b)(3)(A) status review. The court rejects plaintiff's argument that in the absence of a petition, the Secretary must take actions mandated by subsection (b)(3) after completing the species review and determinations required by subsection (c)(2).

FN3. *See* 16 U.S.C. § 1533(b)(3)(A) (providing that if the Secretary finds that a petition presents substantial scientific or commercial information indicating that action may be warranted, the Secretary shall commence a review of the status of the species concerned).

**\*2** Because plaintiffs have not alleged or demonstrated that they filed a petition, they cannot establish that the Secretary has a duty under Section 1533(b)(3)(B)(ii) to publish a proposed regulation in accordance with paragraph (5). It follows that there can be no duty to publish a final regulation. 16 U.S.C. § 1533(b)(6)(A). Because the complaint identifies no duty or act required by Section 1533, the court lacks jurisdiction under the ESA and APA. 16 U.S.C. § 1540(g); *Califano v. Sanders,* 430 U.S. 99, 107 (1977). In the alternative, plaintiffs' failure to allege required action is fatal to their claims for violation of 16 U.S.C. 1533(b)(3) and (c)(2) and 5 U.S.C. § 706(1).

*Conclusion*

Based on the foregoing, defendant's motion to dismiss [# 6] is granted. This action is dismissed.

IT IS SO ORDERED.

D.Or.,2006.
Coos County Bd. of County Com'rs v. Norton
Not Reported in F.Supp.2d, 2006 WL 1720496 (D.Or.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                              Page 3
Not Reported in F.Supp.2d, 2006 WL 1720496 (D.Or.)
**(Cite as: Not Reported in F.Supp.2d)**

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT B

RECEIVED

1  Mark C. Rutzick, OSB # 84336
   Mark C. Rutzick, P.C.
2  870 Pioneer Tower
   888 S.W. Fifth Avenue
3  Portland, OR 97204
   (503) 243-2710
4        Attorney for Plaintiffs

5

6                    IN THE UNITED STATES DISTRICT COURT

7                         FOR THE DISTRICT OF OREGON

8  AMERICAN FOREST RESOURCE          )   Civil No. 02 - 6087 - AA
9  COUNCIL, an Oregon nonprofit corporation; )
   STARFIRE LUMBER COMPANY, an        )
10 Oregon corporation; HERBERT LUMBER )   COMPLAINT
   COMPANY, an Oregon corporation; C & D )
11 LUMBER CO., an Oregon corporation,  )   (Action for Declaratory and Injunctive
                                        )   Relief to Remedy Violations of
12                          Plaintiffs, )   Endangered Species Act and National
                                        )   Environmental Policy Act)
13              vs.                      )
                                        )
14 SECRETARY OF INTERIOR,               )
                                        )
15                          Defendant.  )
   _____)

16

17        For their complaint herein, plaintiffs allege as follows:

18                            **INTRODUCTION**

19        1.    This is an action for declaratory and injunctive relief against the Secretary of Interior

20 to remedy violations of the  Endangered Species Act (ESA), 16 U.S.C.§§1531 et seq. and the

21 National Environmental Policy Act (NEPA), §§4321 et seq. by the United States Fish and Wildlife

22 Service (FWS) concerning the Washington/Oregon/California population of marbled murrelets,

23 which was listed as a threatened species on October 1, 1992.  57 Fed. Reg. 45328.

24                       **JURISDICTION AND VENUE**

25        2.    This Court has jurisdiction over this action under16 U.S.C. §1540(c) and (g) and 28

26 U.S.C. § 1331 (federal question).  Venue in this district is proper under16 U.S.C. §1540(g) because

Page   1 -   COMPLAINT

Mark C. Rutzick, P.C.
870 Pioneer Tower
888 S.W. Fifth Avenue
Portland, OR 97204
(503) 243-2710 • Fax(503) 243-2717
Email: rutrickpc@aol.com

1   the violations occurred in this district. Venue in this district is proper under 28 U.S.C. § 1391(e)

2   because a substantial part of the events or omissions giving rise to the claims occurred in this district,

3   and plaintiffs reside in this district.

### PARTIES

5       3.      Plaintiff American Forest Resource Council (AFRC), a nonprofit corporation

6   organized under the laws of the state of Oregon, is a forest products trade association located in

7   Portland, Oregon which represents approximately 100 forest product manufacturing companies and

8   landowners throughout the states of Oregon, Washington, California, Idaho, Montana and elsewhere

9   in the midwestern and western United States. AFRC and its members actively participate in federal

10  agency land management decisions that involve the allocation and use of forest resources in

11  California, Oregon and Washington, including wildlife, recreation and commodity production.

12  AFRC and its members utilize all the resources of the lands managed by the Forest Service and

13  Bureau of Land Management (BLM) in those states and elsewhere, and have an interest in the

14  environmentally-sound and sustainable management of those resources.

15      4.      AFRC and its predecessors have served as the representative for the forest products

16  industry on major regional federal land management decisions since 1986.   AFRC collects

17  information about the environmental, economic and social impacts of these major federal land

18  management decisions, and disseminates this information to its members and participants, to public

19  officials and to thousands of members of the public that are directly affected by these decisions.

20      5.      One of AFRC's primary purposes is to represent the interests of its members on

21  matters relating to federal timber supply. Many of AFRC's members purchase or seek to purchase

22  timber sales sold by the Forest Service and BLM in the coastal portions of Oregon, California and

23  Washington that contain forests used or potentially used by marbled murrelets.   Many of AFRC's

24  members have been unable to purchase timber sales required to supply raw materials for their

25  manufacturing facilities as a result of restrictions on land management by the Forest Service and

26  BLM stemming from the listing of the Washington/Oregon/California population of marbled

Page    2 -    COMPLAINT

Mark C. Rutzick, P.C.
870 Pioneer Tower
888 S.W. Fifth Avenue
Portland, OR 97204
(503) 243-3710 ● Fax (503) 243-2717
E-mail: rutzickpc@aol.com

1    murrelets and the subsequent designation of critical habitat for the species.

2         6.    AFRC also represents the interests of its members who own private timberlands,

3    including many who own private timberland in the coastal region used or potentially used by

4    marbled murrelets. Many AFRC members own parcels of timberlands that are intermingled with

5    or adjacent to the federal lands used, potentially used or designated as critical habitat for the marbled

6    murrelet. Their management of these parcels of land has been and will be directly and adversely

7    affected by the actions, failures and omissions challenged in this case. The risk of fire, disease or

8    insect infestation starting on federal land and spreading to adjoining private land will also increase.

9    These landowners  may be forced to manage their lands in a different and less environmentally

10   desirable manner in response to the actions, failures and omissions challenged in this case.

11        7.    Plaintiff Starfire Lumber Company (Starfire), based in Cottage Grove, Oregon,

12   operates a cutting sawmill that employs 60 workers who produce a wide variety of custom cut

13   products from larger dense-grain logs often occurring in mature and old-growth stands of timber that

14   may be habitat for the marbled murrelet. Starfire processes approximately 20-25 million board of

15   timber per year, primarily relying on timber sales from the Forest Service and BLM to supply its

16   mill. Its affiliate Engle Investors, Inc. purchases timber sales from the agencies and supplies logs

17   to Starfire. Starfire owns 2,400 acres of timberland in Douglas, Lane and Linn Counties, Oregon

18   adjacent to or intermingled with federal land designated as critical habitat for the marbled murrelet.

19        8.    Plaintiff Herbert Lumber Company (Herbert), based in Riddle, Oregon, operates a

20   sawmill and manufacturing facility in Riddle, Oregon and employs approximately 45 people. The

21   company processes approximately 12 million board feet of timber per year and relies heavily on

22   larger logs from mature and old-growth stands of timber that may be habitat for the marbled

23   murrelet. It manufactures secondary wood products including visual grade clears, door and window

24   trim, paneling and molding, and also produces industrial lumber. Herbert relies primarily on timber

25   sales from the Forest Service and BLM to supply its mill. Herbert owns 750 acres of timberland in

26   Douglas County, Oregon adjacent to or intermingled with federal land designated as critical habitat

Page    3 -    COMPLAINT

Mark C. Rutzick, P.C.
870 Pioneer Tower
888 S.W. Fifth Avenue
Portland, OR 97204
(503) 243-2710 ● Fax (503) 243-2717
E-mail: rutzickpc@aol.com

1  for the marbled murrelet.

2      9.    Plaintiff C & D Lumber Co. (C & D) is a manufacturer of lumber and wood products
3  located in Riddle, Oregon, where it has operated for 44 years. C & D employs 135 workers at its
4  mill and associated facilities. C & D has historically depended heavily on timber sold by the Forest
5  Service and BLM in western Oregon for the supply of raw materials needed to operate its processing
6  facility. C & D is a modern, efficient processor of timber, and with adequate timber supply could
7  continue indefinitely to provide wood products to its customers for use in building construction
8  throughout the United States. Without an adequate supply of Forest Service and BLM timber, C &
9  D faces the prospect of being forced to shut down, lay off all its employees and close its doors
10  forever. C & D owns 24,000 acres of timberland in Douglas, Coos, Jackson and Josephine Counties,
11  Oregon adjacent to or intermingled with federal land designated as critical habitat for the marbled
12  murrelet.

13      10.    Defendant Secretary of the Interior is the official charged with administration of the
14  ESA with respect to terrestrial species including the marbled murrelet. Defendant supervises the
15  FWS, which listed the Washington/Oregon/California population of marbled murrelets as a
16  threatened species, and thereafter designated critical habitat for the species.

17                          **BACKGROUND ALLEGATIONS**

18      11.    The marbled murrelet is a small, robin-sized sea bird that lives in both marine and
19  inland forested environments along the North American Pacific coast, primarily in Alaska and
20  Canada, but also in Washington, Oregon, and Northern California. The marbled murrelet spends the
21  majority of its life on the ocean. The birds travel inland to nest between April and September.

22      12.    The bird is abundant throughout its range along the Pacific with population estimates
23  ranging from 75,000 to 300,000 birds, most of which are concentrated in Alaska. 56 Fed. Reg.
24  28362, 28363 (June 20, 1991).

25      13.    On October 1, 1992 FWS published a Final Rule in the Federal Register in which it
26  "determines the Washington, Oregon and California population of the marbled murrelet

Page    4 -    COMPLAINT

Mark C. Rutzick, P.C.
870 Pioneer Tower
888 S.W. Fifth Avenue
Portland, OR 97204
(503) 243-2710 ● Fax (503) 243-2717
Email: rutzickpc@aol.com

1  (*Brachyramphus marmoratus marmoratus*) to be a threatened species pursuant to the [ESA]." 57

2  Fed. Reg. 45328. FWS explained the basis of the listing:

3      The Service has carefully assessed the best scientific and commercial data available
        and concluded that the marbled murrelet in California, Oregon , and Washington is
4      threatened due to loss of mature and old-growth forests that provide nesting habitat.
        Secondary threats include gill-net fisheries in Washington, predation, and oil spills.

5  57 Fed. Reg. at 45336.

6      14.    In    the    listing    decision,    FWS    expressed    uncertainty    whether    the

7  Washington/Oregon/California population of marbled murrelets constituted a "distinct population

8  segment" listable under the ESA:

9      At the time of proposing to list the marbled murrelet in Washington, Oregon, and
        California, the Service considered the murrelets in these States to constitute a distinct
10     population segment comprising a significant portion of the east Pacific subspecies
        of the marbled murrelet. While the Service continues to believe that existing legal
11     protection is not adequate to ensure survival of murrelets in the three-state region,
        some question remains whether the population listed in this rule qualifies for
12     protection under the Act's definition of "species."

13  57 Fed. Reg. 45330.

14     15.    FWS promised to reexamine the distinct population segment issue within 90 days of

15  the listing decision:

16     Compliance with a court order required a final decision on listing to be made at
        this time. Based on the information now available to the Service, the only
17     supportable decision that can be reached within the limit imposed by the court is
        to list the population as proposed. Nevertheless, the Service intends to reexamine
18     the basis of recognizing this population of murrelets as a "species" under the Act.
        Within 90 days, the Service will announce the results of this examination and at
19     that time may propose a regulatory change that would alter the listing of the
        murrelet as a threatened species.

20  57 Fed. Reg. 45330.

21     16.    The FWS has never performed the promised 90-day reexamination, and has never

22  conducted any review of the distinct population segment finding for the listed population since the

23  listing in 1992.

24     17.    On February 7, 1996, FWS issued a Policy Regarding the Recognition of Distinct

25  Vertebrate Population Segments Under the Endangered Species Act (1996 DPS Policy). 61 Fed.

26  Reg. 4722. The 1996 DPS Policy requires FWS to consider both the "discreteness" and the

Page    5 -    COMPLAINT

Mark C. Rutzick, P.C.
870 Pioneer Tower
888 S.W. Fifth Avenue
Portland, OR 97204
(503) 243-2710 • Fax (503) 243-2717
E-mail: rutzickpc@aol.com

1    "significance" of a population segment to determine whether it is "distinct" for purposes of a

2    proposed listing:

3        Discreteness: A population segment of a vertebrate species may be considered discrete
     if it satisfies either one of the following conditions:

4    1.  It is markedly separated from other populations of the same taxon as a consequence
     of physical, physiological, ecological, or behavioral factors. ...

5    2.  It is delimited by international governmental boundaries within which differences in
     control of exploitation, management of habitat, conservation status, or regulatory

6    mechanisms exist that are significant in light of section 4(a)(1)(D) of the Act.
     Significance: If a population segment is considered discrete under one or more of the

7    above conditions, its biological and ecological significance will then be considered in
     light of Congressional guidance (see Senate Report 151, 96th Congress, 1st Session) that

8    the authority to list DPS's be used " * * *sparingly" while encouraging conservation of
     genetic diversity.  In carrying out this examination, the Services will consider available

9    scientific evidence of the discrete population segment's importance to the taxon to which
     it belongs.  This consideration may include, but is not limited to, the following:

10   1.  Persistence of the discrete population segment in an ecological setting unusual or
     unique for the taxon,

11   2.  Evidence that loss of the discrete population segment would result in a significant gap
     in the range of a taxon,

12   3.  Evidence that the discrete population segment represents the only surviving natural
     occurrence of a taxon that may be more abundant elsewhere as an introduced population

13   outside its history range, or
     4.  Evidence that the discrete population segment differs markedly from other populations

14   of the species in its genetic characteristics.

15   61 Fed. Reg at 4725.  The 1996 Policy promised that existing DPS listings "will be evaluated on a

16   case-by-case basis as recommendations are made to change the listing status for that distinct

17   population segment.  The appropriate application of the policy will also be considered in the 5-year

18   reviews of the status of listed species required by section 4(c)(2) of the Act."  61 Fed. Reg. 4725.

19       18.    FWS has never reviewed the Washington/Oregon/California population of marbled

20   murrelets to determine if it is a listable distinct population segment (DPS) under the 1996 Policy.

21   Such a review if conducted would show that the Washington/Oregon/California population of

22   marbled murrelets is neither discrete nor significant under the 1996 DPS Policy.

23       19.    The ESA directs the Secretary to designate "critical habitat" for a listed species after

24   following a specified procedure:

25       The Secretary shall designate critical habitat, and make revisions thereto, under
     subsection (a)(3) of this section on the basis of the best scientific data available and after

26   taking into consideration the economic impact, and any other relevant impact, of
     specifying any particular area as critical habitat.  The Secretary may exclude any area

Page    6 -    COMPLAINT

Mark C. Rutzick, P.C.
870 Pioneer Tower
888 S.W. Fifth Avenue
Portland, OR 97204
(503) 243-2710 ● Fax (503) 243-2717
E-mail: rutzickpc@aol.com

1    from critical habitat if he determines that the benefits of such exclusion outweigh the
benefits of specifying such area as part of the critical habitat, unless he determines, based
2    on the best scientific and commercial data available, that the failure to designate such area
as critical habitat will result in the extinction of th species concerned.

