UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AM. FOREST RESOURCE COUNCIL,

  Plaintiff,

    v.

H. DALE HALL, Director, U.S. Fish &
Wildlife Serv., et al.,

  Defendants.

Civil Action No.  07-0484 (JDB)

## MEMORANDUM OPINION

Plaintiff American Forest Resource Council ("AFRC"), a forest products trade association located in Portland, Oregon, brings this action for declaratory and injunctive relief against defendants H. Dale Hall, Director of the United States Fish and Wildlife Service, David M. Verhey, Acting Assistant Secretary for Fish, Wildlife, and Parks, and Dirk Kempthorne, Secretary of the Interior.  The case is brought pursuant to the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 et seq., the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq., the Regulatory Flexibility Act, 5 U.S.C. § 601 et seq., the Unfunded Mandates Reform Act, 2 U.S.C. § 1501 et seq., and the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq., to remedy defendants' alleged violations of those statutes in conducting a five-year status review for a small seabird in Washington, Oregon, and California, known as the marbled murrelet.  Currently before the Court are the cross-motions for summary judgment filed by plaintiff, defendants, and intervenor-defendants.[1]  Finding the jurisdictional arguments of defendants and

---

[1]On May 29, 2007, the Court granted the combined motion of Audubon Society of Portland, Center for Biological Diversity, Conservation Northwest, Environmental Protection

intervenor-defendants persuasive, the Court will grant defendants' and intervenor-defendants'
motions and will deny plaintiff's motion.

## BACKGROUND

### I.     Statutory and Regulatory Background

The ESA is "the most comprehensive legislation for the preservation of endangered
species ever enacted by any nation." Tennessee Valley Authority v. Hill, 437 U.S. 153, 180
(1978).  In order to carry out the purpose of the ESA to "provide a means whereby the ecosystems
upon which endangered species and threatened species depend may be conserved," 16 U.S.C. §
1531(b); Babbit v. Sweet Home Chapter of Communities for a Great Oregon, 515 U.S. 687, 699,
the Secretary of the Interior ("the Secretary"), acting through the U.S. Fish and Wildlife Service
("FWS"), lists those species that he has determined to be endangered or threatened, 16 U.S.C. §
1533(a); Rancho Viejo, LLC v. Norton, 323 F.3d 1062, 1064 (D.C. Cir. 2003).

Under the ESA, the term species "includes any subspecies of fish or wildlife or plants, and
any distinct population segment of any species of vertebrate fish or wildlife which interbreeds
when mature."  16 U.S.C. § 1532(16).[2]  According to the ESA, an endangered species is "in

---

Information Center, Gifford Pinchot Task Force, Oregon Wild, Seattle Audubon Society, Sierra
Club, and the Wilderness Society for leave to intervene in these proceedings as defendants
pursuant to Fed. R. Civ. P. 24(a).

[2]FWS and the National Marine Fisheries Service have adopted a joint policy interpreting
the term "distinct population segment" ("DPS").  61 Fed. Reg. 4722 (Feb. 7, 1996).  Under the
joint policy, FWS evaluates three elements to make a decision about whether a DPS exists: "1.
Discreteness of the population segment in relation to the remainder of the species to which it
belongs; 2. The significance of the population segment to the species to which it belongs; and 3.
The population segment's conservation status in relation to the Act's standards for listing (i.e., is
the population segment, when treated as if it were a species, endangered or threatened?)."  Id. at
4725; see also Nw. Ecosystem Alliance v. U.S. Fish and Wildlife Serv., 475 F.3d 1136, 1145 (9th
Cir. 2007) (holding that "the DPS Policy is a reasonable construction of 'distinct population

danger of extinction throughout all or a significant portion of its range," id. § 1532(6), while a

threatened species "is likely to become an endangered species within the foreseeable future

throughout all or a significant portion of its range," id. § 1532(20).  To determine whether a

species is threatened or endangered, FWS must consider the following factors:

> (A) the present or threatened destruction, modification, or curtailment of its habitat or range;
> (B) overutilization for commercial, recreational, scientific, or educational purposes;
> (C) disease or predation;
> (D) the inadequacy of existing regulatory mechanisms; or
> (E) other natural or manmade factors affecting its continued existence.

Id. § 1533(a)(1).  At any time, FWS may propose to list a species and must proceed by the APA

notice and comment procedures applicable to rulemaking to do so.  Id. § 1533(b)(4).

A listing decision may also be made pursuant to a citizen petition.  See id. § 1533(b)(3).