3    16 U.S.C. § 1533(b)(2).

4         20.    On May 24, 1996 the FWS designated approximately 3,887,800 acres of federal, state,

5    county, city and private lands as critical habitat for the Washington/Oregon/California marbled

6    murrelet population. 61 Fed. Reg. 26255, 26269 (May 24, 1996). To evaluate the economic effects

7    of the designation as required under 16 U.S.C. §1532(b)(2), the FWS relied upon a "baseline

8    approach" which ignored all the economic effects of the prior decision to list the population as

9    threatened, and only examined incremental economic effects resulting directly from the critical

10    habitat designation:

11         The Service contracted with ECONorthwest, a consulting firm in Eugene,
Oregon, to conduct an economic analysis of the potential economic effects of
12         designating critical habitat for the marbled murrelet. As required by the Act, the
report addresses only the incremental economic consequences of the proposed
13         critical habitat. It does not address the consequences of listing the species or
other actions that have been proposed or taken to protect marbled murrelets prior
14         to this designation.

15    61 Fed. Reg. at 26268. Using the baseline approach, the FWS found that "[t]he overall net effect

16    [of the designation] is expected to be close to zero." 61 Fed. Reg. at 26268. By ignoring the

17    economic effects of the prior listing of the Washington/Oregon/California population of marbled

18    murrelets, FWS vastly understated the true economic effects of conferring ESA protection on that

19    population.

20         21.    The Council on Environmental Quality (CEQ) regulations implementing NEPA, which

21    are binding on defendant Secretary of Interior, require that unless a federal agency has already

22    determined that it is required to prepare an environmental impact statement (EIS) under NEPA, 42

23    U.S.C. § 4332(2)(C), the agency must prepare an environmental assessment (EA) to determine if a

24    proposed action is likely to significantly impact the environment and therefore require preparation

25    of an EIS. 40 C.F.R. §§ 1501.4(b), 1508.9. The FWS did not prepare either an EA or an EIS for the

26    May 24, 1996 designation of critical habitat for the Washington/Oregon/California population of

Page    7 -   COMPLAINT

Mark C. Rutzick, P.C.
870 Pioneer Tower
888 S.W. Fifth Avenue
Portland, OR 97204
(503) 243-2710 ▪ Fax (503) 243-2717
E-mail: rutzickpc@aol.com

1 marbled murrelets, based on its determination that compliance with NEPA is not required for a

2 critical habitat designation:

> The Service has determined that Environmental Assessments and
> Environmental Impact Statements, as defined under the authority of the
> National Environmental Policy Act of 1969, need not be prepared in
> conjunction with regulations adopted pursuant to section 4(a) of the
> Endangered Species Act of 1973, as amended.

6 61 Fed. Reg. at 25277. In *Catron County Board of Commissioners v. United States Fish and*

7 *Wildlife Service*, 75 F.3d 1429, 1436 (10th Cir. 1996), decided prior to May 24, 1996, the court held

8 that NEPA compliance is required for a critical habitat designation. The Tenth Circuit disagreed

9 with the Ninth Circuit's earlier contrary decision in *Douglas County v. Babbitt*, 48 F.3d 1495, 1507

10 (9th Cir. 1995), *cert. denied*, 516 U.S. 1042 (1996). FWS chose to ignore the *Catron County Board*

11 *of Commissioners* decision and to adhere to the Ninth Circuit's view that NEPA compliance is not

12 required for a critical habitat designation.

13      22.      The actions, failures and omissions described above are causing current and threatened

14 injury to plaintiffs, who have no remedy at law for these injuries.

15                            **Claims for Relief**

16                     **FIRST CLAIM FOR RELIEF**
                  **(Violation of 16 U.S.C. §1533(c)(2) -**
17          **Failure to Conduct Five Year Review of Species Status)**

18      23.      Plaintiffs repeat and reallege the allegations in paragraphs 1-22 as if fully set forth

19 herein.

20      24.      Section 4(c) of the ESA, 16 U.S.C. §1533(c) directs the Secretary of the Interior to

21 "publish in the Federal Register a list of all species determined by him or the Secretary of Commerce

22 to be endangered species and a list of all species determined by him or the Secretary of Commerce

23 to be threatened species," 16 U.S.C. §1533(c)(1), and then states:

24      (2) The Secretary shall --
                  (A) conduct, at least once every five years, a review of all species included in a
25          list published pursuant to paragraph (1) and which is in effect at the time of such
            review; and
26          (B) determine on the basis of such review whether any such species should --
                  (i) be removed from such list;

Page      8 -      COMPLAINT

Mark C. Rutzick, P.C.
870 Pioneer Tower
888 S.W. Fifth Avenue
Portland, OR 97204
(503) 243-2710 • Fax (503) 243-2717
E-mail: rutzickpc@aol.com

1        (ii) be changed in status from an endangered species to a
         threatened species; or
2        (iii) be changed in status from a threatened species to an
         endangered species.

3

4    Each determination under subparagraph (B) shall be made in accordance with the
     provisions of subsections (a) and (b) of this section.

5        25.    The FWS has never conducted a review of the Washington/Oregon/California

6    population of marbled murrelets since its listing on October 1, 1992 to determine if the species

7    should be removed from the list of threatened and endangered species or changed in status from a

8    threatened species to an endangered species. Further, the FWS' failure to conduct a five year review

9    of the Washington/Oregon/California population of marbled murrelets has also resulted in its failure

10   to reexamine the DPS determination for the population under the 1996 DPS Policy because the 1996

11   DPS Policy promised to reexamine existing DPS determinations for listed species during the five

12   year review of those species. The failure to conduct a five year review of the

13   Washington/Oregon/California population of marbled murrelets since the population was listed on

14   October 1, 1992 violates 16 U.S.C. §1533(c)(2) and therefore constitutes the failure of the Secretary

15   to perform an act or duty under 16 U.S.C. §1533 which is not discretionary with the Secretary,

16   entitling plaintiffs to relief under 16 U.S.C. §1540(g). Plaintiffs are also entitled to relief under 5

17   U.S.C. § 706(1).

18                          **SECOND CLAIM FOR RELIEF**
                            **(Violation of 16 U.S.C. §1533(b)(2) –**
19       **Failure to Perform Legally Adequate Economic Effects Analysis**
                     **In Making Critical Habitat Designation)**
20       26.    Plaintiffs repeat and reallege the allegations in paragraphs 1-22 as if fully set forth

21   herein.

22       27.    The FWS "baseline approach" to economic effects analysis used in the May 24, 1996

23   designation of critical habitat for the Washington/Oregon/California population of marbled murrelets

24   is unlawful. In *New Mexico Cattle Growers Association v. United States Fish and Wildlife Service*,

25   248 F.3d 1277 (10th Cir. 2001), the court held:

26       Because economic analysis done using the FWS's baseline model is rendered
         essentially without meaning by 50 C.F.R. §402.02, we conclude Congress

Page    9 -    COMPLAINT

Mark C. Rutzick, P.C.
870 Pioneer Tower
888 S.W. Fifth Avenue
Portland, OR 97204
(503) 243-2710 ■ Fax (503) 243-2717
E-mail: rutzickpc@aol.com

1    intended that the FWS conduct a full analysis of all of the economic impacts of
     a critical habitat designation, regardless of whether those impacts are attributable
2    co-extensively to other causes. Thus, we hold the baseline approach to economic
     analysis is not in accord with the language or intent of the ESA.
3
     As set forth above, the baseline approach to economic analysis pursuant the [*sic*]
4    16 U.S.C. 1533(b)(2) is expressly rejected.

5    *Id.* at 1285.  The baseline approach to economic effects analysis used in the designation of critical

6    habitat for the Washington/Oregon/California population of marbled murrelets is identical to the

7    baseline approach rejected in *New Mexico Cattle Growers Association*, and violates the ESA for the

8    same reasons as stated by the court in that case.  The May 24, 1996 critical habitat designation

9    violated 16 U.S.C. § 1533(b)(2) because it lacked a legally adequate economic effects analysis and

10   therefore was not made "after taking into consideration the economic impact, and any other relevant

11   impact, of specifying any particular area as critical habitat." *Id.*

12       28.    The May 24, 1996 designation of critical habitat for the Washington/Oregon/California

13   population of marbled murrelets made without a legally adequate economic effects analysis in

14   violation of 16 U.S.C. §1533(b)(2) constitutes the failure of the Secretary to perform an act or duty

15   under 16 U.S.C. §1533 which is not discretionary with the Secretary, entitling plaintiffs to relief

16   under 16 U.S.C. §1540(g), and is arbitrary and capricious, an abuse of discretion, not in accordance

17   with law, without observance of procedure required by law, in excess of statutory authority and short

18   of statutory right under 5 U.S.C. § 706(2).

19                          **THIRD CLAIM FOR RELIEF**
                              **(Violation of NEPA --**
20                          **Failure to prepare EA or EIS)**

21       29.    Plaintiffs repeat and reallege the allegations in paragraphs 1-22 as if fully set forth

22   herein.

23       30.    FWS    violated    NEPA    by    designating    critical    habitat    for    the

24   Washington/Oregon/California population of marbled murrelets on the May 24, 1996 without

25   preparing an EA or EIS for the designation.

26       31.    The FWS' failure to prepare an EA or EIS is arbitrary and capricious, an abuse of

Page     10 -    COMPLAINT

Mark C. Rutzick, P.C.
870 Pioneer Tower
888 S.W. Fifth Avenue
Portland, OR 97204
(503) 243-3710 ● Fax (503) 243-2717
E-mail rutzickpc@aol.com

1    discretion, not in accordance with law, without observance of procedure required by law, in excess

2    of statutory authority and short of statutory right under 5 U.S.C. § 706(2).

3                              **FOURTH CLAIM FOR RELIEF**
                              **(Arbitrary and capricious conduct –**
4                    **Failure to explain decision not to prepare EA or EIS)**

5        32.    Plaintiffs repeat and reallege the allegations in paragraphs 1-22 as if fully set forth herein.

6        33.    If the designation of critical habitat for the Washington/Oregon/California population of

7    marbled murrelets had occurred for a species within the geographic region encompassed by the Tenth

8    Circuit Court of Appeals, FWS would have been required to prepare an EA or EIS under *Catron*

9    *County Board of Commissioners v. United States Fish and Wildlife Service*, 75 F.3d 1429. Agencies,

10   including FWS, may choose to prepare an EA or EIS for a proposed action even if such a document

11   is not required under NEPA.  Although *Catron County* was decided before FWS issued the

12   designation of critical habitat for the Washington/Oregon/California population of marbled

13   murrelets, FWS did not discuss the *Catron County* decision in the murrelet critical habitat

14   designation, did not explain why it chose to follow the Ninth Circuit precedent rather than *Catron*

15   *County*, and did not explain the basis for its apparent – and irrational – policy to conduct two

16   diametrically different tracks of NEPA compliance in different regions of the country.  These

17   omissions render the FWS' failure to prepare an EA or EIS for the May 24, 1996 designation of

18   critical habitat for the Washington/Oregon/California population of marbled murrelets arbitrary and

19   capricious, an abuse of discretion, not in accordance with law, without observance of procedure

20   required by law, in excess of statutory authority and short of statutory right under 5 U.S.C. § 706(2).

21                              **FIFTH CLAIM FOR RELIEF**
                              **(Arbitrary and capricious conduct;**
22              **agency action unlawfully withheld or unreasonably delayed –**
                    **Failure to conduct 90-day reexamination of DPS status)**
23       34.    Plaintiffs repeat and reallege the allegations in paragraphs 1-22 as if fully set forth herein.

24       35.    FWS has never fulfilled its promise in the Federal Register on October 1, 1992 to

25   "reexamine the basis of recognizing this population of murrelets as a 'species' under the Act," 57

26   Fed. Reg. 45330, or its promise that "[w]ithin 90 days, the Service will announce the results of this

Page      11 -    COMPLAINT

Mark C. Rutzick, P.C.
870 Pioneer Tower
888 S.W. Fifth Avenue
Portland, OR 97204
(503) 243-1710 ● Fax (503) 243-1711
E-mail: rutzickpc@aol.com

1    examination." *Id.* FWS has never conducted such a reexamination of the basis for recognizing the

2    Washington/Oregon/California population of marbled murrelets as a "species" under the ESA.

3        36.    The failure of the FWS for more than nine years to conduct the reexamination it promised

4    within 90 days is arbitrary and capricious and an abuse of discretion under 5 U.S.C. § 706(2), and

5    constitutes "agency action unlawfully withheld or unreasonably delayed," entitling plaintiffs to relief

6    under 5 U.S.C. §706(1).

7    **SIXTH CLAIM FOR RELIEF**
     **(Arbitrary and capricious conduct;**

8    **agency action unlawfully withheld or unreasonably delayed –**
     **Failure to reexamine DPS status under 1996 DPS Policy)**

9        37.    Plaintiffs repeat and reallege the allegations in paragraphs 1-22 as if fully set forth herein.

10        38.    In the more than six years since the 1996 DPS Policy was announced, FWS has never

11    reviewed the listing of the Washington/Oregon/California population of marbled murrelets to

12    determine if that listing is consistent with the Policy. The 1996 DPS Policy provided that "[t]he

13    appropriate application of the policy [to existing DPS listings] will ... be considered in the 5-year

14    reviews of the status of listed species required by section 4(c)(2) of the Act." 61 Fed. Reg. 4725.

15    The FWS' unlawful failure to conduct a five year review of the Washington/Oregon/California

16    population of marbled murrelets has contributed to its failure to reexamine the DPS determination

17    for the population under the 1996 DPS Policy.

18        39.    The failure of the FWS to reexamine the DPS determination for the

19    Washington/Oregon/California population of marbled murrelets under the 1996 DPS Policy is

20    arbitrary and capricious and an abuse of discretion under 5 U.S.C. § 706(2), and constitutes "agency

21    action unlawfully withheld or unreasonably delayed," entitling plaintiffs to relief under 5 U.S.C.

22    §706(1).

23    <u>**PRAYER FOR RELIEF**</u>

24    WHEREFORE, plaintiffs pray for judgment as follows:

25        1.    A declaration that:

26        a.    The failure of the FWS to conduct a five year review of the status of the

Mark C. Rutzick, P.C.
870 Pioneer Tower
888 S.W. Fifth Avenue
Portland, OR 97204
(503) 243-2710 ◆ Fax (503) 243-2717
E-mail: rutzickpc@aol.com

1   Washington/Oregon/California population of marbled murrelets since the population was listed on

2   October 1, 1992 violates 16 U.S.C. §1533(c)(2) and therefore constitutes the failure of the Secretary

3   to perform an act or duty under 16 U.S.C. §1533 which is not discretionary with the Secretary and

4   also constitutes "agency action unlawfully withheld or unreasonably delayed" under 5 U.S.C.

5   §706(1).

6       b.      The May 24, 1996 designation of critical habitat for the Washington/Oregon/California

7   population of marbled murrelets violated 16 U.S.C. § 1533(b)(2) and has no force or effect because

8   it lacked a legally adequate economic effects analysis and therefore was not made "after taking into

9   consideration the economic impact, and any other relevant impact, of specifying any particular area

10  as critical habitat," *Id.*, and that this violation constitutes the failure of the Secretary to perform an

11  act or duty under 16 U.S.C. §1533 which is not discretionary with the Secretary, and is arbitrary and

12  capricious, an abuse of discretion, not in accordance with law, without observance of procedure

13  required by law, in excess of statutory authority and short of statutory right under 5 U.S.C. § 706(2).