An interested party may file a petition to list or delist a species, which triggers a series of statutory

deadlines.  Within 90 days of receiving a citizen petition, FWS must, "to the maximum extent

practicable," make a finding "as to whether the petition presents substantial scientific or

commercial information indicating that the petitioned action may be warranted" and publish this

finding in the Federal Register.  Id. § 1533(b)(3)(A).  FWS then has one year to conduct a status

review to decide if the action actually is warranted, not warranted, or warranted but precluded.

See id. § 1533(b)(3)(B).  If the action is warranted, FWS must publish a proposed rule to

implement the action in the Federal Register, id. § 1533(b)(3)(B), and FWS must act on the

proposal within one year of its publication, id. § 1533(b)(6)(A).

---

segment'").

Once a species has been placed on the list of endangered or threatened species it becomes unlawful under § 9 of the ESA for any person to "take" the species.  See id. § 1538(a)(1); 50 C.F.R. § 17.31(a).  The term "take" is defined under the ESA as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect" any listed species, and includes an "attempt to engage in any such conduct."  Id. § 1532(19).  Landowners and other non-federal entities may, however, apply for and receive a permit to "take" listed species, so long as: (1) the take is incidental to any otherwise lawful activity; (2) the applicant submits an acceptable habitat conservation plan designed to minimize and mitigate the effects of the incidental take; and (3) the take will not appreciably reduce the species' likelihood of survival and recovery.  Id. § 1539(a)(1)(B), (a)(2)(A)-(B).  The ESA also provides for the granting of scientific or "recovery" permits.  Section 10(a)(1)(A) of the ESA allows the Service to "permit, under such terms and conditions as [it] shall prescribe, . . . any act otherwise prohibited by [§ 9] for scientific purposes or to enhance the propagation or survival of the affected species."  Id. § 1539(a)(1)(A); see also 50 C.F.R. 17.22(a).  Both types of permits are subject to revocation if the Service finds that the permittee is not in compliance with the terms and conditions of the permit.  See id. § 1539(a)(2)(C).

Of significance here, at least once every five years, the Secretary must conduct a status review of each species listed as threatened or endangered ("the five-year status review").  Id. § 1533(c)(2)(A).  According to the statute, the Secretary shall conduct the five-year status review and "determine on the basis of such review whether any such species should -- (i) be removed from such list; (ii) be changed in status from an endangered species to a threatened species; or (iii) be changed in status from a threatened species to an endangered species."  Id. § 1533(c)(2)(B). "Each determination under subparagraph (B) shall be made in accordance with the provisions of

-4-

subsections (a) and (b) of this section." Id. The statute does not require the Secretary to take any further action pending completion of the five-year status review.

The ESA also contains a citizen suit provision, which allows private parties to enforce the substantive provisions of the ESA against regulated parties. See id. § 1540(g)(1)(A); see also Bennett v. Spear, 520 U.S. 154, 173 (1997).

## II.    Factual Background

The following facts are undisputed. The marbled murrelet is a robin-sized seabird that nests almost exclusively in marine and inland forests along the pacific coast of North America. See Pl.'s Statement of Mat. Facts Not in Dispute ¶ 6 ("Pl.'s Statement"). In 1988, the National Audubon Society submitted a petition to FWS requesting that the marbled murrelet in California, Oregon, and Washington ("the tri-state population") be listed as a threatened species under the ESA. Administrative Record ("AR") 929. When FWS failed to meet its statutory deadlines, several conservation organizations filed suit against FWS in the Western District of Washington, seeking an order compelling FWS to issue a final rule listing the tri-state population. See Marbled Murrelet v. Lujan, C91-522R (W.D. Wash. Sept. 17, 1992); AR 902-04, 907. On October 1, 1992, FWS published a final rule listing the tri-state population of marbled murrelets as threatened. 57 Fed. Reg. 45328; AR 887. FWS recognized in the final listing rule that "[t]he three states encompass roughly one-third of the geographic area occupied by this subspecies, comprising a significant portion of its range." 57 Fed. Reg. 45330; AR 889.