14      c.      The FWS' failure to prepare an EA or EIS for the May 24, 1996 designation of critical

15  habitat for the Washington/Oregon/California population of marbled murrelets violates NEPA, 42

16  U.S.C. § 4332(2)(C) and the CEQ regulations, 40 C.F.R. §§ 1501.4(b), 1508.9, and therefore is

17  arbitrary and capricious, an abuse of discretion, not in accordance with law, without observance of

18  procedure required by law, in excess of statutory authority and short of statutory right under 5 U.S.C.

19  § 706(2).

20      d.      The FWS' failure to explain the basis for its decision not to prepare an EA or EIS for the

21  May 24, 1996 designation of critical habitat for the Washington/Oregon/California population of

22  marbled murrelets is arbitrary and capricious, an abuse of discretion, not in accordance with law,

23  without observance of procedure required by law, in excess of statutory authority and short of

24  statutory right under 5 U.S.C. § 706(2).

25      e.      The failure of the FWS for more than nine years to conduct the reexamination of the DPS

26  determination for the Washington/Oregon/California population of marbled murrelets that it

Page    13 -    COMPLAINT

Mark C. Rutzick, P.C.
870 Pioneer Tower
888 S.W. Fifth Avenue
Portland, OR 97204
(503) 243-4710 ● Fax (503) 243-3717
E-mail: rutzickpc@aol.com

1   promised within 90 days of October 1, 1992 is arbitrary and capricious and an abuse of discretion

2   under 5 U.S.C. § 706(2), and constitutes "agency action unlawfully withheld or unreasonably

3   delayed" under 5 U.S.C. §706(1).

4   　　f.　　The failure of the FWS to reexamine the DPS determination for the

5   Washington/Oregon/California population of marbled murrelets under the 1996 DPS Policy is

6   arbitrary and capricious and an abuse of discretion under 5 U.S.C. § 706(2), and constitutes "agency

7   action unlawfully withheld or unreasonably delayed" under 5 U.S.C. §706(1).

8   　　2.　　An equitable order applicable to the FWS and all those acting in concert with it, including

9   the Forest Service and BLM:

10   　　a.　　Directing the FWS to:

11   　　　　i.　　initiate a five year review of the status of the Washington/Oregon/California

12   population of marbled murrelets under 16 U.S.C. §1533(c)(2) within 30 days of the date of the order

13   from the court;

14   　　　　ii.　　include in the five year review a reexamination of the DPS determination for the

15   　　　　Washington/Oregon/California population of marbled murrelets under the 1996 DPS

16   　　　　Policy; and

17   　　　　iii.　　complete the five year review within 180 days of the date the review is initiated.

18   　　b.　　Remanding the May 24, 1996 designation of critical habitat for the

19   Washington/Oregon/California population of marbled murrelets to the FWS, and enjoining the FWS

20   and those acting in concert with it from enforcing, applying, following or conducting formal or

21   informal consultation under section 7 of the ESA, 16 U.S.C. §1536, on the May 24, 1996 designation

22   of critical habitat for the Washington/Oregon/California population of marbled murrelets until:

23   　　　　i.　　FWS initiates and completes a new rule-making process under 16 U.S.C.

24   §1533(a)(3) to designate critical habitat for the Washington/Oregon/California population of marbled

25   murrelets with a legally adequate economic effects analysis; and

26   　　　　ii.　　FWS prepares an EA or EIS for the proposed designation in compliance with

Page　14 -　COMPLAINT

Mark C. Rutzick, P.C.
870 Pioneer Tower
888 S.W. Fifth Avenue
Portland, OR 97204
(503) 243-3710 ● Fax (503) 243-2717
E-mail: rutzickpc@aol.com

1    NEPA, 42 U.S.C. § 4332(2)(C) and the CEQ regulations, 40 C.F.R. §§ 1501.4(b), 1508.9.

2       3.      Awarding plaintiffs their costs and attorney fees under the ESA, 16 U.S.C. § 1540(g)(4)

3    and the Equal Access to Justice Act, 28 U.S.C. § 2412; and

4       4.      Granting such other relief as the court deems just and equitable.

5    DATED this 26th day of March, 2002.

6                                   MARK C. RUTZICK, P.C.

7

8    By: _____
                                    Mark C. Rutzick, OSB #84336
                                       Attorney for Plaintiffs

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Page    15 -    COMPLAINT

Mark C. Rutzick, P.C.
870 Pioneer Tower
888 S.W. Fifth Avenue
Portland, OR 97204
(503) 243-2710 ● Fax (503) 243-2717
E-mail: rutzickpc@aol.com

# EXHIBIT C

*DRAFT*
**5-YEAR REVIEW**

April 21, 2004

Species reviewed:  Marbled Murrelet/*Brachyramphus marmoratus*

Year completed: 2004


FR Notice:    *FR Volume 68, Number 76, Document 03-9671, pages 19569 to 19571*
*FR Volume 68, Number 143, pages 44093-44094*

Lead Field Office: Oregon Fish and Wildlife Office, Region 1

Name of Reviewer(s): Paul Phifer and Brian Cox

Cooperating Field Office(s): Western Washington Fish and Wildlife Office
Arcata Fish and Wildlife Office

Lead Region: Region 1

Cooperating Regional Office(s): N/A


BACKGROUND

1.    Existing Recovery Priority Number: 3

2.    Most recent Species Status as reported to Congress in the Biennial Report:

Species Status (i.e., I, D, S, etc.)

**D**  Fiscal Yr 2003, Recovery Report to Congress Data Call

Recovery Achieved (i.e., 1, 2, 3, or 4; FWS only)

**1** Fiscal Yr 2003, Recovery Report to Congress Data Call

3.    Listing History

3. A.  Original Listing:
FR Volume 57, Number 191, pages 45328 to 45337; October 1, 1992;
Determination of Threatened Status for the Washington, Oregon, and California
Population of the Marbled Murrelet

3. B.  Revised Listing:  N/A

*Marbled Murrelet 5-Year Review*                          *DRAFT*

4.      Associated Listings:   N/A

5.      Review History:
                This is the first 5-year review for this species since publication of the 1997
                Recovery Plan.

6.      Recovery Plan or Outline:
                <u>Issuing/Lead Region</u>: Region 1, USFWS, Portland, OR.

                <u>Recovery Plan Document Citation</u>:
                U.S. Fish and Wildlife Service. 1997. Recovery plan for the threatened marbled
                murrelet (*Brachyramphus marmoratus*) in Washington, Oregon and California.
                203 pp.

        Reference Point Documents:

                Lank, D.B., N. Parker, E.A. Krebs, and L. McFarlane-Tranquilla. 2003.
                Geographic distribution, habitat selection, and population dynamics with respect
                to nesting habitat characteristics of Marbled murrelets (Brachyramphus
                marmoratus). Ctr. Wildlife Ecol. Simon Fraser University, Vancouver, British
                Columbia.

                McShane, C., T. Hamer, H. Carter, G. Swartzman, V. Friesen, D. Ainley, R.
                Tressler,  K. Nelson, A. Burger, L. Spear, T. Mohagen, R. Martin, L. Henkel, K.
                Prindle, C. Strong, and J. Keany.  2004.  Evaluation report for the 5-year status
                review of the marbled murrelet in Washington, Oregon, and California.
                Unpublished report.  EDAW, Inc. Seattle, Washington.  Prepared for the U.S.
                Fish and Wildlife Service, Region 1.  Portland, Oregon.

                U.S. Fish and Wildlife Service. 1992. Endangered and threatened wildlife and
                plants; determination of threatened status for the Washington, Oregon, and
                California population of the marbled murrelet. Federal Register Vol. 57. No.
                191:45328-45337. October 1, 1992.

                U.S. Fish and Wildlife Service. 1997. Recovery plan for the threatened marbled
                murrelet (*Brachyramphus marmoratus*) in Washington, Oregon and California.
                203 pp.

                U.S. Forest Service. 1995. Ecology and conservation of the marbled murrelet.
                Ralph, C. John, George L. Hunt, Martin G. Raphael, John F. Piatt, editors.  PSW
                Research Station, Berkeley, CA.. 420 pp.


<u>REVIEW</u>

**8. Application of the 1996 Distinct Population Segment (DPS) Policy to DPS-listings made prior to enactment of the policy**

8. A.  Prior to this 5-year review, was the DPS classification reviewed to ensure it meets the 1996 policy standards?

**No.**  The Service did not reexamine the DPS classification of the marbled murrelet (murrelet) subsequent to its original listing.  In 1992, a court found that, as the murrelet qualifies for listing as a threatened species throughout a significant portion of its range, "there is no need to consider the alternative basis of whether the tri-state population is a distinct population segment"[1].

As part of this 5-year review process, the DPS classification and listing status are assessed in light of the current regulatory status (e.g., the federal and state listings of the murrelet as threatened).

7. B.  Does the original listing meet the DPS policy with regards to the Discreteness and Significance elements of the 1996 policy?

**Yes**, see Section 13.B.

**9. New Information: Improved Analyses.**  Have any improved analytic methods resulted in relevant new information?

**Yes**, inland survey methods for murrelets have improved since the species was listed in 1992, reducing the detection error rate (i.e., classifying sites as occupied when they are unoccupied) from approximately 15% to 4%.

**10. New Information: Biology and Habitat**

10. A.  Is there relevant new information regarding the species' abundance, population trends (e.g. increasing, decreasing, stable), demographic features (e.g. age structure, sex ratio, family size, birth rate, age at mortality, mortality rate, etc.), or demographic trends?

**Yes**, there is better information on species' abundance and demographic features. Data collected in 2000-02 for the Effectiveness Monitoring Program (2003) have shown higher mean numbers of murrelets at sea in some conservation zones by 2002, however, the large confidence intervals and short time frame (i.e., only three years of data) prohibit a population trend from being scientifically deduced at this time (Table 1).  Other studies, more limited in geographic scope and with differing methodologies, have reported either no evidence of change in

---

[1] Marbled Murrelet v. Lujan, U.S. District Court, Western Washington District at Seattle. No. C91-522R. September 17, 1992.

population, a possible decline, or an actual measured decline (Table 2).  These studies also include large confidence intervals.

*Table 1*

| Region1 | Year(s) | Density birds/km$^2$ | Number of Birds$^2$ | 95% Confidence Interval | Source |
|---------|---------|---------------------|---------------------|------------------------|--------|
| **Total** | 2000 | 2.06 | 18,600 | 11,638 – 30,728 | Huff et al. 2003, Peery pers. comm. 2003 |
| **Total** | 2001 | 2.52 | 22,700 | 15,259 – 32,920 | Huff et al. 2003, Peery pers. comm. 2003 |
| **Total** | 2002 | 2.69 | 24,400 | 14,817 – 35,209 | Huff et al. 2003, Peery pers. comm. 2003 |

Source: Adapted from McShane et al. 2004

*1 Includes all of Washington, Oregon and California.*
*2 Numbers rounded to nearest 100 birds.*
*3 CZ6 was not surveyed in 2000, 2001, or 2002 under the Effectiveness Monitoring Program.  However, this zone was surveyed by Peery et al. in these years.  Values are from: Z. Peery, pers. comm., November 20, 2003 and are revised from the data presented in Peery et al. (2002 and 2003).*

*Table 2*

| Washington | 1996-1999 | Marine surveys | No evidence of change | Thompson 1997-1999 |
|-----------|-----------|----------------|----------------------|---------------------|
| | 1972-1993 | Marine surveys | Possible decline | Speich and Wahl 1995 |
| **Oregon** | 1992-1996 | Marine surveys | >50% decline | Strong 2003a |
| | 1997-2003 | Marine surveys | No clear change | Strong 2003b |
| **California** | 1995-2001 | Occupied detections | Probable decline, Santa Cruz mountains | Suddjian 2001 |

Source: adapted from Lank et al. 2003

The low fecundity levels across Washington, Oregon, and California, as determined through nest success values (i.e., the number of fledglings per breeding pair of murrelets per year), indicate a population that is not stable through reproduction (Beissinger and Peery 2003).  Unadjusted or adjusted adult:juvenile ratios detected at sea, as an indirect index of breeding success, have suggested generally low breeding success from California to southern British Columbia.  Within the 3-state range, lowest ratios were found in central California and highest ratios in Washington (Bradley 2002, Golightly et al. 2002, Peery et al. in prep.).  In general, both radio telemetry and at-sea survey methods indicate murrelet breeding success appears to decline from north to south.

10. B. Is there relevant new information regarding the species' genetics, genetic variation, or trends in genetic variation (e.g. loss of genetic variation, genetic drift, inbreeding, etc.)?

**Yes**.  Several studies produced since 1992 provide new information on murrelet genetics.  Results of a number of studies, including several types of molecular markers and varying methods of data analysis, all indicate statistically significant genetic structure exists in murrelets, with populations from California and the Aleutian Islands differing both from each other and from populations in British Columbia and mainland Alaska (McShane et al. 2004). It is important to note, however, that samples from Washington and Oregon are not included in any of these analyses, and that sample sizes from some areas in the Aleutian Islands and California are low. Genetic divergence of Aleutian and Californian populations is consistent both with the lower population sizes and densities in these areas, and with their non-central locations within the species' range.

Friesen et al. (1996a) published a preliminary analysis of genetic variation among murrelet populations as part of a taxonomic reassessment of the long-billed murrelet. They compared genetic variation among 43 murrelets sampled from the western Aleutian Islands to Oregon. No statistically significant geographic structure (i.e., population structure or population differentiation) was found.  Geographic variation in allozymes was moderate and statistically significant ($P < 0.01$), but sample sizes were too small to compare individual populations.

Friesen's ongoing study of genetic variation in murrelets involves analysis of more rapidly evolving molecular markers (5 microsatellite loci and the mitochondrial control region) from murrelets sampled between the western Aleutian Islands and central California (Friesen et al. 2003, Friesen and Piatt 2003).  Preliminary results support previous indications that significant population genetic structure exists within murrelets.  Murrelets in the Aleutian Islands have unique control region haplotypes[2], and murrelets in California have unique intron alleles and control region haplotypes (Friesen and Piatt 2003); although these haplotypes/alleles do not form distinct clades (phylogenetic groups) on the haplotype/allele trees, several occur at high frequency.

Congdon et al. (2000) compared sequence variation in 9 nuclear introns among 120 murrelets sampled between the western Aleutian Islands and northern British Columbia, and found moderate and statistically significant population structure. In pairwise comparisons of populations, murrelets from the Aleutian Islands were significantly differentiated from those elsewhere (most $P < 0.05$), whereas little or no differentiation was apparent among populations between the Alaskan Peninsula and northern British Columbia.  Most genetic data for murrelets also demonstrate a significant isolation-by-distance effect[3], with pairwise estimates of

---

[2]'Haplotypes' are variants (~ alleles) of non-recombining, haploid genomes such as vertebrate mtDNA.

[3]Isolation by distance is an increase in genetic divergence with increasing geographic distance between populations, usually attributed to a decrease in gene flow with distance.

$F_{st}$ increasing with geographic distance between population pairs (Mantel's tests, $P < 0.05$) (Congdon et al. 2000).

Genetic variability in all types of markers that have been screened in murrelets is similar to other species, with no evidence of either population genetic bottlenecks or inbreeding (McShane et al. 2004). Inbreeding depression and interspecific hybridization are not an immediate threat. Genetic variation in neutral molecular markers in murrelets is similar to that in other species of seabirds, including several species with large and/or increasing population sizes; thus, population-level variation is not an immediate concern (McShane et al. 2004).