From 1992 to 2002, FWS never conducted the mandatory five-year status review for the tri-state population of marbled murrelets as required under the ESA. Pl.'s Statement ¶ 8. Therefore, in March 2002, AFRC and three of its members filed suit in the U.S. District Court for

the District of Oregon seeking to compel FWS to conduct the five-year status review for this species.  See Am. Forest Resource Council v. Dep't of Interior, Civil No. 02-6087-AA (D. Or.). The parties entered into a settlement agreement and twice agreed to an extension of the deadline for completing the five-year status review.  AR 349-50.  FWS published two notices in the Federal Register announcing that the five-year status review was underway and inviting the public to submit comments and relevant information.  68 Fed. Reg. 19569 (AR 875); 68 Fed. Reg. 44093 (AR 861).  On August 31, 2004, FWS completed the status review, and the FWS Regional Director indicated his concurrence with the outcome by signing the status review report on September 1, 2004.  AR 321, 348.

FWS concluded that "[t]he threat situation has not changed such that the murrelet DPS is no longer likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range."  AR 341.  However, FWS also concluded that the tri-state population did not qualify as a DPS under the DPS Policy.  AR 334-36.  In light of this conclusion, FWS indicated that it would undertake a range-wide status review before deciding whether to propose delisting the tri-state population.  In the meantime, FWS indicated there would be no change in the species' status.  AR 348.

In March 2006, FWS asked the United States Geological Survey ("USGS") to evaluate the status of the marbled murrelet in Alaska and British Columbia -- the portions of the marbled murrelet's range that were not examined in the 2004 status review.  AR 55.  USGS issued its report in January 2007 estimating that the Alaska population had declined by more than 70% during the past 20 years and that the British Columbia population is declining at a rate of 5.8% to 31% per year.  AR 100, 103, 193, 197.

To this date, FWS has taken no action on its own initiative to propose delisting the tri-state population of the marbled murrelet, and AFRC has never petitioned FWS to conduct such a delisting.  Pl.'s Statement ¶ 18.

## III.     Procedural Background

AFRC now brings substantive and procedural claims against FWS's five-year status review determination.  AFRC argues that: (1) FWS's decision to maintain the threatened species listing for the tri-state population was arbitrary and capricious; (2) FWS improperly failed to follow rulemaking procedures for the five-year status review; (3) the determination was made by low level employees who lacked appropriate delegated authority; and (4) FWS improperly failed to prepare an environmental assessment or an environmental impact statement.[3]  After AFRC moved for summary judgment, defendants and intervenor-defendants simultaneously opposed AFRC's motion and cross-moved for summary judgment themselves.  A hearing on the motions was held on January 18, 2008.

STANDARD OF REVIEW

Under Fed. R. Civ. P. 56(c), summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  In a case involving review of a final agency action under the Administrative Procedure Act, 5 U.S.C. § 706, however, it is the role of the agency to resolve factual issues to arrive at a decision that is supported by the administrative record, whereas "the

---

[3]AFRC has withdrawn its claim that FWS unreasonably delayed in conducting a five-year status review for the tri-state population of marbled murrelets, see Pl.'s Opp. & Reply at 5 n.2, and its claim that the determination should be set aside because it was not accompanied by the regulatory findings required by the Regulatory Flexibility Act, 5 U.S.C. § 601 et seq., and the Unfunded Mandates Reform Act, 2 U.S.C. § 1501 et seq., see Pl.'s Opp. & Reply at 21 n.9.

function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." See Occidental Eng'g Co. v. INS, 753 F.2d 766, 769-70 (9th Cir. 1985).

Plaintiff challenges FWS's five-year status review of the tri-state population of the marbled murrelet under the citizen suit provision of the ESA, under the NEPA, and under the APA. Because neither the NEPA nor the ESA specifies a standard of review for agency actions, the APA standard of review applies. See National Ass'n of Home Builders v. Norton, 415 F.3d 8, 13 (D.C. Cir. 2005) ("NAHB"). The APA requires that the Court "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The "scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." Motor Vehicle Mfrs. Assn. of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). The court must be satisfied that the agency has "'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" Alpharma, Inc. v. Leavitt, 460 F.3d 1, 6 (D.C. Cir. 2006). The agency's decisions are entitled to a "presumption of regularity," Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 415 (1971), and although "inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one." Id. at 416.

## DISCUSSION

The parties' motions raise threshold issues in addition to addressing the merits of AFRC's claims. Before assessing the merits of the dispute, then, the Court must address defendants' contention that the five-year status review determination is not a challengeable final agency

action.  AFRC, of course, disagrees with defendants' argument but concedes that the Court may

not reach the merits of any claims unless this threshold requirement is met.