10. C.  Is there relevant new information regarding taxonomic classification or changes in nomenclature?

**Yes**, the AOU recognized the marbled and long-billed murrelets as separate species in 1997. Until 1997, long-billed murrelets, mostly found in northeastern Asia, and marbled murrelets were considered to be 2 races of the same species, despite morphological distinctions. Genetic research indicates marbled and long-billed murrelets are genetically distinct and have probably been reproductively isolated for 5-6 million years (Friesen et al. 1996b).

10. D.  Is there relevant new information regarding the species' spatial distribution, trends in spatial distribution (e.g. increasingly fragmented, increased numbers of corridors, etc.), or historic range (e.g. corrections to the historical range, change in distribution of the species' within its historic range, etc.)?

**Yes**, there is new information which corroborates the descriptions of murrelet distributions and historic ranges detailed in the 1992 listing.

Information indicates most murrelets nest within 37 miles (60 km) of the coast (Miller and Ralph 1995); the Service (1997) considers 50 miles (80 km) as the maximum inland distance for determining habitat suitability and amount within the listed range. Commuting distances are, however, extremely variable, with birds in Washington tending to commute larger distances than those in Oregon and California. In Washington, occupied habitat has been documented 52 miles (84 km) from the coast; a grounded murrelet fledgling was found 62 miles (100 km) from the ocean, the maximum inland distance murrelets have been found within the listed range (Hamer 1995).

10. E.  Is there relevant new information addressing habitat or ecosystem conditions (e.g. amount, distribution, and suitability of the habitat or ecosystem)?

**Yes**, based on available information in the 3-state area, it is estimated there are currently 2,223,048 acres of suitable murrelet nesting habitat (McShane et al.

*Marbled Murrelet 5-Year Review*                    *DRAFT*

2004).  The estimate of suitable habitat for Washington and California is fairly complete for most land ownerships; however, the estimate does not include suitable habitat on privately owned lands in Oregon and does not account for some private lands in Washington.

Based on the current estimate, about 91% of murrelet suitable habitat is located on Federal land; State, County, and private lands account for about 8%; and Tribal lands contain about 1% (McShane et al. 2004).  About 47% of the suitable habitat occurs in Washington, 35% in Oregon, and 18% in California.

During and since the listing, there have been other estimates of suitable murrelet habitat in Washington, Oregon, and California, Table 3.

*Table 3.  Estimates of old-growth/suitable murrelet habitat within the listed range, 1992-2003.*

| | Est. of Suitable Murrelet Habitat (ac) | | |
| Year and Source | Washington & Oregon | California | Total |
|---|---|---|---|
| **1992**<br>Source:  the Service (1992), based on acres of old growth in WA & OR | 3,400,000 | No estimate provided | 3,400,000 |
| **1994**<br>Source:  USFS and BLM (1994), based on spotted owl habitat requirements | N/A | N/A | 2,500,000 |
| **1995**<br>Source:  Perry (1995) | 1,542,996 | 819,472 | 2,362,469 |
| **1996**<br>Source:  the Service (1996), based on acres of old-growth forest in WA & OR and acres of old-growth coastal redwood in CA | 3,400,000 | 70,000 | 3,470,000 |
| **2003**<br>Source:  McShane et al. 2004 | 1,829,462 | 393,586 | 2,223,048 |

Adapted from McShane et al. 2004                    *N/A – not applicable*

Some administrative units use northern spotted owl habitat definitions as a surrogate for murrelet habitat.  Because northern spotted owl habitat is often defined at 80 years old and murrelet habitat typically does not develop by that time, the current estimate of 2.2 million acres is almost certainly an overestimate of suitable habitat for those ownerships reporting acres.  Extrapolating from survey results, it is estimated about 820,768 acres, or 34% of the estimated suitable habitat, is likely to be occupied by murrelets (McShane et al. 2004).

Murrelets are thought to be highly vulnerable to nest predation (U.S. Fish and Wildlife Service 1997).  While the extent of the effects of forest modification on murrelet nest success or how these effects may have changed since the 1992 listing is not known, in murrelet nests with known outcomes, predation has

consistently been the most significant cause of nest failure.  The factors affecting rates of predation on murrelet nests (suspected to be the primary type of predation, though adult predation does occur) are not fully clear, yet key elements seem to be proximity to humans, abundance of avian predators, and proximity and type of forest edge to the nest (McShane et al. 2004).  Most active murrelet nests in Washington, Oregon, and California have failed (42-85%)(Table 4), and 17 of 23 (74%; Nelson pers. comm. 2004) of these failures have resulted from predation (based on nests in which is was possible to determine if predation was a factor) (Nelson and Hamer 1995, Hamer and Meekins 1999, Manley and Nelson 1999, Hebert and Golightly 2003, Nelson and Wilson 2002, Peery et al. in prep.).  In a study of artificial nests in Washington and Oregon, 81-86% were disturbed or depredated (Marzluff et al. 1999, Luginbuhl et al. 2001).

*Table 4.   Number of successful and failed murrelet nests by state[1].*

| Location | Number of Successful Nests | Number of Failed Nests | | | Total Nests | Nest Failure Rate |
|---|---|---|---|---|---|---|
| | | Eggs Lost | Chicks Lost | Total Failed Nests | | |
| Washington[2] | 4 | 1 | 2 | 3 | 7 | 42% |
| Oregon[3] | 9 | 4 | 8 | 12 | 21 | 57% |
| California[4] | 8 | 32 | 13 | 45 | 53 | 85% |
| **Total** | **21** | **37** | **23** | **60** | **81** | **61%** |

Source: Adapted from McShane et al. 2004

[1] *Includes only nests with known outcomes and known stage of failure.*
[2] *Sources: Sources: Hamer and Meekins 1999, Washington Department of Fish and Wildlife, unpubl.*
[3] *Sources: Hamer and Nelson 1995, Nelson and Wilson 2002, unpubl.*
[4] *Sources: Singer et al. 1995, Singer et al. 1997, Hebert and Golightly 2003, Peery et al. in prep.; Burkett 2004 pers. comm.*

## 11. New Information: Threats

11. A.  Is there relevant new information regarding the magnitude or imminence of previously identified threats to the species?

**Yes.**

- Several threats have decreased since the listing (McShane et al. 2004).  These include:
  - The rate of annual habitat loss, particularly on Federal lands, has declined.
  - The adequacy of regulatory mechanisms has improved due to the federal and state listings and other state and federal regulation, especially the Northwest Forest Plan. In this 5-year review, the inadequacy of regulatory mechanisms threat situation is assessed in light of the existing regulatory status.

- o New gill-netting regulations in northern California and Washington have reduced the threat to murrelets.

- Some threats are continuing or there is insufficient information to determine whether a change in magnitude or imminence has occurred (McShane et al. 2004). These include:
  - o The historic loss/modification of habitat has not been offset by development of new habitat.
  - o There is more information confirming the high threat predation poses to the murrelet (see information below), however, there is no direct evidence that predation on adult murrelets and murrelet nests has increased in severity since the listing.[4]
  - o Threats from oil spills continue but are unpredictable and effects are variable.

11. B.  Is there relevant new information regarding new threats to the species?

    **No.**

## 12.  New Information: Conservation Efforts

12. A.  Is there relevant new information regarding implementation of conservation measures that benefit the species?

    **Yes.**  The Northwest Forest Plan was implemented in 1994 and encompasses most of the range of the murrelet in the 3-state area. The murrelet Recovery Plan (1997:88) states the Northwest Forest Plan, "In developing the strategy for marbled murrelet nesting habitat on Federal lands, the key components were (1) stabilization or improvement of nesting habitat through protection of all occupied sites (both current and future), (2) development of future habitat in large blocks (creating more interior habitat and thereby possibly decreasing avian predation), and (3) improvement of distribution of habitat, thereby improving distribution of marbled murrelet populations…The plan designed a network of Late-Successional Reserves, in part, around older forests containing suitable marbled murrelet nesting habitat and areas known to be currently occupied by marbled murrelets. Though much of the forest habitat contained with the Late-Successional Reserves is not currently suitable nesting habitat, it would be allowed to grow and develop characteristics that would make it suitable."

    <u>Washington</u>
- 1997 Washington State Forest Practices Rules developed to protect suitable habitat on state lands and private land ownerships over 500 acres.

---

[4] For example, Raphael et al. 2002a.

*Marbled Murrelet 5-Year Review*          *DRAFT*

- 1997 Washington Department of Natural Resources HCP covering 1.4 million acres are within the range of the murrelet.
- Simpson (2000), Plum Creek (1996), Port Blakely (1996) and Murray Pacific (1993) HCPs covering approximately 450,000 acres within the range of the murrelet.
- City of Seattle HCP (2000) covering 91,000 acres and city of Tacoma HCP (2001) covering 14,000 acres.
- Enlarged riparian protection buffers as part of state forest practices rules.
- Reduced use of gill-net fishery within coastal waters, though murrelet mortality still occurs.

Oregon
- State listed as threatened in 1992, but applies only to state-owned lands.
- No current HCPs for murrelets.
- No Forest Practices Rules requiring survey or protection of suitable habitat on private lands prior to harvest.
- Enlarged riparian buffers of fish-bearing streams (1997).

California
- State listed as endangered in April 1992.  This listing applies to all lands.
- Enforces all federal ESA "take" prohibitions, including disturbance-induced harm and harass under section 9 of the ESA.
- 1999 Pacific Lumber Company HCP (19,000 acres)
- 1999 State Redwoods Park murrelet protection management plan.
- Gill-net fishing has been prohibited or has not occurred for many decades in northern California.  In central California (Zone 6 and farther south), gill-net fishing increased in the late 1970s, decreased by the late 1980s, and was prohibited in 2002.

12. B.  Is there relevant new information regarding the effectiveness of the conservation measures being implemented?

**Yes.**  Conservation measures have been implemented since the 1992 listing, however, in most cases, we are not yet able to determine the effectiveness of these measures.

The annual rate of habitat loss, centrally due to the implementation of the Northwest Forest Plan on federal lands in 1994 (McShane et al. 2004) has been significantly reduced.  Roughly 80 percent of the murrelet's critical habitat (3,015,700 out of 3,887,800 acres) is in Late-Successional Reserves within the range of the Northwest Forest Plan (NWFP), and these acres are to be managed "to protect and enhance conditions of late-successional and old-growth forest ecosystems, which serve as habitat for late-successional and old-growth related species" (USFS and BLM 1994:C 9).  Further, preproject surveys for behavior

10

indicating murrelet occupancy are required across the range of the NWFP on land deemed potential habitat.  If behavior indicating occupancy is found (e.g., discovery of a nest or chick, or murrelets flying below forest canopy within a stand of suitable habitat), "all contiguous existing and recruitment habitat for marbled murrelets (i.e., stand that are capable of becoming marbled murrelet habitat within 25 years) within a 0.5-mile radius will be protected" (USFS and BLM 1994:C 10).  While the effect of the NWFP on the long-term survival of the murrelet is unknown, its effectiveness in reducing the rate of annual habitat loss seems clear.

Nine Habitat Conservation Plans (HCPs) (7 in Washington, 1 in Oregon, and 1 in California) have been implemented pertaining to the murrelet.  At most, these HCPs set aside from development 16,000 acres that are not currently suitable murrelet habitat, so that at some point in the future they may become suitable.  It is unclear when and how many of these acres will eventually become murrelet habitat.

The rate of murrelet mortality from gill-netting is assumed to be reduced given the new restrictions in Washington and California.  It is difficult, however, to truly assess the effectiveness of these regulations in limiting murrelet mortality given the difficulty gathering corroborating empirical evidence.

### 13.  New Information: Application of the DPS policy

13. A.  Is there relevant new information with respect to the appropriate application of the DPS policy to the listed entity under review?

**Yes**, see Section 13.B.

13. B.  Given the updated information, is the listed entity consistent with the DPS policy with regards to the Discreteness and Significance elements?

*1) Is the currently listed murrelet population discrete according to the 1996 DPS Policy?*

**Yes**.  There are differences in conservation status between Canada and Washington, Oregon, and California.  The U.S. has a smaller population of murrelets (approximately 24,000;  Huff et al. 2003, Peery pers. comm. 2003), than in Canada (approximately 66,000; Burger 2002).  Further, estimates of loss of old-growth forests in the U.S. Pacific Northwest since pre-industrial times (National Research Council 2000), as compared to the amount of forests within the range of the murrelet in British Columbia that have become unsuitable due to anthropogenic causes (e.g., industrial logging and urbanization) (Demarchi and Button 2001a,b as adapted by Burger 2002), show a higher percentage of murrelet habitat has been lost in Washington, Oregon, and California.

There is also a difference in management between the U.S. and Canada.  This difference is clearly indicated by the central recovery goal in the 2003 Canadian Marbled Murrelet Assessment (Canadian Marbled Murrelet Recovery Team 2003)—"to down-list the species from Threatened to Special Concern, by creating conditions that will limit the decline of the BC population and its nesting habitat to less than 30% over three generations (30 years), during the period 2002 to 2032."  In effect, Canada is managing for a decline in habitat and number of murrelets because it acknowledges harvest of murrelet habitat will continue (Canadian Marbled Murrelet Recovery Team 2003).  No similar acceptable loss of population numbers or habitat is planned for in the United States.

Finally, there are differences in regulatory mechanisms between the U.S. and Canada.  Canada has no equivalent to the Northwest Forest Plan (1994) that protects over 90 percent of the murrelet's suitable habitat in Washington, Oregon, and California.  British Columbia is currently in the process of revising its Identified Wildlife Management Strategy (IWMS), under which the murrelet is a Red species, meaning it is either endangered or threatened (Guy pers. comm. 2004, BC Species and Ecosystems Explorer 2004).  Under this revised strategy, it is proposed approximately half of the murrelet's range will be under a strategic land use planning process that establishes wildlife habitat areas (WHAs) for the murrelet.  As of this writing, the exact elements of this strategy are uncertain (Guy pers. comm. 2004).

Canada also recently enacted the Species at Risk Act (SARA) designating the murrelet as a threatened species[5].  SARA's prohibitions against killing, harming, harassing, capturing, or taking a listed species, its protection of critical habitat, and its legal enforcement measures (e.g., inspections) will come into effect June 1, 2004[6].

As of this writing, it is unclear how implementation of SARA, the Canadian murrelet recovery strategy, and British Columbia's revised IWMS will interact and affect on-the-ground management of the murrelet and its habitat.  Given that the new Canadian recovery strategy's equates a 30 percent decline in murrelet habitat and population numbers over 30 years with the ability to uplist the murrelet to Special Concern, we assume there is and will continue to be a significant difference between Canada's and the U.S.'s management of the murrelet.

*2) Is the currently listed  murrelet population significant according to the 1996 DPS Policy?*

---

[5] SARA defines a "threatened species" as, "a wildlife species that is likely to become an endangered species if nothing is done to reverse the factors leading to its extirpation or extinction" (SARA 2(1)).
[6] http://www.sararegistry.gc.ca/the_act/HTML/Guide_e.cfm, last checked April 23, 2004.

**Yes**. Loss of the DPS would result in a significant gap in the range. This gap is significant because the Washington, Oregon, and California area is a large fraction of the range, roughly 18% of the total coastal distribution, encompassing 17 degrees of latitude.