The APA authorizes judicial review for two categories of agency action: "[a]gency action

made reviewable by statute" and "final agency action for which there is no other adequate remedy

in a court."  5 U.S.C. § 704.  Because the NEPA creates no independent cause of action, final

agency action is a prerequisite to a NEPA suit against a federal agency.  See Karst Envtl Educ. &

Protection, Inc. v. EPA, 475 F.3d 1291, 1295 (D.C. Cir. 2007) (explaining "that because NEPA

creates no private right of action, challenges to agency compliance with the statute must be

brought pursuant to the Administrative Procedure Act, 5 U.S.C. § 551 et seq., which requires

'final agency action for which there is no other adequate remedy in a court'") (citation omitted).

Although only the second category of agency action subject to judicial review contains an explicit

requirement of finality, the D.C. Circuit has held that the finality requirement is also applicable to

the first category.  See Carter/Mondale Presidential Committee, Inc. v. Federal Election Comm'n,

711 F.2d 279, 285 (D.C. Cir. 1983) (concluding "that Congress also assumed that '[a]gency action

made reviewable by statute' would be final action").  Thus, an agency action must be final in order

to be judicially reviewable under the statutory review provisions of the ESA.  NAHB, 415 F.3d at

13; see also Ctr. for Law and Educ. v. Dep't of Educ., 396 F.3d 1152, 1165 (D.C. Cir. 2005)

("APA . . . bars review prior to final agency action."); Indep. Petroleum Ass'n of Am. v. Babbitt,

235 F.3d 588, 594 (D.C. Cir. 2001) ("If the agency action is not final, the court . . . cannot reach

the merits of the dispute.") (citation omitted).

The Supreme Court has developed a two-part test to determine if an agency action is final

and thus reviewable.  See Bennett v. Spear, 520 U.S. 154, 177 (1997).  "First, the action must

mark the 'consummation' of the agency's decisionmaking process . . . -- it must not be of a merely tentative or interlocutory nature." Id. "And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" Id. Although defendants' position has changed somewhat over the course of the briefing, they now assert that neither part of this test is satisfied by the decision resulting from the five-year status review. Over the years, there has been an enormous amount of litigation revolving around FWS's failure to conduct various five-year status reviews, yet the parties cite no cases -- and the Court is aware of none -- in which substantive and procedural challenges to a five-year status review determination have been brought. Thus, the Court must start here with an analysis of the Bennett v. Spear test itself.

Assessing the first Bennett v. Spear requirement, the Court concludes that the 2004 five-year status review determination did mark the consummation of the agency's decision-making process. Indeed, defendants themselves originally took this position in their opening brief. In 2004, in response to a settlement agreement, FWS published a twenty-eight page report at the conclusion of the five-year status review of the tri-state population. On the last page of the report, FWS checked the line next to "No Change in Status" and included an asterisk referring to two sentences at the bottom of the page. There, the following was printed: "The Washington, Oregon, and California population does not satisfy the criteria for designation as a Distinct Population Segment (DPS) under the Service's 1996 DPS Policy. There will be no change in the species status pending the completion of a range-wide status review." AR 348. Defendants acknowledge that "[w]hile the second statement might be perceived as an indication that the determination was

not complete, this is incorrect." Defs.' Cross-Motion at 14 n.3. According to defendants, the "range-wide status review is a separate process from the five-year review." Id.

In their reply brief and at the motions hearing, defendants modified their position to argue that the information at the asterisk demonstrates the tentative or interlocutory nature of the five-year status review. Because FWS has indicated that no change would occur in the species' status pending the completion of a range-wide status review, defendants now argue that the 2004 report was not the consummation of the agency's decision-making. The Court does not find this interpretation to be persuasive.

Propelled by litigation, FWS published two Federal Register notices to initiate the five-year review process and to solicit information and comments. AR 861, 875. FWS met with the relevant land management agencies and the interested public. FWS also assigned over a dozen biologists to the review team and hired EDAW, Inc. to assist in the scientific review of all available information. After sixteen months of work, the five-year review report was released, which "summarize[d] the key information considered and the results of the Service's deliberative process." AR 322. At that time, all parties apparently agreed that FWS had fulfilled its obligations under the settlement agreement to conduct the five-year status review -- FWS completed its review of the tri-state population as it had set out to do.

Although FWS indicated that its determination might be subject to revision based upon a range-wide status review, the Court is reluctant to hold that FWS's footnote prevents this determination from being the consummation of the agency's decision-making, especially where it is a statutorily mandated duty. Indeed, "if the possibility . . . of future revision in fact could make agency action non-final as a matter of law, then it would be hard to imagine when any agency rule

. . . would ever be final as a matter of law." U.S. Air Tour Ass'n v. FAA, 298 F.3d 997, 1013

(D.C. Cir. 2002) (quoting General Electric Co. v. EPA, 290 F.3d 377, 380 (D.C. Cir. 2002)).  The

Court therefore concludes that it is appropriate to view the 2004 report as the consummation of

FWS's five-year status review of the tri-state population, with the range-wide status review as a

separate and distinct process to be completed in the future.