Loss of the Washington, Oregon, and California population would eliminate genetic structural components that are statistically significantly different than those found in British Columbia, the Alaska mainland, and the Aleutian Islands, see Section 10.B (Congdon et al. 2000, Friesen et al. 2003, Lank et al. 2003). This loss would be significant as it would reduce the evolutionary potential of the entire metapopulation (McShane et al. 2004). Theoretically, if populations differ genetically, loss of a population will reduce the species' genetic resources and therefore its potential to adapt and evolve. The amount of variation that is lost will depend on the extent of genetic divergence among populations, and to the extent that differences are adaptive, local adaptations will also be lost. Extensive evidence exists for the loss both of neutral variation (Daugherty et al. 1990) and of local adaptations (Greig 1979) following loss of a population in genetically structured species.

Estimates of $F_{st}$ and its analogs for murrelets indicate that approximately 90% of their neutral genetic variation is contained within populations, and approximately 10% is distributed among populations in California, British Columbia/mainland Alaska, and the Aleutian Islands (McShane et al. 2004). Thus, loss of any of these populations will reduce the species' resources and compromise its long-term viability.

**14. New Information: Other.**   Is there any additional, relevant, new information not addressed in questions 9.A. -13. A.?

**No.**

## 15. Using Recovery Criteria

15. A. Does the species have a recovery plan that was written in accordance with Recovery Planning Guidance and that has up-to-date recovery criteria (with downlisting and/or delisting criteria, and in some cases uplisting criteria) that address biological factors, conservation measures and the threats to the species?

**Yes**, the U.S. Marbled Murrelet Recovery Plan was published in 1997. It states,

"Specific delisting criteria can be developed when completion of some recovery tasks provides necessary information about murrelets and their biological requirements. Interim delisting criteria include:

    1) Trends in estimated population size, densities and productivity have been stable or increasing in four of the six zones over a 10-year period, which should encompass at least one to two El Niño events.

    2) Management commitments, including protection and monitoring in marine and terrestrial habitats, have been implemented to provide adequate protection of marbled murrelets in the six Marbled Murrelet Conservation Zones for at least the near future (50 years)."

15. B.  Does the updated information on the species indicate that any or all of the recovery criteria for downlisting, delisting or uplisting have been met?

**No**, there is no compelling evidence from the updated information that the trends in estimated population size, densities and productivity have been stable or increasing in four of the six conservation zones over a 10-year period.

It is unclear whether the current management commitments are adequate to protect the murrelet in the six conservation zones for the next 50 years. Attainment of this goal cannot be assured prior to its completion.

## 16.  Synthesis

16. A.  **Biological Assessment**:  Given the updated information, particularly information presented in question 10, summarize the biological status of the species.

The murrelet is a small, dove-sized seabird that inhabits the coastal forests and nearshore marine environment along the Pacific coast of North America from southern California to southern Alaska and the Aleutian Islands.  Throughout most of its breeding range, the murrelet uses old-growth coniferous forest habitat for nesting and forages in the nearshore marine environments.  In Washington to California, only tree-nesting is known.

Current estimates are that 2,223,048 acres of suitable murrelet nesting habitat exist (McShane et al. 2004), and some genetic structural differences have been found between murrelets in California, British Columbia and mainland Alaska, and the Aleutian Islands (McShane et al. 2004).  There is insufficient information to determine a population trend in Washington, Oregon, and California (see Section 10.A).  Current estimates (Huff et al. 2003, Peery pers. com. 2003) of the Washington, Oregon, and California murrelet population is 24,400 birds, with a 95% confidence interval of 14,817 to 35, 209 birds (see Section 10.A).

16. B. 1.  **Threats Assessment (5-Factor Analysis):** Given the updated information, particularly information presented in question 11, provide an analysis of the threats to the species in the context of the 5 listing factors.

a)  the present or threatened destruction, modification, or curtailment of its habitat or range;

> The original listing states, "The principal factor affecting the marbled murrelet in the three-state area, and the main cause of population decline has been the loss of older forests and associated nest sites."[7]  This historic loss of habitat continues to pose a threat to the murrelet population in Washington, Oregon, and California.

> New information supports the general association of murrelet nesting preferences and older forests (Lank et al. 2003), and the positive relationship between numbers of murrelets found at sea, and inland sites with larger patches of old-growth that have relatively low levels of fragmentation and isolation (Meyer and Miller 2002, Meyer et al. 2002, Miller et al. 2002, Raphael et al. 1995, Raphael et al. 2002b).  This new information supports the conclusion that the past harvest of old-growth forests in the Washington, Oregon, and California range of the murrelet has significantly contributed to a commensurate decline in the number of murrelets.  There is no compelling information indicating this situation has improved through the production of significant new suitable nesting habitat since listing (McShane et al. 2004).

> The original listing also states, "Under current forest management practices, logging of the remaining older forests is likely to continue, except in areas with mandated protection."  The 1994 Northwest Forest Plan significantly reduced the rate of annual habitat loss on federal lands, yet some annual habitat loss or modification is estimated to be continuing, primarily on private or state lands (McShane et al. 2004).  Using the recent past as a guide, it is estimated 0.5% to 1% of suitable habitat will be lost or modified each year for the near future (McShane et al. 2004).  While it is expected the development of new habitat will, sometime in the future, surpass the annual loss or modification of habitat, there is insufficient information to determine precisely when this will occur or what the status of the murrelet will be when this happens.

b) overutilization for commercial, recreational, scientific or educational purposes;

> These elements were not identified as threats in the original listing and no new information to change this conclusion has surfaced.

c) disease or predation;

> Disease was not identified as a threat in the original listing and there is insufficient information to determine if disease is currently a threat to the murrelet.

---

[7] 57 FR 45328.

The original listing states, " Predation is an additional threat to the continued existence of the murrelet." New information confirms the importance of predation in limiting murrelet nest success, with recent studies indicating nest failure rates due to predation of 68% to 100% (Hebert and Golightly 2003, Peery et al. in prep.) in real nests, and 81% to 86% in artificial nests (Luginbuhl et al. 2001, Marzluff and Restani 1999). The factors affecting rates of predation on murrelet nests (suspected to be the primary type of predation, though adult predation does occur) are not fully clear, yet key elements seem to be proximity to humans, abundance of avian predators, and proximity and type of forest edge to the nest (McShane et al. 2004).

d) the inadequacy of existing regulatory mechanisms; and

To determine whether inadequate regulatory mechanisms pose a threat to the murrelet, we analyzed the current regulatory situation, including the federal and state listings of the murrelet.

It is assumed the current threat posed by the inadequacy of existing regulatory mechanisms has been reduced since the listing, but not eliminated, due to the federal and subsequent state listings (i.e., as threatened in Washington and Oregon), the implementation of the Northwest Forest Plan in 1994, implementation of Habitat Conservation Plans on private lands, and gill-netting restrictions in Washington and California.

e) other natural or manmade factors affecting its continued existence.

We assessed the following factors: gill-netting, oil spills, forest fires, and murrelet population decline.

The threat posed by gill-netting mortality is assumed to be reduced given the new regulatory mechanisms in California and Washington. The reduction of this threat is difficult to confirm with empirical evidence given how difficult it is to collect such information.

There is insufficient information to determine whether the threat from oil spills or forest fires has changed since the listing. As there have been several oil spills and large catastrophic forest fires since 1992 with confirmed and estimated murrelet mortality or loss of suitable habitat (McShane et al. 2004), these threats are presumed to be unchanged since the listing.

Although the existing long-term population data for Washington, Oregon, and California can not be used to empirically identify a three-state trend, several leading murrelet experts believe the data suggest a decline across the southern range (Lank et al. 2003, McShane et al. 2004). For example, Lank et. al. (2003) state in their summary that, "Marine census data suggests all Marbled Murrelet

populations are declining in numbers." Several other studies have found or estimated a decline in specific areas across Washington, Oregon, and California, Table 2 (Section 10.A). A declining population is a threat, as opposed to an outcome of other threats, when it contributes to a species' endangerment.

Possibly exacerbating this potential decline are the estimated low fecundity levels across the same range. As determined through nest success values (i.e., the number of fledglings per breeding pair of murrelets per year), fecundity levels indicate a population that is not stable through reproduction (Beissinger 2003, Golightly et al. 2002).

16. B. 2. Describe any interactions, additive and/or synergistic effects of these threats.

The original listing described oil spill and gill-netting mortality as "additive" to the central threat of habitat loss and modification. This description continues to appear accurate, although the threat of gill-netting mortality is assumed to be reduced.

16. C. **Conservation Efforts:** Given the updated information, particularly information presented in question 12, summarize the conservation efforts.

There are new restrictions in Washington and California that are believed to have reduced murrelet gill-net mortality. Implementation of the Northwest Forest Plan in 1994 has decreased the loss or modification of murrelet habitat on federal lands. Nine Habitat Conservation Plans have been implemented across Washington, Oregon, and California, and the species has been listed as threatened by both the state of Washington and Oregon.

**17. Result**

17. A. Given your responses to questions 15 B., and/or 16.A.-16.C., does the 5-year review indicate that a change in classification is warranted?

**No**. The threat situation has not changed such that the murrelet DPS is no longer likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range.

17. B. Based on this review indicate the appropriate Recovery Priority Number for the species.

**2**

17. C. If applicable, indicate the Listing and Reclassification Priority Number.

Reclassification (Uplisting from Threatened to Endangered) Priority Number:_____

Reclassification (Downlisting from Endangered to Threatened) Priority Number:_____

Delisting (Removal from list regardless of current classification) Priority Number:_____

## 18. Future Actions

More information for the next review is needed concerning:
- Genetic differences across the range
- Regulatory effectiveness and conservation status of the murrelet in Canada
- Natal and adult movement and dispersal, affects on the rates of immigration/emigration
- Habitat quality, quantity and trends
- Further information on the effects of predation across the range
- Population trends
- Linking site specific information to landscape characteristics.

## REFERENCES

19. List all information and data sources used in this review, and provide file locations if these sources will not be filed with the review.  Include on this list any experts used and their affiliations and note whether they provided information or if they acted as peer-reviewers, or both.

1) Beissinger, S.R., and M.Z. Peery. 2003. Range-wide analysis of juvenile ratios from marbled murrelet monitoring programs: implications for demographic analyses. Unpublished report, University of California, Dept. of Environmental Science, Policy, and Management, Berkeley, California.

2) Bradley, R.W. 2002. Breeding ecology of radio-marked marbled murrelets (Brachyramphus marmoratus) in Desolation Sound, British Columbia. Department of Biological Sciences. Burnaby, BC, Simon Fraser University, 86 pp.

3) Burger, A.E. 2002. Conservation assessment of marbled murrelets in British Columbia, a review of biology, populations, habitat associations and conservation. Pacific and Yukon Region, Canadian Wildlife Service, 168 pp.

4) Burkett, Esther, Biologist, CDFG, Sacramento, CA; phone conversations and meetings with Harry Carter, Biologist, HSU, Davis, CA; March-May 2003, 16 March 2004.

5) Canadian Marbled Murrelet Recovery Team. 2003. Marbled Murrelet Conservaiton Assessment 2003, Part B: Marbled Murrelet Recovery Team

Advisory Document on Conservation and Management.  Canadian Marbled Murrelet Recovery Team Working Document NO. 1.

6)  Congdon, B.C., J.F. Piatt, K. Martin, and V.L. Friesen. 2000. Mechanisms of population differentiation in marbled murrelets: historical versus contemporary processes. Evolution 54(3): 974-986.

7)  Daugherty, C.H., A. Cree, J.M. Hay, and M.B. Thompson. 1990. Neglected taxonomy and continuing extinctions of tuatara (Sphenodon). Nature 347:177-179.

8)  Demarchi, D.A., and A.A. Button. 2001a. Marbled Murrelet nesting habitat capability in British Columbia: Map 2 – weighted average capability. Map @ 1:300,000. Resources Inventory Branch, Ministry of Environment, Lands, and Parks, Victoria, BC.

9)  Demarchi, D.A., and A.A. Button. 2001b. Marbled Murrelet nesting habitat capability in British Columbia: Map 2 – weighted average suitability. Map @ 1:300,000. Resources Inventory Branch, Ministry of Environment, Lands, and Parks, Victoria, BC.

10) Friesen, V.L., T.P. Birt, Z. Peery, and S. Beissinger. 2003. Conservation genetics of marbled murrelets in northern California. Kingston, Ontario, Queen's University, 37 pp.

11) Friesen, V.L., and J.F. Piatt. 2003. A genetic study to aid in the restoration of murres, guillemots and murrelets to the Gulf of Alaska. Restoration project 00169 final report. Exxon Valdez Trustee Council, Anchorage, AK.

12) Friesen, V.L., A.J. Baker, and J.F. Piatt. 1996a. Phylogenetic relationships within the Alcidae (Charadriiformes: Aves) inferred from total molecular evidence. Molecular Biology and Evolution 13(2): 359-367.

13) Friesen, V.L., J.F. Piatt, and A.J. Baker. 1996b. Evidence from cytochrome B sequences and allozymes for a 'new' species of alcid: the long-billed murrelet. The Condor 98:681-690.

14) Golightly, R.T., P.N. Hebert, and D.L. Orthmeyer. 2002. Evaluation of human-caused disturbance on the breeding success of marbled murrelets (Brachyramphus marmoratus) in Redwood National and State Parks, California. Arcata, CA, Bureau of Land Management, National Park Service, U.S. Fish and Wildlife Service, U.S. Geological Survey, California Department of Fish and Game, and California Department of Parks and Recreation, 61 pp.

15) Greig, J.C. 1979. Principles of genetic conservation in relation to wildlife management in Southern Africa. Sout African Journal of Wildlife Research 9:57-78.

16) Guy, Stewart. Chief, Biodiversity Branch, Ministry of Water, Land and Air Protection, British Columbia. Personal Communication. March 16, 2004.

17) Hamer, T.E. 1995. Inland habitat associations of marbled murrelets in western Washington. Pp. 163-175 In: Ecology and conservation of the marbled murrelet (C.J. Ralph, G.L. Hunt, Jr., M.G. Raphael, and J.F. Piatt, eds.). U.S. Forest Service, Gen. Tech. Rep. PSW-GTR-152, Pacific Southwest Research Station, Albany, California.

18) Hamer, T.E., and D. J. Meekins. 1999.  Marbled murrelet nest site selection in relation to habitat characteristics in western Washington, 1998 Report. Mount Vernon, WA, Hamer Environmental, 26 pp.

19) Hamer, T.E., and S.K. Nelson. 1995. Characteristics of marbled murrelet nest trees and nesting stands. In: Ecology and conservation of the marbled murrelet (C.J. Ralph, G.L. Hunt, Jr., M.G. Raphael, and J.F. Piatt, eds.). U.S. Forest Service, Gen. Tech. Rep. PSW-GTR-152, Pacific Southwest Research Station, Albany, California.

20) Hebert, P.N., and R.T. Golightly. 2003. Breeding biology, and human-caused disturbance to nesting of marbled murrelets (Brachyramphus marmoratus) in Northern California: progress report 2002. Unpublished draft report, Humboldt State University, Dept. of Wildlife, Arcata, California.

21) Huff, M., P. Jodice, J. Baldwin, S. Miller, R. Young, K. Ostrom, C.J. Ralph, M. Raphael, C. Strong, and C. Thompson. 2003. Draft Marbled murrelet effectiveness monitoring northwest forest plan 2002 annual summary report. 29pp.

22) Lank, D.B., N. Parker, E.A. Krebs, and L. McFarlane-Tranquilla. 2003. Geographic distribution, habitat selection, and population dynamics with respect to nesting habitat characteristics of Marbled murrelets (Brachyramphus marmoratus). Ctr. Wildlife Ecol. Simon Fraser University, Vancouver, British Columbia.

23) Luginbuhl, J.M., John M. Marzluff, Jeffrey E. Bradley, Martin G. Raphael, and Daniel E. Varland. 2001. Corvid survey techniques and the relationship between corvid relative abundance and nest predation. Journal of Field Ornithology 72(4): 556-572.