    That leaves the second Bennett v. Spear requirement: whether "rights or obligations have

been determined" or "legal consequences flow" from the five-year status review.  AFRC argues

that the five-year status review determination "has the legal consequence of continuing to expose

plaintiff American Forest Resource Counsel (AFRC), its members and other land owners along

the entire Pacific coastline to the coercive legal effects of the ESA's criminal and civil sanctions in

the daily course of managing millions of acres of land that may contain habitat for marbled

murrelets."  Pl.'s Opp. & Reply at 1.  Defendants respond by arguing that the five-year status

review determination has no legal effect whatsoever because it constitutes at most a

recommendation for future action.  According to defendants, the alleged legal consequences of

which AFRC complains arise from the 1992 listing of the tri-state population -- an action that

AFRC can no longer challenge because the applicable time period has expired.  See 28 U.S.C. §

2401(a).  A careful examination of the effects of a five-year status review is thus required.

    The ESA requires FWS to conduct a five-year status review and determine what changes

"should" be made to a species' status.  See 16 U.S.C. § 1533(c)(2)(B).  FWS may propose that a

listed species: (1) should not be changed; (2) should be delisted; (3) should be changed from

threatened to endangered; or (4) should be changed from endangered to threatened.  Regardless of

what suggestion is made at the conclusion of the five-year review process, FWS has no

corresponding duty to implement the proposal.  <u>See, e.g., Coos County Bd. of County Comm'rs v.</u>
<u>Norton</u>, 2006 WL 1720496, at *1 (D. Or. June 19, 2006) ("The court rejects plaintiff's argument
that in the absence of a petition, the Secretary must take actions mandated by subsection (b)(3)
after completing the species review and determinations required by subsection (c)(2)."); 50 C.F.R.
§ 424.16(a) ("Based on the information received through . . . [§] 424.21 [the five-year status
review], or through other available avenues, the Secretary <u>may</u> propose revising the lists as
described in § 424.10.") (emphasis added); AR 354 ("The 5-year review is not itself a rule-
making, but it does provide a 'determination' of whether or not a change in classification is
warranted.  In contrast to a positive 12-month finding, the 5-year review does not have a statutory
requirement to promptly publish a proposed regulation.").

On its own initiative, FWS may publish a proposed regulation to implement the
determination or an interested person may submit a petition to change the species' classification,
but the result of that future rulemaking is not determined or foreclosed by the five-year status
review.  If FWS chose to exercise its discretion to take further action, FWS would be required to
publish a proposed regulation in the Federal Register, follow the APA notice and comment
procedures, and promulgate a final rule within one year.  <u>See</u> 16 U.S.C. § 1533(b)(5); <u>see also</u>
<u>Bernstein/Glazer, LLC v. Babbitt</u>, 2000 WL 322778, at *4 (S.D.N.Y. Mar. 28, 2000) ("Indeed, a
change in the status of a species may only occur in accordance with the publication of a proposed
rule and a period for public comment.").  But even if FWS followed this course, nothing
guarantees that the agency's proposal would be adopted without change through the rulemaking
process.  <u>See</u> <u>National Ass'n of Home Builders v. Norton</u>, 340 F.3d 835, 839 (9th Cir. 2003)
(noting that after a status review was conducted, FWS proposed listing the species as endangered,

conducted a notice and comment period, and then issued a final rule).  In other words, the result of

the five-year status review does not necessarily lead to a corresponding change in either the status

of the listed species or legal obligations related to a listing.  The status review either leaves things

just as they were or it is the start of a process to change the listing of a species -- a process

requiring APA rulemaking.  Any subsequent rulemaking would allow the agency to correct any

possible errors in its status review recommendations.  See DRG Funding Corp. v. Sec'y of

Housing and Urban Dev., 76 F.3d 1212, 1215 (D.C. Cir. 1996) ("When completion of an agency's

processes may obviate the need for judicial review, it is a good sign that an intermediate agency

decision is not final.").  Thus, a change in a species' status -- and the legal consequences of such a

change -- could only occur after a full rulemaking, not after a five-year status review

determination.

      The lack of a statutory requirement to implement the five-year status review determination

distinguishes this case from Fox Television Stations, Inc. v. FCC, 280 F.3d 1027, 1033 (D.C. Cir.