24) Manley, I.A., and S.K. Nelson. 1999. Habitat characteristics associated with nest success and predation at marbled murrelet tree nests (Abstract). Pacific Seabirds 26:40.

25) Marzluff, J.M., and M. Restani. 1999. The effects of forest fragmentation on rates of avian nest predation and parasitism. College of Forest Resources, Univ. of Washington, Seattle. Unpublished report.

26) Marzluff, J.M., J.M. Luginbuhl, J.E. Bradley, E. Neatherlin, M.G. Raphael, D.M. Evans, D.E. Varland, L.S. Young, S.P. Horton, and S.P. Courtney. 1999. The influence of stand structure, proximity to human activity, and forest fragmentation on the risk of predation to nests of marbled murrelets on the Olympic Peninsula. Unpublished report. Sustainable Ecosystems Institute and University of Washington College of Forest Resources, Seattle, WA.

27) McShane, C., T. Hamer, H. Carter, G. Swartzman, V. Friesen, D. Ainley, R. Tressler,  K. Nelson, A. Burger, L. Spear, T. Mohagen, R. Martin, L. Henkel, K. Prindle, C. Strong, and J. Keany.  2004.  Evaluation report for the 5-year status review of the marbled murrelet in Washington, Oregon, and California. Unpublished report.  EDAW, Inc. Seattle, Washington.  Prepared for the U.S. Fish and Wildlife Service, Region 1.  Portland, Oregon.

28) Meyer, C.B., and S.L. Miller. 2002. Use of fragmented landscapes by marbled murrelets for nesting in southern Oregon. Conservation Biology 16(3), 755-766.

29) Meyer, C.B., S.L. Miller, and C.J. Ralph. 2002. Multi-scale landscape and seascape patterns associated with marbled murrelet nesting areas on the U.S. west coast. Landscape Ecology 17: 95-115.

30) Miller, S.L., and C.J. Ralph. 1995. Relationship of marbled murrelets with habitat characteristics at inland sites in California. Pp. 205-218 In: Ecology and conservation of the marbled murrelet (C.J. Ralph, G.L. Hunt, M.G. Raphael, and J.F. Piatt, eds.). Gen. Tech. Rep. PSW-GTR-152. Albany, CA. Pacific Southwest Research Station, Forest Service, U.S. Department of Agriculture. 420 pp.

31) National Research Council, Committee on Environmental Issues in Pacific Northwest Forest Management. 2000. Environmental Issues in Pacific Northwest Forest Management. National Academy Press, Washington, DC, 259 pp.

32) Nelson, S.K. 2004. Research Associate, Oregon State University. Personal communication. April 26, 2004.

33) Nelson, S.K. 1997. Marbled Murrelet (Brachyramphus marmoratus). In: Birds of North America, No. 276 (A. Poole and G. Gill, eds.). Academy of Natural Sciences, Philadelphia, and American Ornithologists' Union, Washington, DC.

34) Nelson, S.K., and T.E. Hamer. 1995. Nest success and the effects of predation on marbled murrelets. Pp. 89-97. In: Ecology and conservation of the marbled murrelet (C.J. Ralph, G.L. Hunt, Jr., M.G. Raphael, and J.F. Piatt, eds). U.S. Forest Service, Ge. Tech. Rep. PSW-GTR-152, Albany, California.

35) Nelson, S.K., and A.K. Wilson. 2002. Marbled murrelet habitat characteristics on state lands in western Oregon. Corvallis, OR, Oregon Cooperative Fish and Wildlife Research Unit, Oregon State University, Department of Fisheries and Wildlife, 151 pp.

36) Peery, M.Z., S.R. Beissinger, S.H. Newman, E.B. Burkett, and T.D. Williams. In preparation. Applying the declining population paradigm: diagnosing causes of poor reproduction in the marbled murrelet. Completed manuscript, 2003. Submitted to Conservation Biology, 31 pp.

37) Peery, M.Z., S.R. Beissinger, B.H. Becker, and S.H. Newman. 2002. Marbled murrelet (Brachyramphus marmoratus) demography in Central California: 2001 Progress Report. Prepared for the California Department of Fish and Game, US Fish and Wildlife Service, California State Parks.

38) Peery, Zach, Graduate Student, UC, Berkeley, CA; phone conversation with Harry Carter, Biologist, Richmond, BC; 25 November 2003.

39) Perry, D.A. 1995. Status of forest habitat of the marbled murrelet. In: Ecology and conservation of the marbled murrelet (C.J. Ralph, G.L. Hunt, M.G. Raphael, and J.F. Piatt, eds.). Gen. Tech. Rept. PSW-GTR-152. Albany, California. Pacific Southwest Experiment Station, Forest Service, U.S. Dept. Agric. 420 pp.

40) Raphael, M.G., J. A. Young, and B.M. Galleher. 1995. A landscape-level analysis of marbled murrelet habitat in western Washington. Pp. 177-190 In: Ecology and conservation of the marbled Murelet (C.J. Ralph, J.G.L. Hunt, M.G. Raphael, and J.F. Piatt, eds.). Pacific Southwest research Station, Forest Service, U.S. Department of Agriculture, Albany, CA.

41) Raphael, M.G., D. Evans Mack, J.M. Marzluff, and J. Luginbuhl. 2002a. Effects of forest fragmentation on populations of the marbled murrelet. Studies in Avian Biology 25: 221-235.

42) Raphael, M.G., D. Evans Mack, and Brian A. Cooper. 2002b. Landscape-scale relationships between abundance of marbled murrelets and distribution of nesting habitat. Condor 104(2), 331-342.

43) Singer, S.W., E.E. Burkett, and J.B. Bulger. 1997. Marbled murrelet nest-finding efforts - effectiveness of various techniques and the discovery of a new type of nest. Pacific Seabird Group Annual Meeting, Portland, OR.

44) Singer, S.W., D.L. Suddjian, and S.A. Singer. 1995. Fledging behavior, flight patterns, and forest characteristics at marbled murrelet tree nests in California. Northwestern Naturalist 76: 54-62.

45) Speich, S.M., and T.R. Wahl. 1995. Marbled murrelet populations of Washington – marine habitat preferences and variability of occurrence, Pp. 313-326 In: Ecology and conservation of the marbled murrelet (C.J. Ralph, G.L. Hunt, Jr., M.G. Raphael, and J.F. Piatt, eds.). General Technical Report PSW-GTR-152. Forest Service, Albany CA.

46) Strong, C.S. 2003a. Decline of the marbled murrelet population on the central Oregon coast during the 1990's. Northwestern Naturalist 84: 31-37.

47) Strong, C.S. 2003b. Marbled murrelet abundance and reproductive indices in Oregon during 2002. Unpublished report. Portland, OR, Oregon Department of Fish and Wildlife, and U.S. Fish and Wildlife Service, 14 pp.

48) Suddjian, D.B. 2003. Ten years of monitoring marbled murrelets at the south fork of Butano Creek, San Mateo County, California, 1992-2001. Davenport, CA, Big Creek Lumber Company, 125 pp.

49) Thompson, C.W. 1997. Distribution and abundance of marbled murrelets and Common Murres on the outer coast of Washington. 1997 report to the Tenyo Maru Trustee Council. WA Dept. of Fish & Wildlife. 91 pp.

50) U.S. Fish and Wildlife Service. 1997. Recovery Plan for the marbled murrelet (Brachyramphus marmoratus) in Washington, Oregon, and California. USFWS Region 1, Portland, OR. 261 pp.

51) U.S. Fish and Wildlife Service. 1996. Formal consultation on 1996-1998 treaty commercial salmon net fisheries in Areas 4, 4A in coastal waters and areas 4B, 5, 6C and 6D in the Strait of Juan de Fuca (Biological opinion). Unpublished report, U.S. Fish and Wildlife Service, Olympia, Washington.

52) USFS and BLM (U.S. Bureau of Land Management). 1994. Final supplemental environmental impact statement on management of habitat for late-successional and old-growth forest related species within the range of the northern spotted owl (Northwest Forest Plan). Portland, Oregon. 2 vol.

53) USFS and BLM. 2004. Final supplemental environmental impact statement to remove or modify the survey and manage mitigation measure standards and

*DRAFT*

guidelines: Forest Service National Forests in Regions 5 and 6 and Bureau of Land Management Districts in Washington, Oregon, and California within the Range of the Northern Spotted Owl. January 2004. Forest Service - U.S. Department of Agriculture Bureau of Land Management - U.S. Department of Interior.

*Marbled Murrelet 5-Year Review*                    *DRAFT*

U.S. FISH AND WILDLIFE SERVICE
SIGNATURE PAGE for 5-YEAR REVIEW

Marbled Murrelet*/Brachyramphus marmoratus*

CURRENT CLASSIFICATION ___Threatened_____

5-Year Review Result             ___X____ No Change in Status
                                 _____ Delist
                                 _____ Endangered to Threatened
                                 _____ Threatened to Endangered

APPROPRIATE LISTING/RECLASSIFICATION PRIORITY NUMBER_____N/A_____

REVIEW CONDUCTED BY __Paul Phifer and Brian Cox_____

*Lead Field Supervisor, Fish and Wildlife Service*

Approve _____Date_____

Do not Approve_____Date_____

*Cooperating Field Supervisor, Fish and Wildlife Service*

Concur _____Date_____

Not concur_____Date_____

*Lead Regional Director, Fish and Wildlife Service*

Concur _____Date_____

Not concur_____Date_____

# EXHIBIT D



# United States Department of the Interior

**FISH AND WILDLIFE SERVICE**
911 NE. 11th Avenue
Portland, Oregon 97232-4181

IN REPLY REFER TO:

FWS/R1/AES

JUN 2 8 2007

To:      Director, Fish and Wildlife Service
             Washington, DC

From:    Acting Regional Director, Region 1
             Portland, Oregon

Subject:   Review of Service Decisions under the Endangered Species Act Involving the
             Deputy Assistant Secretary, Fish and Wildlife and Parks, in Region 1 (2001-2006)

As requested, we have evaluated the involvement of Julie MacDonald, former Deputy Assistant
Secretary (DAS) for Fish and Wildlife and Parks, in important decisions made by the U.S. Fish
and Wildlife Service (Service) in Region 1 during the years 2001 to 2006. Specifically, we
evaluated past Service decisions to determine if the DAS, in her oversight capacity as a
Departmental official, modified the science and/or the Service's recommendation/position on
final actions or decisions.

We focused on the important and controversial issues and decisions of 2001 through 2006.
During that time period, the DAS had a wide range of oversight and reviewed and commented on
numerous issues; however, we limited our review to identify only those actions where the DAS
oversight resulted in an inappropriate change in science that may compromise actions taken in
the future, or where the Service's recommendation/decision was changed based on a policy
interpretation made by the DAS.

During the time period of this review, Region 1 began implementing structured decision making,
particularly on the more controversial issues in the Region. We held panels with recognized
experts and Service managers to develop sound, fully-informed decisions using the best science
available. We used objective criteria to determine scientific expertise, and documented the
panel's discussions in order to write recommendations that were sound and transparent.
Assistant Secretary Manson was supportive of this approach, and we benefited from its
application when defending our use of the science and our conclusions with the DAS.

The following represents a list of those actions where the Region believes the DAS oversight
changed the Service's position.



**Marbled Murrelet (*Brachyramphus marmoratus*)**
The Service conducted a 5-year review on this species in 2004. We used structured decision making for the 5-year review, working with experts on the marbled murrelet, and making a recommendation that fully considered the risks and uncertainties. The Service recommended that the listing status remain the same, and supported the listing as a distinct population segment (DPS). The Assistant Secretary and the DAS subsequently reversed Region 1's DPS determination, stating that the marbled murrelet in the lower 48 was not a DPS, because it did not satisfy the DPS policy's discreteness criteria, and thus was not a listable entity. Since this was based upon an interpretation of the DPS policy made by the Department, the Regional Director signed the 5-year review in support of the Department's position. The Office of the Solicitor review of the proposed delisting rule suggested that the conclusion reached by the Department on the 5-year review was based on an incorrect "discreteness" analysis under the DPS policy, as it compared current levels of legal protection in the United States (Endangered Species Act) and Canada (Species at Risk Act), rather than comparing the levels that would exist if the species were not listed in the United States.

**Bull Trout (*Salvelinus confluentus*)**
The Service voluntarily remanded a final rule designating critical habitat because of extensive exclusions made by the DAS, with little or no justification in the administrative record supporting those exclusions. On remand, the Service provided to the Department a rule that proposed a number of exclusions; however, we did not propose to exclude any Federal lands. The DAS became heavily involved, directing an approach that involved reviewing the existing management of Federal lands in support of the bull trout. Where special management for bull trout was practiced, we excluded those Federal lands based on a very small margin of benefits associated with the saving of administrative costs of conducting adverse modification analysis in future consultations. Provided the Department will continue to utilize this approach to critical habitat, we don't recommend redoing this rule. In addition, the rule is being litigated, and a decision is expected from the courts relatively soon and we expect exclusions of Federal lands to be addressed. Should the courts not support the approach to exclusions, this would have ramifications for future critical habitat rules, including marbled murrelet and northern spotted owl.

**12 Species of Picture Wing Flies**
The DAS gave direction that the critical habitat rule for these species consist of no more than 1 acre per species. The Service published the proposed rule based on that direction. We received numerous peer review comments questioning our methodology and lack of explanation for the approach. The DAS also provided comments on the rule, supporting the peer review comments and directing that we provide an adequate response to those comments in the final rule. Instead, we have chosen to re-propose the designation rule using scientifically based criteria prior to finalizing the rule.

Thank you for the opportunity to comment on this matter. If you have any questions, please contact Terry Rabot at 503-231-6151.

# EXHIBIT E

A14/SEM/06-005/08/14(1)(2)
DISTRIBUTION: General
ORIGINAL: English

_____

### Secretariat of the Commission for Environmental Cooperation

### Determination in accordance with Articles 14(1) and (2)
### of the North American Agreement for Environmental Cooperation

| | |
|---|---|
| **Submitters:** | Nature Canada |
| | Sierra Club (U.S. and Canada) |
| | Conservation Northwest |
| | David Suzuki Foundation |
| | Environmental Defence |
| | ForestEthics |
| | Ontario Nature |
| | Western Canada Wilderness Committee |
| | BC Nature (formerly Federation of BC Naturalists) |
| | Federation of Alberta Naturalists |
| | Natural History Society of Newfoundland and Labrador |
| | Nature Nova Scotia |
| | Nature Quebec |
| **Represented by**: | Sierra Legal Defence Fund |
| **Party:** | Canada |
| **Date received:** | 10 October 2006 |
| **Date of this determination:** | 11 December 2006 |
| **Submission I.D.:** | **SEM-06-005 (Species at Risk)** |

_____

## I.    INTRODUCTION

On 10 October 2006, the Submitters listed above filed with the Secretariat of the Commission for Environmental Cooperation (the "Secretariat") a submission on enforcement matters pursuant to Article 14 of the *North American Agreement on Environmental Cooperation* ("NAAEC" or "Agreement"). Under Article 14 of the NAAEC, the Secretariat may consider a submission from any nongovernmental organization or person asserting that a Party to the Agreement is failing to effectively enforce its environmental law if the Secretariat finds that the submission meets the requirements of Article 14(1). When the Secretariat determines that those requirements are met, it then determines whether the submission merits requesting a response from the Party named in the submission (Article 14(2)).

The Submitters assert that Canada is failing to effectively enforce the Federal *Species at Risk Act* (SARA) in regard to the process and timelines for listing species, developing and adopting recovering strategies, and ensuring that SARA requirements are met on non-federal lands.