2002), a case upon which plaintiff heavily relies.  Congress had enacted the Telecommunications

Act of 1996 to propel deregulation of the broadcast and cable television industries, and had

repealed several statutes prohibiting telephone/cable and cable/broadcast cross-ownership and had

relaxed restrictions upon radio ownership and cable/network cross-ownership.  280 F.3d at 1033.

To ensure continuing deregulation, Congress required the FCC to review its ownership rules every

two years and ordered that the FCC "shall repeal or modify any regulation it determines to be no

longer in the public interest."  Id. at 1033-34.  When the FCC reviewed two of its ownership rules

in 1998, it determined that they remained in the public interest and, accordingly, that they would

not be repealed or modified. Television network and cable system owners then sought review of the FCC's decision in the D.C. Circuit.

In addressing the threshold issue of finality, the FCC conceded that its decision was, "in effect, at the least a decision not to initiate a rule-making." Id. at 1038. If the FCC determined that the rules were no longer in the public interest, that would have triggered the statute's mandate to repeal or modify the rules. The contrary finding that the rules remained in the public interest was thus a denial of the duty to initiate a rulemaking to repeal or modify them. Because it is well-established that "an agency's refusal to institute [rulemaking] proceedings has sufficient legal consequence to meet the second criterion of the finality doctrine," the D.C. Circuit held that the FCC's decision was a final agency action subject to judicial review. Id. (quoting Capital Network Sys., Inc. v. FCC, 3 F.3d 1526, 1530 (D.C. Cir. 1993)).

Here, although FWS is required to review the status of each listed species every five years, there is no corresponding duty to implement any proposal resulting from that review. See Wyoming v. U.S. Dep't. of Interior, 360 F. Supp. 2d 1214, 1229 (D. Wyo. 2005) (noting "that the only mandatory aspect of the status review provision is that one must take place every five years"). So, unlike in Fox, when FWS determined that the tri-state population listing should not be changed, the determination was not the equivalent of refusing to initiate rulemaking proceedings. And indeed FWS has made no such concession similar to the FCC's in Fox. Instead, FWS has steadfastly asserted that it has not declined to initiate rulemaking because there is no mandatory duty that it make such a decision and no request triggering a rulemaking has been made. Defendants correctly point out that if plaintiff believes that the threatened listing of the tri-state population causes its members unwarranted injury, plaintiff has the right and the ability to

-15-

petition FWS to delist the tri-state population of the marbled murrelet. If plaintiff filed such a petition, statutory deadlines would require FWS to take prompt action, and the ESA explicitly makes FWS's decision on such petitions subject to judicial review. But plaintiff has failed to pursue this course of action that has been available to it since 2004.

As of now, FWS has not declined to delist the tri-state population; it has simply made the recommendation that the species remain listed as threatened. Plaintiff's legal obligations and rights remained exactly the same the day before the five-year status report was issued and the day after the five-year status report was issued, and plaintiff concedes as much. Because the five-year status review led to a recommendation about the species' listing without imposing new legal obligations and without denying plaintiff any rights, the Court concludes that the second prong of the Bennett v. Spear test has not been satisfied here. See, e.g., NAHB, 415 F.3d at 16 (holding that there was no final agency action where "the scope of a landowner's liability under section nine of the ESA remains exactly as it was before the Protocols' publication: a complete prohibition on 'take' of any endangered species"); Indep. Equip. Dealers Ass'n v. EPA, 372 F.3d 420, 428 (D.C. Cir. 2004) (holding that there was no final agency action where the action "left the world just as it found it, and thus cannot be fairly described as implementing, interpreting, or prescribing law or policy"). Accordingly, then, in the absence of final agency action, the five-year status review of the tri-state population of marbled murrelets is not subject to judicial review.

## CONCLUSION

For the foregoing reasons, the Court concludes that plaintiff has failed to state a claim under the APA, ESA, and NEPA. See Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt., 460 F.3d 13, 18 n. 4 (D.C. Cir. 2006) (explaining that failure to satisfy the APA's final agency action

requirement warrants dismissal or judgment for failure to state a claim upon which relief can be granted rather than dismissal for lack of subject matter jurisdiction).  The Court will therefore grant defendants' and intervenor-defendants' motions for summary judgment and deny plaintiff's motion.  A separate order accompanies this memorandum opinion.


                              _____/s/_____
                                   JOHN D. BATES
                              United States District Judge


       Dated:   February 5, 2008