A14/SEM/06-005/08/14(1)(2)
DISTRIBUTION: General
ORIGINAL:  English

The Secretariat has determined that the following allegations, contained in the submission, meet the criteria set forth in Article 14(1) and merit requesting a response from Canada in light of the factors contained in Article 14(2): (1) Canada is failing to effectively enforce the SARA's recovery planning requirements as regards identification of critical habitat (s. 41) and mandatory planning timelines (s. 42), and (2) Canada is failing to effectively enforce the emergency order provision in s. 80 with respect to the Spotted Owl in British Columbia and the Woodland Caribou in Alberta.  The reasons for this determination are provided below.


## II.    SUMMARY OF THE SUBMISSION


This Submitters assert the failure of the Canadian federal government to effectively enforce the SARA with respect to at least 197 of the 529 species identified as at risk in Canada, so as to frustrate the Act's purpose: preventing wildlife species from becoming extirpated or becoming extinct and providing for the recovery of wildlife species that are extirpated, endangered or threatened as a result of human activity.[1]  More particularly, the Submitters allege that Environment Canada, Parks Canada Agency, the Minister of the Environment and the Department of Fisheries and Oceans are failing to enforce the SARA with regard to listing (s. 27), recovery planning (ss. 41 and 42), and national enforcement through "safety net" and emergency orders (ss. 34 and 80).[2]

The Submitters summarize the SARA's provisions as follows:

> An overview of how the foregoing provisions work together to address species endangerment is as follows: a scientific body for the classification of species, the Committee on the Status of Endangered Wildlife in Canada (COSEWIC), is created which assesses the status of species, species are "listed" on the official list of species that are extirpated, endangered, threatened or of special concern (ss. 27-31) which triggers obligations under the Act including prohibitions against harm (ss. 32-36), and protections of residence or habitat (ss. 33-36 and ss. 56-64), recovery planning and critical habitat identification (ss.37-46), and recovery plan implementation (action planning) (ss.47-64). The *SARA* also contains a provision to enable protecting species and habitat on an emergency basis (s.80).[3]

The Submitters claim that responsibility for enforcing and implementing the SARA lies primarily with the federal Minister of the Environment and Environment Canada, as well as with the federal Department of Fisheries and Oceans and the Parks Canada Agency.[4]

The Submitters state that listing is a prerequisite to protection under the SARA, and that Canada is failing to effectively enforce the listing process by adopting an interpretation of s. 27 of the SARA that circumvents the statutory timeline for listing and allows Environment Canada to conduct protracted socio-economic consultations prior to deciding whether to make a listing recommendation to the Governor in Council.[5]   According to the Submitters, the legislative record as well as the wording of s. 27 of the SARA reflect a compromise whereby

---

[1] Submission at 1.
[2] *Ibid.*
[3] Submission at 2.
[4] *Ibid.*
[5] Submission at 2-6.

A14/SEM/06-005/08/14(1)(2)
DISTRIBUTION: General
ORIGINAL: English

the Governor in Council (and not the Minister of the Environment) is allowed to take into account socio-economic considerations in a listing decision, provided it makes a decision within nine months of COSEWIC completing its assessment in respect of a species and not, as advanced by the Minister, within nine months of the Minister forwarding to the Governor in Council a copy of the COSEWIC assessment along with the Minister's listing recommendation.[6] According to the Submitters, when the SARA came into force, the federal government was not adequately prepared to implement the Act, and that is why it is now failing to honour the compromise reflected in s. 27.[7]

As regards recovery planning, the Submitters maintain that Canada has fallen behind in meeting statutory timelines for posting recovery strategies for listed species, with only 23 of 133 strategies due in 2006 posted as of 29 September (contrary to s. 42).[8] Further, they assert that Canada is not systematically identifying critical habitat in recovery strategies (as required by s. 41(1)(c)), in particular where such habitat is located on non-federal lands.[9]

Finally, the Submitters maintain that the federal government is failing to effectively enforce the SARA by refusing to extend the application of the Act to lands other than federal lands and species other than those otherwise protected under federal law (migratory birds and aquatic species).[10] The Submitters maintain that in accordance with the SARA, the application of the Act must be extended, by ministerial order, if the Minister finds that the laws of a province or territory do not effectively protect species at risk, their residences or critical habitat (s. 34), or a species faces an imminent threat to its survival or recovery (s. 80).[11] The Submitters allege that Alberta, British Columbia, the Northwest Territories and the Yukon lack laws protecting endangered species or biological diversity,[12] and they assert that the federal Environment Minister's failure to recommend to the Governor in Council that the SARA's provisions be made to apply in those provinces and territories amounts to a failure to effectively enforce s. 34 of the SARA in respect of the SARA-listed species that occur therein, with the result that the SARA is no longer an act of national application.[13]  In addition, the Submitters cite the Spotted Owl (British Columbia) and the Woodland Caribou (Alberta) as examples of species that, according to the Submitters, face imminent threats to their survival or recovery,[14] and they assert that the failure to issue emergency orders in respect of these species amounts to a failure to effectively enforce s. 80 of the SARA.[15]

---

[6] *Ibid.*
[7] Submission at 3.
[8] Submission at 7-8.
[9] Submission at 9:  "[…] to date, of the 23 recovery strategies posted on the SARA registry, only 3 identify critical habitat, and 5 partially identify critical habitat.  There is little certainty as to whether the prohibitions in the SARA apply where critical habitat has been identified only partially. Moreover, the 3 species where recovery plans identify critical habitat are located within protected areas (Aurora Trout and Horsetail Spike-rush), or have restricted distribution (Barrens Willow)."
[10] Submission at 9-13.
[11] Submission at 9-10.
[12] Submission at 11.
[13] *Ibid.*
[14] Submission at 11-13.
[15] Submission at 13.

A14/SEM/06-005/08/14(1)(2)
DISTRIBUTION: General
ORIGINAL: English

## III.  ANALYSIS

Article 14 of the NAAEC directs the Secretariat to consider a submission from any nongovernmental organization or person asserting that a Party to the NAAEC is failing to effectively enforce its environmental law.  When the Secretariat determines that a submission meets the Article 14(1) requirements, it then determines whether the submission merits requesting a response from the Party named in the submission based upon the factors contained in Article 14(2).

### A.  Opening Phrase of Article 14(1)

The opening phrase of Article 14(1) authorizes the Secretariat to consider a submission "from any nongovernmental organization or person asserting that a Party is failing to effectively enforce its environmental law […]."  The submission meets, in part, the requirements inherent in this phrase.  The Submitters are nongovernmental organizations as defined in Article 45(1) of the NAAEC. In addition, the provisions of the SARA identified by the Submitters are clearly environmental law within the meaning of NAAEC Article 45(2), as they are provisions of a statute whose primary purpose is the protection of the environment through the protection of endangered species and their habitat.[16] However, while the submission alleges a failure to effectively enforce the cited provisions of law and not a deficiency in the law itself, the Secretariat is of the view that not all of the allegations made by the Submitters can be considered by the Secretariat under Article 14 of the NAAEC, for the reasons set forth below.

### 1.  Alleged failure to effectively enforce listing process in SARA s. 27

The Submitters allege, first, that "[t]he federal government is failing to enforce the 9-month timeline for listing, as well as frustrating the listing process by considering matters not contemplated by the SARA."[17]  Specifically, the Submitters allege:

> [S]ection 27 of the SARA requires that species be listed within 9 months and does not admit an extended consultation by the Minister of the Environment. Additionally, there is no jurisdiction for the Minister of the Environment to consider the socio-economic consequences of listing in determining whether or not to recommend to the federal Cabinet to list a species.  By creating indefinite timelines and undertaking socio-economic assessments of the implications of species listing prior to the statutory 9-month time frame for discussion by the federal Cabinet, the Government of Canada is failing to enforce the listing provisions of the SARA. The consequences of this failure to enforce, by the design of the SARA which requires listing as a precondition to all protections and recovery measures that flow from the Act, is to jeopardize the SARA in its entirety.[18]

The Submitters also allege that the Government is delaying listing because "[…] after the SARA came into force, the federal Government realized that it was not adequately prepared to

---

[16] Art. 45(2)(a)(iii) of the NAAEC.
[17] Submission at 4.
[18] Submission at 6.

A14/SEM/06-005/08/14(1)(2)
DISTRIBUTION: General
ORIGINAL: English

implement the SARA."[19] The question of whether the language and legislative history of s. 27 of the SARA support the Government's interpretation regarding timelines, and the question of whether the Government is acting within the bounds of the law in taking into account socio-economic considerations in deciding on listing recommendations to the Governor in Council, are essentially questions of law. The Secretariat finds that the NAAEC's submissions on enforcement matters process, which is intended to shed light on facts regarding alleged failures to effectively enforce environmental laws, is ill-suited to assertions grounded to such an extent in threshold questions of law

The Secretariat notes that it is not determining the broader question of whether s. 27 of the SARA can ever give rise to an allegation that would be eligible for review under the NAAEC's submissions on enforcement matters process. It is simply finding that the allegations advanced by the Submitters in this submission, as regards the interpretation of s. 27 of the SARA, do not raise a factual question of enforcement which can be considered by the Secretariat under Article 14.

### 2. Alleged failure to effectively enforce recovery planning requirements in SARA ss. 41 and 42

Next, the Submitters allege that Canada is failing to effectively enforce the SARA's recovery planning timelines (s. 42) and recovery planning requirements (s. 41).[20] On the issue of timelines, the Submitters assert that as of 29 September 2006, Canada had failed to meet mandatory deadlines for placing over 100 recovery strategies for newly listed species in the SARA public registry.[21] They assert that an evaluation of the SARA's implementation raises concern that the process for developing and posting recovery strategies will fall even further behind in 2007 and thereafter.[22] In addition, the Submitters allege that most of the posted recovery strategies do not identify the species' critical habitat, as required by s. 41(1)(c).[23] They cite an external evaluation which concludes that "[w]here provinces/territories are leading recovery planning efforts, they report a reluctance to identify critical habitat on non-federal lands until the supporting policy framework is clarified."[24] The Submitters further allege that "[…] because critical habitat is not identified, the SARA's prohibitions against harming critical habitat cannot be enforced and the Act's intent to protect endangered or threatened species by protecting their habitat is frustrated."[25]

Sections 41 and 42 of the SARA are clear as regards timelines for posting recovery strategies and the requirement that such strategies include an identification of the species' critical habitat, to the extent possible. The Submitters allege that in the case of many species, Canada is not meeting these obligations. In the past, the Secretariat has found that assertions regarding

---

[19] Submission at 3.
[20] Submission at 7.
[21] *Ibid.*
[22] *Ibid.*
[23] Submission at 8.
[24] Submission at 9.
[25] *Ibid.*

A14/SEM/06-005/08/14(1)(2)
DISTRIBUTION: General
ORIGINAL: English

an alleged failure by a government to fulfill a clear, specific legal obligation satisfy the requirements of Article 14(1).[26] The assertions in the submission regarding enforcement of the requirements in ss. 41 and 42 are based on factual questions regarding the alleged delays in meeting those requirements, and not solely on legal interpretations of the act. The Secretariat finds that the Submitters' allegations regarding the alleged failure by Canada to effectively enforce the SARA in regard to timelines for posting recovery strategies under s. 42 and identify species' critical habitat within such strategies pursuant to s. 41 satisfy the requirements of Article 14(1) of the NAAEC.

### 3.   Alleged failure to effectively enforce "safety net" and emergency order provisions under SARA ss. 29, 34 and 80

Finally, the Submitters assert that Canada is failing to effectively enforce the SARA's "safety net" (s. 34) and emergency order (ss. 29, 80) provisions, which allow the federal government to take action to ensure the SARA is respected on non-federal lands in cases where either the laws of a province do not effectively protect a species at risk (safety net provisions) or a species faces an imminent threat to its survival or recovery (emergency order).[27] Both s. 34 and s. 80 provide that the Minister "shall" exercise his or her powers under the provision if the Minister "is of the opinion" that either the laws of a province do not adequately protect a species or its residence, or that a species faces imminent threats to its survival or recovery. These sections create a clear, specific obligation to act, but only when a prior condition is met: the Minister must form an opinion on the matter. Forming an opinion involves the exercise of discretion.  Generally, a Minister's decision based on the exercise of discretion can only be challenged, as the Submitters appear to acknowledge,[28] if it is patently unreasonable. A decision may be patently unreasonable if it was made arbitrarily or in bad faith, cannot be supported on the evidence, or did not take into account the appropriate factors.

With respect to the "safety net" provisions, the Submitters contend that if a province's laws do not address the components in SARA's "Measures to Protect Listed Wildlife Species" to ensure a species is effectively protected (SARA ss. 32-36), "the Minister has no choice but to recommend to the Governor in Council (in accordance with s. 34) that s. 32 and/or s. 33 apply to the provincial lands."[29]   The Secretariat finds that whether the laws of a province or territory fail to meet the SARA's standards is essentially a threshold legal question that is ill-suited to the submissions on enforcement matters process under NAAEC Articles 14 and 15.

With respect to the SARA's emergency order provisions (s. 80), as applied to the Spotted Owl, the Submitters state that they

---

[26] SEM-98-003 (Great Lakes), Determination pursuant to Article 14(1) and (2) (8 September 1999) at 7.
[27] Submission at 10.
[28] Submission at 14:  "On September 15, 2006, the Submitters launched another court action to review the minister's decision and have it declared patently unreasonable."
[29] Submission at 12.

> […] consider that the [circumstances set out in the submission] are egregious and likely represent a worst-case scenario in terms of emergencies facing endangered species. They consider that by failing to recommend the issuance of an emergency order, the Minister of the Environment is failing to effectively enforce the Act."[30]

The Submitters make similar assertions with respect to the Woodland Caribou.[31]

The Secretariat finds that whether facts exist which trigger the Minister's duty to recommend the issuance of an emergency order pursuant to s. 80 of the SARA in respect of the Spotted Owl and the Woodland Caribou involves factual questions of enforcement to which the submissions on enforcement matters process under Articles 14 and 15 of the NAAEC is well-suited.

### B.   Six Specific Criteria under Article 14(1)

Article 14(1) lists six specific criteria relevant to the Secretariat's consideration of submissions.  The Secretariat must find that a submission:

    (a)   is in writing in a language designated by that Party in a notification to the Secretariat;

    (b)   clearly identifies the person or organization making the submission;

    (c)   provides sufficient information to allow the Secretariat to review the submission, including any documentary evidence on which the submission may be based;

    (d)   appears to be aimed at promoting enforcement rather than at harassing industry;

    (e)   indicates that the matter has been communicated in writing to the relevant authorities of the Party and indicates the Party's response, if any; and

    (f)   is filed by a person or organization residing or established in the territory of a Party.[32]

The submission meets the above criteria.  It has been submitted in writing, in English, a language designated by Canada.  It clearly identifies the Submitters.[33]

The submission provides sufficient information to allow the Secretariat to review it, including a copy of an extensive, formative evaluation of federal species at risk programs commissioned by the federal government and made public in July 2006.[34]  Subsection 2.4 of the Stratos Report concerns recovery planning, and it lists "meeting the Act's specified timelines" and "identification of critical habitat for species at risk" as expected outputs for recovery planning. It concludes:

---

[30] *Ibid.*
[31] Submission at 12-13.
[32]NAAEC Article 14(1)(a)-(f).
[33] Submission at ii.
[34] Submission at Tab 3: Stratos Inc., "Formative Evaluation of Federal Species at Risk Programs – Final Report, July 2006" (Prepared for Environment Canada, Fisheries and Oceans Canada, Parks Canada Agency) [hereinafter the "Stratos Report"].

A14/SEM/06-005/08/14(1)(2)
DISTRIBUTION: General
ORIGINAL:  English

It is too early to reach a conclusion on whether the expected outcomes will be realized.  On the one hand, hundreds of recovery strategies are currently in various stages of development. Should these be finalized, they will represent a significant accomplishment vis-à-vis past, non-mandated recovery planning efforts.

On the other hand, there are numerous warning signs that the recovery planning process is not yet on track, and a great deal of uncertainty and concern exists with respect to the progress of recovery planning processes. The following factors are of particular concern:

- Not all legislated deadlines for the development of recovery strategies are being met.
- With a few exceptions, critical habitat is not being identified by the core departments.
- The development of action plans has not been approached in a systematic manner. As a result, few scientifically defensible and socio-economically desirable actions have been identified.
- All core departments lack resources and appropriate guidance for involving Aboriginal peoples, consulting affected parties, and conducting socio-economic analysis.
- A great deal of uncertainty and concern exists with respect to the process for recovery strategy development going forward.[35]

These are identified as cross-cutting issues that affect all core federal departments.[36]

As regards the question of enforcing the SARA on non-federal lands, including through issuance of emergency orders pursuant to SARA s. 80, Subsection 2.6 of the Stratos Report, entitled "Protections (Permitting, Compliance Promotion, and Enforcement)," lists a number of expected outputs regarding federal enforcement, and expecting provinces and territories to do the same.[37] An expected intermediate outcome is that "Parties to the [National Accord for the Protection of Species at Risk] take action to legally protect species at risk and their habitat."[38] As regards Environment Canada, the evaluation concludes:

Environment Canada has significant responsibilities for ensuring compliance with and enforcing SARA on all federal lands, with the exception of those under the jurisdiction of Parks Canada. At the time of this evaluation, however, a number of gaps were identified in the Department's related activities and programs, including

- the lack of a formal and funded compliance promotion strategy/program;
- the lack of an enforcement strategy with respect to SARA, with investigations occurring only on a reactive basis, for the most part;
- no enforcement agreements in place with the provinces or territories;
- no clear strategy or plan to authorize other persons to act as enforcement officers;
- resources that [sic] were allocated to support the Department's enforcement activities, but these did not reach the regional offices responsible for undertaking enforcement activities; and
- the policy framework to support the Act's safety net provisions, which remains outstanding.

Moreover, the Department does not have a system or mechanism for determining the degree to which equivalent actions have been taken by other parties to the Accord (i.e., provinces and territories).[39]

---

[35] Stratos Report at 35.
[36] Stratos Report at 42.
[37] Stratos Report at 45.
[38] *Ibid.*
[39] Stratos Report at 47.

A14/SEM/06-005/08/14(1)(2)
DISTRIBUTION: General
ORIGINAL: English

In addition, the Submitters support their assertions regarding recovery planning and emergency orders with copies of many submissions to the federal government.[40]

In accordance with the CEC Council's *Guidelines for Submissions on Enforcement Matters* (the "Guidelines"), in its review of a submission under Article 14(1)(c), the Secretariat considers whether the submission addresses the factors listed in Article 14(2).[41] The submission addresses these factors.[42] The submission is accompanied by more than ten appendices containing information about actions taken by one or some of the Submitters to communicate their concerns regarding all of the matters raised in the submission to the federal Minister of the Environment and government agencies. Considering all of the information provided in support of the submission, including a detailed document describing the Submitters' objections to British Columbia's recovery strategy for the Spotted Owl,[43] and recalling that Article 14(1) is not intended to be an insurmountable procedural obstacle,[44] the Secretariat finds that the submission provides sufficient information to allow the Secretariat to review it.

The submission appears to be aimed at promoting enforcement rather than at harassing industry: the submission is concerned with Canada's actions to apply and enforce the law, rather than with the actions of any one industry or corporation. The submission is accompanied by copies of submissions made by the Submitters to government authorities, as well as responses received, if any.[45]

## C. Article 14(2)

The Secretariat reviews a submission under Article 14(2) if it finds that the submission meets the criteria in Article 14(1). The purpose of this review is to determine whether to request a response to the submission from the Party concerned.

During its review under Article 14(2), the Secretariat considers each of the four factors listed in that provision based on the facts involved in a particular submission. Article 14(2) lists these four factors as follows:

---

[40] See submission at Tab 4 (identifying critical habitat in a recovery strategy); Tab 5 (alleged shortcomings of provincial recovery strategy for the Spotted Owl); Tab 7 (petition requesting emergency order under s. 80 for Spotted Owl); Tab 8 (petition requesting emergency order under s. 80 for Woodland Caribou); Tab 9 (Environment Canada acknowledgement of receipt for Woodland Caribou petition); Tab 10 (petition and federal government response to Petition 121, concerning, *inter alia*, Question 6, identification of critical habitat); Tab 11 (letter to Minister of Environment regarding delays in posting recovery strategies, and Minister's response); Tab 13 (letter to the Canadian Wildlife Service commenting on a federal policy discussion paper regarding critical habitat), Tab 14 (letter to Minister of the Environment regarding the Stratos Report).
[41] Guideline 5.6.
[42] Submission at 14-15.
[43] Submission at Tab 5.
[44] See SEM-97-005 (Biodiversity), Determination pursuant to Article 14(1) and (2) (26 May 1998) at 2: "The Secretariat is of the view that Article 14, and Article 14(1) in particular, are not intended to be insurmountable procedural screening devices."
[45] Submission at 13-14 and at Tabs 4-14.

A14/SEM/06-005/08/14(1)(2)
DISTRIBUTION: General
ORIGINAL: English

In deciding whether to request a response, the Secretariat shall be guided by whether:

(a) the submission alleges harm to the person or organization making the submission;

(b) the submission, alone or in combination with other submissions, raises matters whose further study in this process would advance the goals of this Agreement;

(c) private remedies available under the Party's law have been pursued; and

(d) the submission is drawn exclusively from mass media reports.[46]

The Secretariat, guided by the factors listed in Article 14(2), has determined that the submission merits requesting a response from Canada with respect to the assertion that (1) Canada is failing to effectively enforce the SARA's recovery planning requirements as regards identification of critical habitat (s. 41) and mandatory planning timelines (s. 42), and (2) Canada is failing to effectively enforce the emergency order provisions under s. 80 with respect to the Spotted Owl in British Columbia and the Woodland Caribou in Alberta.

First, the submission contains an allegation of harm to the organizations making the submission: the Submitters state that as nongovernmental organizations dedicated to the protection of nature and the environment, they are directly concerned by the disappearance of species in Canada and by Canada's failure to enforce the law that has been adopted to protect species at risk.[47] Next, the submission raises matters whose further study in this process would advance the goals of the Agreement, including fostering the protection of the environment in Canada for the well being of present and future generations; avoiding creating trade distortions; and enhancing compliance with, and enforcement of, environmental laws and regulations.[48] Furthermore, the submission does not rely on mass media reports.

The Submitters have pursued private remedies in connection with matters raised in the submission. They state that in December 2005 and September 2006, they initiated court actions in connection with the application of s. 80 of the SARA in the case of the Spotted Owl in British Columbia.[49] In addition, in December 2005, the Submitters filed a detailed petition with the federal Minister of the Environment setting out why they believe the Minister should issue an emergency order under s. 80 of the SARA for the protection of the Woodland Caribou in Alberta.[50]

As regards recovery planning, in June 2006, Sierra Legal Defence Fund contacted the Minister of Environment on behalf of some of the Submitters, asking for a meeting with the Minister on the issue of delays in posting recovery strategies on the public registry, and the

---

[46] Article 14(2) of the NAAEC.
[47] Submission at 14-15.
[48] Article 1 (a), (e), (g) of the NAAEC.
[49] Submission at 12.
[50] Submission at Tab 8.

A14/SEM/06-005/08/14(1)(2)
DISTRIBUTION: General
ORIGINAL: English

Minister replied in September, stating that ministry officials are aware of the delays and are doing everything in their power to overcome unexpected obstacles which have arisen.[51]

As regards identification of critical habitat in recovery strategies, in 2004, one of the Submitters, Canadian Nature Federation (now Nature Canada), provided comments to the Canadian Wildlife Service on a federal policy discussion paper regarding critical habitat,[52] and in August 2006, this Submitter wrote to the Minister of Environment, underscoring the findings of the Stratos Report that identify challenges in the recovery planning area, including the need to meet legislated deadlines, as well as less than anticipated progress by core departments in identifying critical habitat.[53] In that letter, Nature Canada recommended that core departments publicly report back on progress towards implementing the evaluation's recommendations; that Environment Canada be ensured adequate resources for migratory bird conservation and protected area delivery; and that core departments and the responsible Minister ensure stronger delivery of the Act by seeking adequate resources for departmental SARA programs.[54]

The Submitters maintain that resorting to the courts "[…] has proven protractile and strongly suggests that private remedies are unsuitable concerning listing, recovery planning, critical habitat identification and failure to enforce prohibitions (before critical habitat is identified), particularly where many species, by both their legal status and their circumstances, require timely action to avoid extirpation."[55] They state further that given a lack of jurisprudence in Canada and a lack of success in earlier proceedings in provinces to protect species, "Canada's courts are not proving to be an effective forum for addressing concerns regarding species endangerment."[56]

The Secretariat has carefully considered - in light of the factors contained in Article 14(2) - those allegations of the Submitters which meet the Article 14(1) criteria, in order to determine whether these allegations, taken together, merit requesting a response from Canada. In doing so, the Secretariat has examined whether private remedies available under the Party's law have been pursued. The submission and its appendices indicate that the Submitters have engaged in a range of actions in regard to all of the matters covered by these allegations, including responding to public calls for comments on discussion papers; addressing requests for meetings, offers to cooperate, and formal petitions to the Minister of the Environment; and applying to the courts for review of ministerial decisions. Not all actions were pursued in connection with each allegation. On the other hand, it appears that there are issues common to each of the allegations, such as the connection between the timeliness and adequacy of recovery strategies and the existence of imminent threats that would necessitate the issuance of an emergency order, such that a remedy pursued in respect of one allegation could serve to address, in part, issues raised in another.

---

[51] Submission at Tab 11.
[52] Submission at Tab 13.
[53] Submission at Tab 14.
[54] *Ibid.*
[55] Submission at 15.
[56] *Ibid.*

A14/SEM/06-005/08/14(1)(2)
DISTRIBUTION: General
ORIGINAL:  English

The Secretariat has weighed these considerations in light of its determination that the submission – focusing, as it does, on legislation for the protection of species at risk in Canada, and supported by a recent, in-depth, government-funded assessment that raises concerns about enforcement matters addressed in the submission – clearly raises matters whose further study in this process would advance the NAAEC's goal of fostering the protection and improvement of the environment in Canada for the well-being of present and future generations, as well as supporting the environmental goals and objectives of the NAFTA.

In sum, having reviewed the submission in light of the factors contained in Article 14(2), the Secretariat has determined that the submission merits requesting a response from Canada with respect to the assertions that (1) Canada is failing to effectively enforce the SARA's recovery planning requirements as regards identification of critical habitat (s. 41) and mandatory planning timelines (s. 42), and (2) Canada is failing to effectively enforce the emergency order provision in s. 80 with respect to the Spotted Owl in British Columbia and the Woodland Caribou in Alberta.


## IV.   CONCLUSION

For the foregoing reasons, the Secretariat has determined that submission SEM-06-005 (Species at Risk) meets the requirements of Article 14(1) of the NAAEC and merits requesting a response from the Party in light of the factors listed in Article 14(2), with respect to the assertions that (1) Canada is failing to effectively enforce the SARA's recovery planning requirements as regards identification of critical habitat (s. 41) and mandatory planning timelines (s. 42), and (2) Canada is failing to effectively enforce the emergency order provisions under s. 80 with respect to the Spotted Owl in British Columbia and the Woodland Caribou in Alberta.  Accordingly, the Secretariat requests a response to these allegations from Canada, subject to the provisions of NAAEC Article 14(3).  A copy of the submission and its appendices were previously forwarded to the Party under separate cover.


Respectfully submitted,

**Secretariat of the Commission for Environmental Cooperation**


*(original signed)*
Katia Opalka
Legal Officer, Submissions on Enforcement Matters Unit


c.c.:    José Manuel Bulás, SEMARNAT
        David McGovern, Environment Canada
        Judith E. Ayres, US-EPA
        Felipe Adrián Vázquez-Gálvez, CEC Executive Director
        Devon Page, Sierra Legal Defence Fund


12

PATTI GOLDMAN (DCB# 398565)
KRISTEN L. BOYLES (WSB #23806)
JOSHUA OSBORNE-KLEIN (WSB #36736)
Earthjustice
705 Second Avenue, Suite 203
Seattle, WA  98104
(206) 343-7340
(206) 343-1526 *[FAX]*
pgoldman@earthjustice.org
kboyles@earthjustice.org
josborne-klein@earthjustice.org

*Attorneys for Defendant-Intervenors*

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN FOREST RESOURCE COUNCIL, | ) Case No.  1:07-cv-00484-JDB |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| H. DALE HALL, Director, United States Fish and | ) |
| Wildlife Service, DAVID M. VERHEY, Acting Assistant | ) |
| Secretary for Fish and Wildlife and Parks, and DIRK | ) |
| KEMPTHORNE, Secretary of Interior, | ) |
| | ) |
| Defendants, | ) |
| | ) |
| and | ) |
| | ) |
| AUDUBON SOCIETY OF PORTLAND, CENTER FOR | ) |
| BIOLOGICAL DIVERSITY, CONSERVATION | ) |
| NORTHWEST, ENVIRONMENTAL PROTECTION | ) |
| INFORMATION CENTER, GIFFORD PINCHOT TASK | ) |
| FORCE, OREGON WILD, SEATTLE AUDUBON | ) |
| SOCIETY, SIERRA CLUB, and THE WILDERNESS | ) |
| SOCIETY, | ) |
| | ) |
| Defendant-Intervenors. | ) |

**[PROPOSED] ORDER GRANTING DEFENDANT-INTERVENORS'
CROSS-MOTION FOR SUMMARY JUDGMENT AND DENYING
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

[PROPOSED] ORDER GRANTING DEFENDANT-INTERVENORS'
CROSS-MOTION FOR SUMMARY JUDGMENT AND DENYING
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT   - 1 -

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

THIS MATTER comes before the Court on cross-motions for summary judgment filed by plaintiff, defendants, and defendant-intervenors.  The Court has considered all relevant motions and memoranda, the excerpts of the administrative record, and all other submissions filed in this case, and orders as follows:

1.    Plaintiff's motion for summary judgment is DENIED;

2.    Defendant-intervenors' cross-motion for summary judgment is GRANTED;

DATED this _____ day of _____, 2007.


_____
THE HONORABLE JOHN D. BATES
U.S. District Court Judge

Presented by:


/s/  Joshua Osborne-Klein_____
PATTI GOLDMAN (DCB# 398565)
KRISTEN L. BOYLES (WSB #23806)
JOSHUA OSBORNE-KLEIN (WSB #36736)
Earthjustice
705 Second Avenue, Suite 203
Seattle, WA  98104
(206) 343-7340
(206) 343-1526 *[FAX]*
pgoldman@earthjustice.org
kboyles@earthjustice.org
josborne-klein@earthjustice.org

*Attorneys for Defendant-Intervenors*


[PROPOSED] ORDER GRANTING DEFENDANT-INTERVENORS'
CROSS-MOTION FOR SUMMARY JUDGMENT AND DENYING
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT   - 2 -